**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**

RAMONA WINEBARGER and REX WINEBARGER,          **CASE NOS. 5:15CV57-RLV;**
Plaintiffs,                                                                            **3:15CV211-RLV**

v.

BOSTON SCIENTIFIC CORPORATION,
Defendant
------------------------------------------------------------------

MARTHA CARLSON,
Plaintiff,

v.

BOSTON SCIENTIFIC CORPORATION
Defendants

**PLAINTIFFS OBJECTIONS AND COUNTER DESIGNATIONS TO DEFENDANT**
**BOSTON SCIENTIFIC'S DEPOSITION DESIGNATIONS OF MICHAEL J.**
**KENNELLY, M.D.  TAKEN JULY 2, 2014**

| BSC Designations | Objection | Plaintiffs Counter Designation |
|---|---|---|
| **mk070214, (Pages 7:3 to 10:3)**<br>7<br>3  THE VIDEOGRAPHER: Starting of Number 1<br>4  on the record at 5:39 p.m. This is the videotaped<br>5  deposition of Dr. Michael Kennelly. This is in the<br>6  United States District Court for the Southern<br>7  District of West Virginia, Charleston Division, MDL<br>8  Number 2326, Case Number 2:13-CV-5475. Today's<br>9  date and time are indicated on the video screen.<br>10  We are located today at 2001 Vail<br>11  Avenue in Charlotte, North Carolina. The court<br>12  reporter today is Cindy Hayden. My name is Scott<br>13  Swing. I'm the videographer. We're both here on<br>14  the behalf of Golkow Technologies out of<br>15  Philadelphia, Pennsylvania.<br>16  At this time, counsels will verbally<br>17  introduce themselves and who they represent,<br>18  starting with the noticing attorney first, please.<br>19  MR. SULLIVAN: My name is Kevin<br>20  Sullivan, and I represent the Defendant, Boston<br>21  Scientific Corporation.<br>22  MR. FABRY: John Fabry. I represent<br>23  the Plaintiff, Martha Carlson. | | |

24 THE VIDEOGRAPHER: At this time, the
25 court reporter will swear the witness for the

<center>8</center>

1 record, please.
2 * * *
3 MICHAEL J. KENNELLY, M.D.
4 being first duly sworn, testified as follows:
5 * * *
6 THE VIDEOGRAPHER: We may proceed.
7 EXAMINATION
8 BY MR. SULLIVAN:
9 Q. Sir, would you please state your full
10 name.
11 A. Michael Joseph Kennelly.
12 Q. Doctor, what's your profession?
13 A. Urology with subspecialization in
14 female pelvic medicine, reconstructive surgery.
15 Q. And what is your professional address?
16 A. 2001 Vail Avenue, Suite 360, Charlotte,
17 North Carolina, but I also have two other
18 addresses.
19 Q. Okay. What are those?
20 A. One is at McKay Urology. I think it's
21 1025 Edgehill Road South, Charlotte, North
22 Carolina, and then the third is at 1100 Blythe
23 Boulevard, Carolinas Rehabilitation, Charlotte,
24 North Carolina.
25 Q. Okay. Doctor, I'm going to be asking

<center>9</center>

1 you a series of questions today relating to Martha
2 Carlson and the care and treatment you provided to
3 her back in the 2010 time frame. If at any time
4 you don't understand one of my questions today or
5 you need the question repeated for any reason,
6 please just verbally tell me to do that and I will,
7 okay?
8 A. Okay.
9 Q. Secondly, if at any time you're tired
10 and you want to take a break for any reason, if you
11 need to respond to a page or call or anything like
12 that, again, just tell us and we'll let you do
13 that, okay?
14 A. Okay.
15 Q. Is there any reason, sir, you won't be
16 able to give accurate, complete, truthful testimony
17 today?
18 A. No.
19 Q. You understand you're here today to
20 testify about your care and treatment of Martha
21 Carlson and her surgery on July 16th, 2010?
22 A. Yes.
23 Q. You understand you're not a defendant
24 in this case?
25 A. Yes.

| | | |
|---|---|---|
| **10**<br>1 Q. And you understand that Boston<br>2 Scientific has not made any claims against you?<br>3 A. Yes. | | |
| **mk070214, (Pages 12:14 to 12:20)**<br>**12**<br>14 Q. And, sir, have you and I ever met<br>15 before today?<br>16 A. No.<br>17 Q. Okay. Have you ever met with any<br>18 attorney representing Boston Scientific Corporation<br>19 regarding this case?<br>20 A. No. | | |
| **mk070214, (Pages 14:14 to16:8)**<br>**14**<br>14 Q. We've marked as Exhibit Number 2 a<br>15 stack of documents, and the heading on the top of<br>16 the first page of that exhibit says McKay Urology<br>17 at the top. What are those documents?<br>18 A. Those are the office notes from McKay<br>19 Urology specific to the patient, Martha Carlson.<br>20 Q. Okay. Is McKay Urology your private<br>21 practice?<br>22 A. I have three practices.<br>23 Q. Okay.<br>24 A. That's one of the practices.<br>25 Q. All right. So you practice urology at<br>**15**<br>1 McKay Urology, yes?<br>2 A. Yes.<br>3 Q. All right. And is that where you saw<br>4 Ms. Carlson?<br>5 A. Correct.<br>6 (Kennelly Exhibit 3, Informed Consent<br>7 Forms, was marked for identification.)<br>8 BY MR. SULLIVAN:<br>9 Q. All right. Exhibit Number 3, sir, what<br>10 is that?<br>11 A. This is consent forms for Ms. Carlson<br>12 that were from McKay Urology.<br>13 Q. Okay. Are those the informed consent<br>14 forms for her -- for the surgery that you performed<br>15 on July 16th, 2010?<br>16 A. Correct.<br>17 (Kennelly Exhibit 4, Billing records<br>18 for Mrs. Carlson, was marked for identification.)<br>19 BY MR. SULLIVAN:<br>20 Q. Okay. And then we've marked other<br>21 documents previously as Exhibit Number 4. Can you<br>22 tell me what those are?<br>23 A. These are the billing records for<br>24 Mrs. Carlson.<br>25 (Kennelly Exhibit 5, Curriculum Vitae<br>**16**<br>1 of Michael Joseph Kennelly, M.D., was marked for | | |

| | | |
|---|---|---|
| 2 identification.)<br>3 BY MR. SULLIVAN:<br>4 Q. And Exhibit Number 5 is a copy of your<br>5 curriculum vitae?<br>6 A. Correct.<br>7 Q. Is that up to date, sir?<br>8 A. In 2014. | | |

**mk070214, (Pages 17:3 to 21:12)**

<div align="center">17</div>

3 Q. All right. Did you produce any
4 documents in connection with the cross-notice of
5 the videotaped deposition?
6 A. Yes.
7 Q. Okay. Do you have those with you?
8 A. Correct.
9 Q. Okay. Could I see those?
10 A. So things that they had requested. So
11 copy of the bibliography, that's in the CV; copy of
12 any list identifying previous testimony by
13 deposition or trial, if available. I don't have
14 that available.
15 Any documents ever provided to you by
16 defendant in regard to any of their products,
17 including, but not limited, Boston Scientific
18 Uphold vaginal support system, directions for use,
19 IFU, patient brochures, marketing literature, sales
20 literature, implantation videos, any and all
21 correspondence with you and defendant.
22 In regards to that, you know, I do have
23 documentation from Boston Scientific that is sort
24 of faculty guide that includes a lot of that
25 information that's in here.

<div align="center">18</div>

1 Q. Okay. So why don't we mark the
2 Cross-Notice of Deposition as the next exhibit.
3 We'll mark that as Exhibit Number 8.
4 (Kennelly Exhibit 8, Cross-Notice of
5 Videotaped Deposition of Dr. Michael Kennelly, was
6 marked for identification.)
7 BY MR. SULLIVAN:
8 Q. And have you brought with you today all
9 documents in your possession that responds to
10 Schedule A of Exhibit 8?
11 A. As far as some that are in my
12 possession, correct. They also wanted -- you know,
13 just completing what they wanted, any documents or
14 agreements between you and defendant, Boston
15 Scientific, including consulting, training or other
16 services. So I do have the contracts from Boston
17 Scientific.
18 Q. Okay.
19 A. And then they wanted any and all
20 documents showing payments made to you by
21 defendant, Boston Scientific. The only ones I

22 could come up with are basically 2011. Our hard
23 drive crashed at home, so prior to that, I don't
24 have those; but this is payments from 2011 up until
25 now.

                    19

1 Q. All right.
2 A. So those are the most current from
3 2011. And any copies of all expert reports you
4 prepared. I've not prepared any.
5 Q. All right. So let's mark these
6 documents on the record. The contracts are these
7 three documents here, correct?
8 A. Those are -- correct. So the first two
9 are actually executed documents. The last document
10 is not executed.
11 Q. Okay.
12 A. But I have received it from Boston
13 Scientific.
14 (Kennelly Exhibit 9, Contract with
15 Boston Scientific dated 6/1/09, was marked for
16 identification.)
17 (Kennelly Exhibit 10, Contract with
18 Boston Scientific dated 8/3/11, was marked for
19 identification.)
20 (Kennelly Exhibit 11, Unexecuted
21 Contract with Boston Scientific dated 6/26/14, was
22 marked for identification.)
23 BY MR. SULLIVAN:
24 Q. All right. So we'll mark those -- mark
25 the June 1st, 2009, cover letter document that you

                    20

1 referred to as a contract as Exhibit Number 9; the
2 August 3rd, 2011, cover letter documents as Exhibit
3 Number 10; the June 26th, 2014, cover letter, this
4 is the one you said was not executed?
5 A. Correct.
6 Q. We'll mark that as Exhibit Number 11.
7 And the documents regarding payments, which are two
8 confirmation of service packets and one 1099 form,
9 correct?
10 A. Correct.
11 (Kennelly Exhibit 12, Confirmation of
12 Service dated 9/25/11, was marked for
13 identification.)
14 (Kennelly Exhibit 13, Confirmation of
15 Service dated 10/16/11, was marked for
16 identification.)
17 (Kennelly Exhibit 14, 2011 1099, was
18 marked for identification.)
19 (Kennelly Exhibit 15, Pelvic Floor
20 Institute, Women's Health Business of Boston
21 Scientific Faculty Guide dated June 2010, was
22 marked for identification.)
23 BY MR. SULLIVAN:
24 Q. All right. So we'll mark the
25 confirmation of service documents as Exhibit

1 Number 12 will be the one with the date 9/25/11 on
2 it.
3 Exhibit Number 13 will be the
4 confirmation of service documents with the date
5 10/16/11.
6 And the 1099 form we'll mark as Exhibit
7 Number 14.
8 All right. And this binder that's
9 labeled Pelvic Floor Institute, Women's Health
10 Business of Boston Scientific, Faculty Guide, June
11 2010, this appears to be your original, correct?
12 A. Correct.

**mk070214, (Pages 22:8 to 39:4)**

8  Q. All right. Sir, with respect to the
9  office notes, consent forms that were marked as
10  Exhibits Number 2 and 3 tonight, were these records
11  made at or near the time of your treatment of
12  Ms. Carlson?
13  A. Correct.
14  Q. And were they created by persons with
15  knowledge of the events described in the records?
16  A. Correct.
17  Q. And was it your regular practice to
18  create such records in connection with your
19  practice?
20  A. Yes.
21  Q. And are those records kept and created
22  as regularly -- regular activity associated with
23  your business of practicing medicine?
24  A. Yes.
25  Q. Other than the documents that you've

1  produced for us and that we've marked as exhibits,
2  do you know of any other documents that pertain to
3  your care and treatment of Ms. Carlson?
4  A. No, I do not.
5  Q. Doctor, before we get directly into
6  your care and treatment of Ms. Carlson, can you
7  tell us generally what pelvic organ prolapse is?
8  A. So, pelvic organ prolapse is a
9  condition whereby the pelvic organs within the
10  female, typically the uterus, the bladder, the
11  rectal area, the peroneum and urethra have lost
12  support. And it includes a combination of
13  different support possible defects.
14  In the urethral area could be involved
15  in a urethrocele hypermobility leading to stress
16  urinary incontinence. In the anterior vaginal wall
17  it oftentimes leads to relaxation of a cystocele,
18  which could be a central or paravaginal defect. In
19  the uterus area, the uterine area tends to drop.
20  In the posterior compartment, it's a weakening of
21  the rectovaginal fascia for a rectocele to develop.

22  Q. Okay. So if we use the terms cystocele
23  tonight, that refers to a bladder prolapse,
24  correct?
25  A. That's anterior vaginal wall prolapse.

                          24

1   Q. Okay. Where the bladder bulges into
2   the vagina?
3   A. Correct. But there's also the urethra,
4   so it could include a urethrocele also.
5   Q. Okay. And a rectocele again is what?
6   A. Is a posterior vaginal wall relaxation,
7   so weakening of the posterior wall of the vagina.
8   Q. Okay. And does that result in a,
9   again, bulge into the vaginal area?
10  A. Correct.
11  Q. Okay. And which organ bulges into the
12  vaginal area with rectocele?
13  A. It can be a -- could be the rectum. It
14  could be a piece of small bowel, such as an
15  enterocele.
16  Q. Okay. And can you tell us, Doctor,
17  what are the symptoms that are typically associated
18  with pelvic organ prolapse?
19  A. It can be a variety of symptoms based
20  on, you know, the individual patient. Several
21  patients do complain of heaviness, feeling a
22  sensation of fullness. If they do a lot of
23  standing, lifting, straining, they can complain of
24  back pain, discomfort. Majority of times, patients
25  notice where they see a visible bulge coming from

                          25

1   the vaginal area when they're wiping.
2   Q. Okay. Can pelvic organ prolapse be
3   asymptomatic?
4   A. Absolutely.
5   Q. Okay. And in the more severe cases,
6   Doctor, what symptoms would you expect to see?
7   A. Well, severity is not based on
8   prolapse, meaning the degree of prolapse. So
9   that's what -- severity as far as how far the
10  bulging is doesn't have any correlation to
11  severity. So it's really individualized for the
12  patient.
13  Q. All right. And so are there different
14  symptoms you would use to gauge severity?
15  A. Well, the -- the difficulty is, within
16  the pelvic area, there are several organs
17  within that area. So if you have an organ that's
18  around that area that may be involved due to
19  traction, pulling, you may think that it's due to
20  prolapse, but it may actually be due to the
21  intrinsic dysfunction for that organ.
22  For example, patients may complain of
23  urgency, frequency, needing to go to the rest room,

24  and they may have also prolapse on exam. But, in
25  reality, it may be the prolapse contributing, but

26

1  it may also be not the prolapse. There are several
2  patients that have that similar condition without
3  prolapse.
4  So the exact symptoms that people are
5  describing, it makes it challenging. If someone is
6  talking on defecatory symptoms of constipation,
7  straining, difficulty with bowel movements, that
8  could be a neurological component that has to do
9  with the neuromuscular aspect of the rectal area as
10  opposed to true bulging effect.
11  So differential diagnosis evaluation
12  trying to associate their symptoms from a vaginal
13  bulge is sometimes difficult.
14  Q. Do you use any type of grading system
15  to stage or describe the severity of pelvic organ
16  prolapse in patients?
17  A. Well, there are two types of systems
18  that have been utilized. One is the Baden-Walker
19  System and one is also the POP-Q System. So those
20  are the two different types.
21  Q. Okay. Do you use both those types?
22  A. I do, depending on kind of what we're
23  utilizing it for. If we're doing research studies,
24  oftentimes, they would like us to use the POP-Q
25  System. I personally find that the Baden-Walker

27

1  System is a more individualized patient friendlier
2  system that's easier to comprehend when you're
3  talking amongst other clinicians.
4  Q. Can you tell us generally how the
5  Baden-Walker System is applied?
6  A. Right. So, typically, the Baden-Walker
7  System is you identify which compartment you're
8  talking about, whether anterior, apical or
9  posterior. And if it is less than halfway down the
10  vaginal area, that would be Grade I. Grade II is
11  when it's to the vaginal opening. Grade III is
12  when it's beyond the opening, and Grade IV is when
13  you've had total -- total evolved prolapse.
14  Q. Okay. So in the Baden-Walker System,
15  the Grade I would be less severe than the Grade III
16  or Grade IV?
17  A. Correct.
18  Q. All right. How do you perform the
19  POP-Q?
20  A. So, the POP-Q is a challenging type of
21  exam that looks at different areas. So, the first
22  part is identifying a point that is minus 3
23  centimeters from the vaginal opening. And that's
24  on, let's say, the anterior wall. That is a
25  fixation point. And as the patient is in lithotomy

1  position straining, you try to identify from the
2  vaginal opening where that minus 3 point lands. If
3  it stays stable at minus 3, then that point is
4  called AAs minus 3.
5  If you then look at -- the next point
6  would be BA, which is actually the most distal
7  extent on straining. It doesn't say the exact
8  location of that area. The next point you're
9  looking at is where the cervical cuff is, measuring
10 from the vaginal opening.
11 Then they do the same on the posterior
12 compartment. You couple that with a couple other
13 measures, a genital hiatus measurement, a
14 peritoneal body measurement, and then based on that
15 system, if it is from the farthest or it's to
16 minus 2 centimeters from the vaginal opening, that
17 is Grade I, doesn't distinguish what compartment it
18 is whatsoever, anterior, apical or posterior; if it
19 is between plus 1 and -- or minus 1 and plus 1,
20 that is Stage II; if it is between plus 1 and just
21 out to the extent of the total aversion, that would
22 be Stage III, and then Stage IV is eversion.
23 But the challenge with that system is
24 that it's a very measurement-oriented system with a
25 lot of numbers and it's great for research, it's

1  great for capturing population based aspects; but
2  on the individual patient, it may not have as much
3  sort of clinical application.
4  Q. Okay. So is the general idea of the
5  POP-Q to sort of measure how far the organ -- the
6  prolapsed organ has dropped from its normal
7  position?
8  A. Correct. However, there's a lot of
9  variability within that because your technique of
10 measuring one inter -- interobserver variation
11 adapts when the patient is actually straining and
12 how well they strain is different also.
13 Q. So different positions might get a
14 different measurement, different day?
15 A. Correct.
16 Q. And you mentioned -- just to clarify,
17 you mentioned the lorthotic [sic] position. Can
18 you describe what that is?
19 A. So lithotomy position, basically where
20 you're lying on your back where your legs are
21 elevated typically in stirrups.
22 Q. Okay. And you referred to apical,
23 anterior and posterior compartments?
24 A. Correct.
25 Q. Can you describe what those are?

1  A. Right. So the anterior compartment

2 would include the vaginal wall that is covering
3 over the urethra and the bladder.
4 The apical compartment typically covers
5 the cervix and uterus. In a post hysterectomized
6 patient, it would just include the top part of the
7 vaginal area. And then the posterior vaginal wall
8 encovers the rectum and possibly some of the small
9 intestines.
10 Q. And in your practice, have you treated
11 many patients with pelvic organ prolapse?
12 A. Yes.
13 Q. Is that a common complaint in your
14 patient population?
15 A. Correct.
16 Q. And how does pelvic organ prolapse
17 affect or impact the quality of a woman's life?
18 A. It can impact it in a variety of
19 different ways. It can be from the spectrum where
20 it doesn't impact them at all versus to the point
21 where it becomes debilitating.
22 So depending on either the amount of
23 prolapse or the amount of symptoms that go along
24 with it, it's up to that individual patient to kind
25 of decide for herself, you know, where it fits in.

                    31

1 Q. Does pelvic organ prolapse typically
2 improve without treatment?
3 A. For people with mild prolapse, it can
4 oftentimes improve if they're just trying to
5 improve their general physical health. If they're
6 trying to improve their core, which a lot of ladies
7 will do, sometimes that's with exercise training,
8 they can improve the tone. If -- if they've
9 recently delivered a child, just due to the
10 stretch, the elasticity of the -- the muscles and
11 the surrounding structures, in time, it oftentimes
12 will improve.
13 In general, for the older patient who
14 is not trying to change their health in any way, it
15 likely does not improve; but it may not worsen.
16 Q. Okay. Does it typically, though, get
17 worse over time for those patients?
18 A. It's -- it's variable. We don't have a
19 crystal ball.
20 Q. Are there certain -- I think you
21 touched on some of them, but are there certain risk
22 factors for the development of pelvic organ
23 prolapse?
24 A. Well, some of it is generic, which we
25 don't have full elucidation of those ideas or

                    32

1 terms.
2 Certainly, other risk factors are
3 smoking; people who have had vaginal deliveries as

4  opposed to C-sections; people who have connective
5  tissue disorders, that can lead to it; people who
6  are sort of prone to chronic conditions, such as
7  coughing, straining; people with job environments
8  that lead to a lot of heavy lifting that are on
9  their feet a lot; people who are parachute jumpers,
10  things that are high-impact activities.
11  Q. Did you mention childbirth?
12  A. I believe that I did.
13  Q. Okay.
14  A. But if I didn't, then, yes.
15  Q. Okay. And increasing age?
16  A. Increasing age, well, prolapse does
17  increase with age. Whether or not that's
18  necessarily a true risk factor or not, it's hard to
19  truly say.
20  Q. What are the nonsurgical treatments --
21  treatment options for pelvic organ prolapse?
22  A. So nonsurgical treatments include
23  observation, exercise therapy, trying to improve
24  your core muscles, trying to improve the pelvic
25  floor tone. Utilization of pessary management.
                    33
1  And those are about the limits to the nonsurgical
2  treatments.
3  Q. Okay. What type of exercises provide
4  nonsurgical treatment?
5  A. Typically, what one is trying to do is
6  improve the levator muscles, which are the muscles
7  surrounding the pelvic floor that help hold up the
8  bladder, the vaginal area and the uterus, trying to
9  identify those muscles first and then increasing
10  the tone and strength over time. It usually takes,
11  oftentimes, six to eight weeks just to improve upon
12  that area.
13  Q. Okay. Is that an effective option for
14  most women?
15  A. It's certainly a good option to start
16  with, depending on their degree. If someone comes
17  in with a Stage III prolapse, the chances of just
18  behavioral therapy and pelvic floor physiotherapy
19  to actually improve that are probably less than 10
20  percent.
21  Q. Okay. And you mentioned pessary. Can
22  you explain what a pessary is?
23  A. So pessary is a silicone vaginal device
24  made of many different styles and shapes specially
25  fitted for the female based on their prolapse,
                    34
1  whether it's the anterior, apical or posterior
2  prolapse. It's oftentimes placed within the
3  vaginal area.
4  Women have the ability to take it out
5  themselves and self-care for it or they can come
6  back periodically to have it taken out, cleansed

7  and then replaced.

8  Q. Okay. And what purpose does the

9  pessary serve?

10  A. The whole goal of it is trying to

11  improve the overall symptoms. It's basically

12  symptom management that you're trying to improve.

13  So if someone is symptomatic enough that they are

14  wanting to do something about it and behavioral

15  therapy is not working, pessary therapy is the

16  first option.

17  Q. Okay. Does the -- the pessary, upon

18  being placed within the vagina, does that provide

19  support for the prolapsed organ?

20  A. Correct. It's a -- it's an internal

21  strut, an internal area that's taking up space and

22  has the prolapsed organ or the anterior, posterior,

23  apical will not be allowed to protrude through the

24  vaginal opening, basically, obstructing that area.

25  Q. Is pessary a good option for most

<div align="center">35</div>

1  women?

2  A. It's an option that's a personal

3  choice. There are many, many women who do not want

4  to have any type of vaginal device in place for a

5  variety of reasons.

6  Q. What are some of those reasons?

7  A. Some of it is there's a generational

8  gap. There's a lot of women who went through, in

9  the older patient, who has never been exposed to a

10  vaginal tampon; and so, culturally, they're just

11  not used to putting anything within the vaginal

12  area.

13  There are many women who were then in

14  the era of vaginal tampons, where they were

15  concerned regarding retained devices and have

16  infections develop. And so, psychologically,

17  they're concerned about something that's within

18  that area for a period of time.

19  There are some women who have pelvic

20  pain discomfort and just don't want anything in the

21  vaginal area. There are patients who have

22  urogenital atrophy and sort of narrow vaginal

23  introitus and, consequently, can't tolerate that.

24  So there are many factors, many reasons.

25  Q. And are there -- does the patient who

<div align="center">36</div>

1  uses a pessary have any maintenance, chores

2  associated with that?

3  A. Correct. So our recommendations are

4  initially to be able to -- once it's put in place,

5  patients will come back fairly soon within a two-

6  to three-week period. We'll re-evaluate the

7  tissues to make sure they're in good health and

8  hygiene.

9  If they're in good health and hygiene,

10  they either have the options to be able to do

11 self-care, self-cleansing of the device, which we
12 educate them about. If they don't want to proceed
13 along that, then we will follow them back up on a
14 routine schedule, typically, within a three-month
15 period and then extend it out, if their tissues
16 continue to be doing well.
17 Q. Okay. And how often would a patient
18 need to clean the pessary?
19 A. Well, it's very individualized also.
20 So there are some ladies who are more factitious
21 that would like to take it in and out themselves
22 daily, cleanse it and put it in. There's other
23 patients who may not have hand dexterity, who would
24 prefer just not to know about it. So those
25 patients we typically would see at the one month.

37

1 If they're doing well, then we would see them at
2 three months. If their tissues are doing well,
3 then probably move it out to six months.
4 Q. And, Doctor, what are the surgical
5 treatment options for pelvic organ prolapse?
6 A. So there are -- the emphasis of
7 surgical treatment is basically to reduce the
8 prolapse, to provide support. So there are a
9 variety of treatments that are available. It
10 depends on the compartment that you're talking
11 about.
12 So on the anterior compartment, if you
13 have a urethrocele, you can -- or, in general, I
14 should say -- in general, you can have native
15 tissue repairs. You can have augmented tissue
16 repairs with graph materials are the two main
17 types.
18 Q. And when you refer to native tissue
19 repair, native tissue surgery, can you describe how
20 that proceeds?
21 A. So native tissue repair is basically
22 using suture material that's absorbable to plicate
23 or buttress the prolapse.
24 Q. All right. So is that taking --
25 suturing the patient's own tissue to provide

38

1 support?
2 A. So it's utilizing prolapsed tissue and
3 sort of mending it, sort of plicating -- so
4 typically it's -- say, I'll have an analogy to
5 tailoring. You buy a suit, it doesn't quite fit.
6 You need it tailored. And, in essence, they are
7 basically taking that material and they're sort of
8 buttressing it or tightening it up.
9 Q. Okay. And can that native tissue
10 repair be done transvaginally and abdominally?
11 A. So, typically, it's done vaginally. So

| | | |
|---|---|---|
| 12 there are vaginal approaches and abdominal<br>13 approaches from the -- and, once again, it depends<br>14 on the compartment you're talking about.<br>15 Q. So is native tissue repair always a<br>16 good option for your patients?<br>17 A. Native tissue repair is -- is a good<br>18 option if they have -- don't have a lot of<br>19 associated risk factors to it. I think when we're<br>20 talking to patients about the treatment choices,<br>21 you're also talking about what the expected results<br>22 are.<br>23 We do know from historical data that<br>24 native tissue repair in the anterior compartment<br>25 has a 40 percent failure rate over time. If we're<br>        39<br>1 trying to improve upon that, some of the treatments<br>2 have been using grafted material to improve upon<br>3 that area to improve the success rates as far as<br>4 longevity. | 38:23 to 39:4<br>FRE 403<br>Non-<br>responsive | |
| **mk070214, (Pages 39:11 to 57:2)**<br>        39<br>11 Q. Doctor, you mentioned that the native<br>12 tissue repair is typically done transvaginally.<br>13 What do you mean by -- by that, the approach? Can<br>14 you describe what transvaginally means?<br>15 A. Well, there are typically two<br>16 approaches to pelvic prolapse reconstruction.<br>17 There's vaginal approaches and there's also<br>18 abdominal approaches.<br>19 So from a vaginal approach, you can<br>20 treat the anterior compartment. You can oftentimes<br>21 treat the vault. You can also treat the posterior<br>22 compartment. From the abdominal approach, you<br>23 predominantly are treating the apical compartment<br>24 with possibility with highly skilled treating a<br>25 paravaginal defect anteriorly.<br>        40<br>1 Q. Okay. So the transabdominal approach<br>2 would require an incision into the abdomen?<br>3 A. Typically, it's either done with an<br>4 incision in the abdomen versus laparoscopy.<br>5 Q. Okay. Would you consider the abdominal<br>6 approach a more invasive procedure than a<br>7 transvaginal approach?<br>8 A. Certainly, if you're making an<br>9 incision, correct.<br>10 Q. Okay. And why is that?<br>11 A. You're cutting through abdominal<br>12 fascia, abdominal muscles, and when you're having<br>13 to resew that back together, that's typically a<br>14 six-week recovery period as opposed to a vaginal<br>15 approach that is normally an outpatient or just an<br>16 observation procedure, which patients get back to<br>17 doing their sort of normal daily activities without | | |

| | | |
|---|---|---|
| 18  pain, discomfort.<br>19  Q. And are there additional risks<br>20  associated with a transabdominal approach that are<br>21  not present with a transvaginal approach?<br>22  A. Typically, the risks are wound<br>23  infection. The other risks are longer operation,<br>24  so length of time under anesthesia. The risk of<br>25  DVT -- DVTs are also a matter of length of time<br>        41<br>1  from surgery. The issues of bowel dysfunction,<br>2  going into the intra-abdominal area, so an ileus<br>3  with possible secondary bowel obstruction are<br>4  possibilities.<br>5  Q. All right. And you mentioned the<br>6  recurrence rate for a native tissue repair. Strike<br>7  that.<br>8  How would you describe the recurrence<br>9  rate for a native tissue repair versus a graft-type<br>10  surgery?<br>11  A. Well, there are two types of grafts.<br>12  There are biological grafts and there are synthetic<br>13  grafts. So in regards to native tissue repair,<br>14  oftentimes, you're using defective tissue that has<br>15  the possibility of recurring on its own, and that's<br>16  why the 40 percent tends to recur.<br>17  When you're using biological grafts,<br>18  they can be made of either porcine dermis, they can<br>19  be made of bovine dermis. They also can be made of<br>20  human cadaveric fascia. So how the body wants to<br>21  respond to these materials, whether they will<br>22  autolyze the material, whether your sutures will<br>23  pull through the material, and then, hence, have a<br>24  weakening of the repair is kind of up to how the<br>25  body will respond.<br>        42<br>1  The other alternative is using<br>2  synthetic material, which instead of relying on an<br>3  interpositional graft, the synthetic material<br>4  actually acts as a true support where the body will<br>5  then integrate within that material to provide<br>6  support.<br>7  Q. Okay. And you're referring to the<br>8  polypropylene mesh?<br>9  A. Correct.<br>10  Q. Okay. Just getting back to the native<br>11  tissue repair for a second, does the quality of the<br>12  patient's tissue play a role in recurrence?<br>13  A. Certainly, if people have poor tissue<br>14  quality, if they have smoking history, if they have<br>15  genetic factors, if they've had prior repairs in<br>16  the past; in addition, if they've had an apical<br>17  component, that is, apical prolapse component, that<br>18  all leads to the possibilities of recurrence.<br>19  Q. Now, you started to talk about the | 42:10-42:18<br>FRE 401, 403<br>Irrelevant as<br>there is no<br>evidence of<br>poor tissue<br>quality in<br>Plaintiff | |

20  polypropylene mesh grafts. Can you generally
21  describe the surgery for us?
22  A. For which compartment?
23  Q. Which compartment did you -- did you
24  operate on Ms. Carlson?
25  A. So in Ms. Carlson, the compartment that
                            43
1  we operated on was level 1 support, which would be
2  the apical, in addition to the anterior
3  compartment.
4  Q. Okay. Can you describe that type of
5  vaginal mesh procedure?
6  A. So for Ms. Carlson we used the Uphold
7  vaginal mesh support, in addition to the anterior
8  colporrhaphy. So if you want it, the description
9  is detailed in the operative report.
10  Q. Just generally, Doctor, if you could.
11  A. In general, it's utilizing support from
12  the sacrospinous ligaments bilaterally to provide
13  fixation to elevate the apical vault, which in her
14  case would be the cervix, in addition to elevate
15  the anterior wall to provide a good support
16  structure, for which then the anterior colporrhaphy
17  would reinforce that.
18  Q. Okay. So, basically, you're inserting
19  a mesh material transvaginally, correct?
20  A. Correct.
21  Q. And that mesh material forms a graft or
22  a support for the prolapsed organs; is that fair?
23  A. In her particular case, the Uphold
24  device is really a strap, it's a polypropylene
25  strap that is supporting her apex, which would be
                            44
1  her cervix and vault. And that strap gets secured
2  to the bilateral sacrospinous ligaments.
3  The actual mesh that you may be
4  referring to is probably not a great support,
5  meaning it is not a full coverage of the anterior
6  vaginal wall. It is a small platform.
7  Q. Okay.
8  A. The product that --
9  Q. You said that the body, I think you
10  said integrates with -- with the mesh; is that
11  right?
12  A. Correct.
13  Q. What did you mean by that?
14  A. When you're talking about a biological
15  material, it's really an interpositional graft. So
16  it is you're totally relying on your repair that
17  the actual graft material itself and the sutures
18  that are connected to it and the sutures then
19  connect to a fixation point.
20  If any of those areas -- much like a

21 trampoline -- if any of those areas break, whether
22 the material fabric breaks, whether the suture
23 breaks, whether the fixation point breaks, your
24 repair has failed. It will come right back down
25 because there's no integration of the natural

45

1 tissues around that area to secure it in place, as
2 opposed to a synthetic mesh material, that material
3 is designed that as it's put in place, it is
4 allowing the body to actually integrate within the
5 material to be able to improve its strength over
6 time.
7 Q. So the -- the patient's tissue actually
8 has in-growth with the mesh; is that what you're
9 saying?
10 A. Correct, it integrates within it.
11 Q. Okay. So is vaginal placement of mesh
12 a good option for some patients with pelvic organ
13 prolapse?
14 A. Absolutely.
15 Q. Why is that?
16 A. For the right patient for the right
17 indications, it is one of the only options that are
18 available for some patients to provide improved
19 support and also relieving their symptoms.
20 Q. And are there benefits to placing the
21 mesh through the vagina as opposed to through the
22 abdomen?
23 A. Once again, depending on the
24 compartment you're talking about, there are some
25 areas, specifically the anterior or the posterior

46

1 vaginal wall, that you cannot really place
2 synthetic mesh from the abdominal approach. The
3 abdominal approach is predominantly used for the
4 apex.
5 But to your point, there are clear
6 advantages from the vaginal placement as opposed to
7 abdominal. We've elucidated those some in the
8 past. Some of it is convenience for the patient,
9 time in the operating room, blood loss, decreasing
10 risk of bowel, postoperative issues, decreasing
11 risk of DVT.
12 Q. Does the shape of the mesh that you
13 place differ depending on the organ that's
14 prolapsed?
15 A. Correct.
16 Q. Why is that?
17 A. Once again, you're trying to tailor it
18 to the defect that's there. Everyone's body is a
19 little bit different. There's no sort of one size
20 that fits all. And so you, oftentimes, do have to
21 tailor and shape it. The anterior compartment is a
22 wider compartment, whereas, the posterior

| | | |
|---|---|---|
| 23  compartment doesn't have as much width to require | 46:25-47:5 | |
| 24  support. | FRE 403 | |
| 25  Q. How long has transvaginal placement of | Irrelevant as | |
| 47 | FDA info has | |
| 1  mesh been an accepted part of medical practice to | been ruled | |
| 2  repair pelvic organ prolapse? | inadmissible | |
| 3  A. I believe -- I believe the FDA first | | |
| 4  approved transvaginal mesh in 2004, but I could be | | |
| 5  wrong. | | |
| 6  Q. How long has it been a part of your | | |
| 7  medical practice? | 47:6-10 | |
| 8  A. Well, I've been utilizing -- if you're | FRE 401; 403 | |
| 9  including stress urinary incontinence, utilizing | Irrelevant | |
| 10  polypropylene mesh for slings, probably since 2000. | | |
| 11  Q. Okay. And how long have you been using | | |
| 12  mesh for pelvic organ prolapse repair? | | |
| 13  A. Are you including biological materials | | |
| 14  or synthetic material? | | |
| 15  Q. The polypropylene, synthetic? | | |
| 16  A. So polypropylene, I don't know the | | |
| 17  exact date. | | |
| 18  Q. Do you know about how many years you've | | |
| 19  been doing that? | | |
| 20  A. Probably since 2007. | | |
| 21  Q. And, Doctor, what's a sacral colpopexy? | | |
| 22  A. So sacral colpopexy is a procedure | 47:21-48:6 | |
| 23  where synthetic material is used that's securing | FRE 401; 403 | |
| 24  the apex of the vagina to the sacrum. | Irrelevant | |
| 25  Q. And is that performed using the same | | |
| 48 | | |
| 1  synthetic mesh that we've been talking about? | | |
| 2  A. It's -- correct. It's used | | |
| 3  polypropylene mesh. | | |
| 4  Q. And that's -- is that an abdominal | | |
| 5  approach? | | |
| 6  A. Correct. | | |
| 7  Q. Okay. Is it good for physicians like | | |
| 8  yourself to have different options for their | | |
| 9  patients with pelvic organ prolapse? | | |
| 10  A. Yes. | | |
| 11  Q. Why is that? | | |
| 12  A. Because oftentimes during the preop | | |
| 13  evaluation, what you see in the office is different | | |
| 14  than what you see in the operating room. So you | | |
| 15  may, once again, depending on the patient's core | | |
| 16  muscles, depending on their anxiety level, being | | |
| 17  disrobed and undergoing a pelvic exam, depending on | | |
| 18  their time of day, whether it's early morning | | |
| 19  versus late in the afternoon, you may identify | | |
| 20  prolapse, which you can see. However, when you get | | |
| 21  under anesthesia, when your body is totally | | |
| 22  relaxed, all of a sudden you'll find other | | |
| 23  compartments that are relaxed. | | |
| 24  Q. And have the surgical options for | | |
| 25  pelvic organ prolapse changed over the last ten | | |

49
1  years?
2  A. In general, surgical options have not.
3  Techniques and devices have changed.
4  Q. Okay. And how have the techniques
5  changed?
6  A. So traditionally from a vaginal
7  approach, if you're talking about anterior
8  compartment, in addition to native tissue repairs,
9  when biological grafts came into play, that would
10  kind of be the aspect. And then -- if you're
11  talking about apical repairs, we'd typically be
12  doing sacrospinous vaginal vault suspensions or
13  iliococcygeal vaginal vault suspensions.
14  Posteriorly, the same native tissue
15  repairs, grafted-type repairs. As things evolved,
16  a lot of patients -- a lot of surgeons did not know
17  the anatomy and didn't have the techniques to do
18  some of the more complicated sacrospinous ligament
19  repairs, iliococcygeal repairs with the
20  technique -- with the devices of the day. With
21  advances in devices for suture capturing devices
22  for advances in placement, it became easier for
23  surgeons to get to learn some of these operations.
24  Technology then changed to use
25  trocar-based systems. And then after that
50
1  iteration, then it came back to sort of
2  site-specific-type repairs.
3  Q. What are trocars, Doctor?
4  A. So trocars are needles with cannulas
5  that are passed through tissue to try to get to a
6  certain area through a percutaneous or a puncture
7  type of approach.
8  Q. Okay. And were trocars used in
9  transobturator approaches?
10  A. For?
11  Q. For pelvic floor surgery?
12  A. Well, there are -- there are some
13  procedures or devices that were transobturator and
14  percutaneous approaches.
15  Q. Has there been a movement away from the
16  transobturator approaches?
17  A. Correct.
18  Q. Okay. And has there been a movement
19  away from the use of trocars?
20  A. I would say the majority of physicians
21  have. There are some who still believe that the
22  trocar-based systems are the best systems in their
23  hand.
24  Q. And you mentioned suture capturing
25  devices. Does the Uphold use a suture capturing
51
1  device?

2  A. Correct.
3  Q. Do you know what that's called?
4  A. A Capio device.
5  Q. Does the Uphold kit have trocars?
6  A. No.
7  Q. Okay. Is there -- do you believe
8  there's advantages to the Capio device over
9  trocars?
10  A. Absolutely.
11  Q. What are those?
12  A. The key advantage is that you actually
13  know exactly where you're placing it based on
14  digital palpation, digital feel. You are utilizing
15  the device as it's being deployed into the position
16  and location that is desired.
17  With a trocar-based system, it is a
18  nonpalpatory pass that is based on your
19  intellectual judgment and 3-D dimensional imaging
20  of the pelvis and structures around the area.
21  Q. Okay. And when you say a pass, that's
22  the piercing of the tissue?
23  A. That's the trocar movement through the
24  tissues.
25  Q. Okay. And so if you can't digitally
                    52
1  palpate where you're placing that, does that create
2  risks for the patient?
3  A. Correct.
4  Q. And what kind of risks are associated
5  with the trocar that are not associated as much
6  with the Capio?
7  A. It probably depends on the patient's
8  anatomy and it depends on the surgeon's skill
9  and --
10  Q. Let me ask it a different way then.
11  Why is it an advantage to be able to
12  digitally palpate or feel where you're placing the
13  sutures?
14  A. In my hands, I much prefer to be able
15  to palpate the structures that I know, which would
16  include the ischial spine, the sacrospinous
17  ligament, and once palpating these structures that
18  are identifiable, utilizing a device or a suture
19  technique to place it in that as opposed to relying
20  on something that I have no actual palpatory feel.
21  Q. Is there -- there a risk when you're
22  using the trocar where you can't palpate where
23  you're placing it? Is there a risk that you might
24  perforate an organ?
25  A. There's always a risk, you know, based
                    53
1  on any type of, you know, sharp device.
2  Q. In terms of -- you mentioned an          53:2-21

| | | |
|---|---|---|
| 3  evolution of the devices over the past ten years as | FRE 401; 403 | |
| 4  well, and you touched on the Capio. What about the | Irrelevant | |
| 5  size of the mesh itself, has that changed? | | |
| 6  A. It has. | | |
| 7  Q. And how has it changed? | | |
| 8  A. Originally, when synthetic material | | |
| 9  you're talking about, when it first came out, there | | |
| 10  were large sheets of synthetic material, also the | | |
| 11  weight and diameter of the mesh material, the | | |
| 12  stiffness of the mesh material was very heavy. | | |
| 13  It was thought that due to prolapse, | | |
| 14  intuitively, you'd need strong material. However, | | |
| 15  over time, as the science has evolved with the mesh | | |
| 16  technology, they have realized that a lighter | | |
| 17  weight, less dense mesh material would be better. | | |
| 18  They also realized that trying to place incisions | | |
| 19  away from the mesh material would be better. | | |
| 20  Utilizing less mesh, less tension would all be | | |
| 21  advantageous. | | |
| 22  Q. Why -- why is lighter or smaller mesh | | |
| 23  advantageous? | | |
| 24  A. Well, for -- I think those are two | | |
| 25  separate things. So lightweight mesh has more | | |
| 54 | | |
| 1  pliability, less stiffness. It has more comfort | | |
| 2  for the patient, if you -- the other comment you | | |
| 3  said was less mesh. I think less mesh leads to | | |
| 4  less mesh being exposed at the incision line. | | |
| 5  Q. And so are there -- are there risks of | | |
| 6  exposure, erosion reduced in that -- that sense? | | |
| 7  A. I don't -- for -- certainly, there's | | |
| 8  less risk of exposure with less mesh material. | | |
| 9  Q. Doctor, do you still use synthetic | | |
| 10  polypropylene mesh today in some of your patients | | |
| 11  to treat pelvic organ prolapse? | | |
| 12  A. Yes. | | |
| 13  Q. Do you use it placed through the | | |
| 14  abdomen or only transvaginally? | | |
| 15  A. Both. | 54:16-55:1 | |
| 16  Q. Both. And do you also use the | FRE 401; 403 | |
| 17  polypropylene mesh slings to treat stress urinary | Irrelevant; | |
| 18  incontinence? | FRE 703 | |
| 19  A. Yes. | Foundation | |
| 20  Q. Okay. That's the same mesh in both | | |
| 21  those products? | | |
| 22  A. Correct. | | |
| 23  Q. Do you find polypropylene mesh slings | | |
| 24  to be a safe and effective treatment for stress | | |
| 25  urinary incontinence? | | |
| 55 | | |
| 1  A. Yes. | | |
| | | |
| 5  Q. And in your experience, Doctor, is the | 55:5-12 FRE | |

| | | |
|---|---|---|
| 6  synthetic polypropylene mesh a safe and effective<br>7  treatment for your patients with pelvic organ<br>8  prolapse?<br><br>11  THE WITNESS: For the right patient,<br>12  yes.<br>13  BY MR. SULLIVAN:<br>14  Q. Okay. And for the right patient,<br>15  Doctor, do you believe the Uphold product to be a<br>16  safe and effective option for treatment of pelvic<br>17  organ prolapse?<br>18  A. Yes.<br><br>21  BY MR. SULLIVAN:<br>22  Q. Doctor, what are the -- strike that.<br>23  Are there risks in utilizing vaginal<br>24  mesh for the treatment of pelvic organ prolapse?<br>25  A. Correct.<br>          56<br>1  Q. What are those major risks?<br>2  A. The risks are the same as native tissue<br>3  repair, which would include bleeding, infection,<br>4  injury to surrounding structures. With any<br>5  surgery, the risk of anesthesia, DVTs. The only<br>6  risk that is separate from the synthetic-based<br>7  repair versus a native tissue repair is exposure of<br>8  mesh material.<br>9  Q. When you say exposure of mesh material,<br>10  what is that?<br>11  A. It's where the material may be seen<br>12  within the vaginal wall.<br>13  Q. Is exposure different from erosion?<br>14  A. Correct.<br>15  Q. What's erosion?<br>16  A. Erosion would be where it is<br>17  penetrating into another organ.<br>18  Q. How did you become aware of these<br>19  risks, Doctor?<br>20  A. I think with any surgery, risks are<br>21  incurred, and a lot of times from, you know, other<br>22  surgeries, experience, training, you try to<br>23  identify these risks and try to mitigate them.<br>24  Q. Okay. So it's part -- was it part of<br>25  your medical training as a urologist?<br>          57<br>1  A. As within urology or within general<br>2  surgery. | 703<br>Foundation<br><br><br><br>55:14-19<br>FRE 703<br>Foundation | |
| **mk070214, (Pages 58:18 to 59:21)**<br>          58<br>18  Q. Are you familiar with directions for<br>19  use that accompany the Uphold product?<br>20  A. Yes. | | *Counter Designation to 55:21 –*<br>*57:2*<br>*mk070214, (Pages 168:8 to*<br>*168:12)*<br>        *168*<br>*8  Q. Are you aware that the Uphold product*<br>*9  had no clinical testing before it was released onto*<br>*10  the market?*<br>*11  MR. SULLIVAN: Objection.*<br>*12  THE WITNESS: I was not aware of that.*<br><br><br><br><br><br>*mk070214, (Pages 166:4 to*<br>*168:1)*<br>        *166*<br>*4  Did you know that the* |

| | | |
|---|---|---|
| 21 Q. Were you familiar with the directions<br>22 for use that accompanied the Uphold product prior<br>23 to your surgery on Ms. Carlson?<br>24 A. Yes.<br>25 Q. And you reviewed that before performing<br><div align="center">59</div>1 an Uphold surgery for the first time?<br>2 A. Yes.<br>3 Q. Is that good practice to review the<br>4 directions for use before using a medical device?<br>5 A. Yes.<br>6 Q. Why is that?<br>7 A. There's important information within<br>8 the instructions for use. It tells the<br>9 precautions. It tells the description of the<br>10 procedure. It tells the contraindications.<br>11 Q. And is part of the reason you do that<br>12 so that you can have informed -- informed<br>13 discussion with your patient about the potential<br>14 risks and complications?<br>15 A. That may be a -- a part of it.<br>16 Q. Okay.<br>17 A. But I think for good medical care when<br>18 utilizing a device, try to get as much information<br>19 on it prior to use is important.<br>20 Q. So that you are informed?<br>21 A. Correct. | 59:11-59:15<br>FRE 401, 403<br>Irrelevant | *manufacturers of the*<br>*5 resin used in Boston Scientific*<br>*Corporation's*<br>*6 polypropylene mesh, which was*<br>*included in their*<br>*7 mesh kits, warned Boston*<br>*Scientific, quote, medical*<br>*8 application caution, do not use*<br>*this Chevron*<br>*9 Phillips chemical material in*<br>*medical applications*<br>*10 involving permanent*<br>*implantation in the human body*<br>*11 or permanent contact with*<br>*internal bodily fluids or*<br>*12 tissue?*<br>*13 MR. SULLIVAN: Objection.*<br>*14 THE WITNESS: I subsequently*<br>*have known*<br>*15 that information.*<br>*16 BY MR. FABRY:*<br>*17 Q. Okay.*<br>*18 A. But at the time in 2010, I*<br>*didn't know*<br>*19 that information.*<br>*20 (Kennelly Exhibit 19, Material*<br>*Safety*<br>*21 Data Sheet for Marlex*<br>*Polypropylene (All Grades),*<br>*22 was marked for identification.)*<br>*23 BY MR. FABRY:*<br>*24 Q. Let me hand you what I've*<br>*marked as*<br>*25 Exhibit 19. What's the revision*<br>*date on that, on*<br><div align="center">*167*</div>*1 the bottom highlighted?*<br>*2 A. 10/9/2007.*<br>*3 Q. And the other highlighted*<br>*section*<br>*4 there, the medical application*<br>*caution, did I read*<br>*5 that correctly?*<br>*6 A. Correct.*<br>*7 Q. And that's information that*<br>*Boston*<br>*8 Scientific did not provide to you*<br>*in 2007, '8, '9*<br>*9 or 2010 before you implanted*<br>*Ms. Carlson with a*<br>*10 Boston Scientific mesh?*<br>*11 A. Correct.*<br>*12 Q. Are you familiar with the*<br>*term clinical*<br>*13 study with respect to medical* |

| | | |
|---|---|---|
| | | *devices?*<br>*14 A. Yes.*<br>*15 Q. And what, in your own words, is a*<br>*16 clinical study?*<br>*17 A. A clinical study would be the -- the*<br>*18 use of either a device or a product or a chemical*<br>*19 in humans, and then assessing its outcome.*<br>*20 Q. Have you as a physician participated in*<br>*21 any clinical studies?*<br>*22 A. Yes.*<br>*23 Q. And how important is clinical testing*<br>*24 to you as a practicing physician when utilizing a*<br>*25 new product on the market?*<br>*168*<br>*1 A. I think it's -- it's very helpful.* |
| **mk070214, (Pages 61:14 to 61:17)**<br>61<br>14 Q. Are you aware of any of your patients<br>15 on whom you've implanted the Uphold product that<br>16 have complained or presented with mesh exposure?<br>17 A. Not that I recall. | 61:14-17<br>FRE 401;403<br>Misleading:<br>implies no<br>patients had<br>problems and<br>witness<br>cannot make<br>that<br>representation<br>without 100%<br>follow up of<br>all patients. | |
| **mk070214, (Pages 61:23 to 66:5)**<br>61<br>23 Q. Is one of the risks of pelvic organ<br>24 prolapse repair using the vaginal mesh that it will<br>25 not result in a complete resolution of the woman's<br>62<br>1 prolapse?<br>2 A. With any surgery, there's a possibility<br>3 of incomplete support or recurrence.<br>4 Q. Okay. Why is that?<br>5 A. It's just the nature of the process<br>6 itself. There's many factors underlying tissue,<br>7 patient body habitus.<br>8 Q. One of the risks associated with<br>9 vaginal mesh for treatment of pelvic organ prolapse<br>10 is pain; is that correct?<br>11 A. As with any surgical procedure.<br>12 Q. Why is that? | | |

| | | |
|---|---|---|
| 13 A. Pain is in the eye of the beholder. So | | |
| 14 it's a subjective response for which there are no | | |
| 15 definitive tests that identify the exact location, | | |
| 16 pinpoint triggers for pain. | | |
| 17 Q. Getting back to the risk of exposure | | |
| 18 for a second. Are you aware of any factors that | | |
| 19 increase the risk of exposure in a patient? | | |
| 20 A. So from vaginal surgery, the risks are | | |
| 21 placing the mesh over the incision area, performing | | |
| 22 a hysterectomy at the same time, smoking, excessive | | |
| 23 bleeding at the time are wound-healing issues. | | |
| 24 Q. And is one of the risks associated with | | |
| 25 vaginal mesh surgery for the treatment of pelvic | | |
|          63 | | |
| 1 organ prolapse urinary incontinence? | | |
| 2 A. For people who have Stage III or IV | | |
| 3 prolapse or called stress incontinence can occur. | | |
| 4 Q. And do you know why that is? | | |
| 5 A. Typically, if there's a significant | | |
| 6 prolapse, the prolapse itself is supporting the | | |
| 7 urethra. So once you reduce the prolapse, the | | |
| 8 urethra becomes unsupported and then you have | | |
| 9 occult stress incontinence. | | |
| 10 Q. Back in July of 2010, which was the | 63:10-64:7 | |
| 11 month that you performed the Uphold surgery on | FRE 401; 403 | |
| 12 Ms. Carlson, did you have a practice as to your | Irrelevant | |
| 13 informed consent procedure with a patient | | |
| 14 undergoing that type of surgery? | | |
| 15 A. Correct. | | |
| 16 Q. And what was your procedure at that | | |
| 17 time? | | |
| 18 A. So the process -- and informed consent | | |
| 19 is a process, so it's more than one encounter. So | | |
| 20 it's going through the understanding of what is the | | |
| 21 underlying problem at hand; identifying the | | |
| 22 condition; explaining the different options | | |
| 23 available; trying to provide reasonable expectation | | |
| 24 of outcomes; and then reviewing the associated | | |
| 25 risks alongside the treatment. | | |
|          64 | | |
| 1 Q. And do you typically tell your surgical | | |
| 2 patients about the likelihood or the chance of | | |
| 3 having a particular complication? | | |
| 6 THE WITNESS: We inform patients of the | | |
| 7 potential complications that can arise. | | |
| 8 BY MR. SULLIVAN: | | |
| 9 Q. Back in July of 2010, was it your | | |
| 10 practice to give patients a likelihood of success | | |
| 11 or a likelihood of the occurrence of any particular | | |
| 12 risk? | | |
| 13 A. In regards to success, we typically try | | |
| 14 to give them success of either good, fair or poor. | | |
| 15 Q. Okay. What about with respect to the | | |

| | | |
|---|---|---|
| 16  likelihood of an occurrence of any complication, a<br>17  particular complication?<br>18  A. I don't use percentages.<br>19  Q. And why is that?<br>20  A. Percentages change with each and every<br>21  surgery you do as far as the denominator. So if<br>22  you're going to track your own personal percentages<br>23  or you're going to use national percentages or<br>24  other percentages, it's not really -- you have to<br>25  choose what is the best area.<br><div align="center">65</div>1  So I think it's -- it's best in your<br>2  hands with also understanding that things that are<br>3  in your hands, other things may occur. So that's<br>4  why you still have to give not just your<br>5  experience, but what in general is out there, what<br>6  may potentially happen.<br>7  Q. Okay. So back in July of 2010, was it<br>8  your practice to give patients your personal<br>9  experience in terms of outcomes for the Uphold<br>10  procedure?<br>11  A. It's a combination of personal<br>12  experience, in addition to national experience<br>13  that's been out there.<br>14  Q. And how do you know the national<br>15  experience at that time?<br>16  A. The national experience is what has<br>17  been written in the instructions for use, but it's<br>18  been written in the medical literature, discussion<br>19  with colleagues regarding these type of procedures.<br>20  Q. And it was your practice to share all<br>21  that with patients back in July 2010 prior to<br>22  performing the surgery?<br>23  A. Yes, and even prior to that because we<br>24  consented her twice.<br>25  Q. Okay. And we'll get to those forms in<br><div align="center">66</div>1  a minute, Doctor.<br>2  Doctor, is there any treatment for<br>3  pelvic organ prolapse that is a guaranteed hundred<br>4  percent cure?<br>5  A. No. | 64:15-66:1<br>FRE 401, 403<br>Irrelevant | |
| **mk070214, (Pages 67:4 to 73:23)**<br><div align="center">67</div>4  Q. So, Doctor, I'm handing you a multipage<br>5  document that we've marked as Exhibit Number 16 for<br>6  your deposition.<br>7  Do you recognize that, Doctor, as the<br>8  directions for use for the Uphold product?<br>9  A. Yes.<br>10  Q. And this is the -- a document that you<br>11  said you were familiar with, correct?<br>12  A. Correct.<br>13  Q. And you reviewed this -- these<br>14  directions for use prior to performing the surgery | | |

15  on Ms. Carlson back in July of 2010, correct?
16  A. Correct.
17  Q. And you're aware the -- this -- these
18  directions for use accompany the Uphold product?
19  A. The company is Boston Scientific.
20  Q. They accompany -- they come with the
21  product?
22  A. Yes.
23  Q. Okay. And did you review the
24  directions for use from out of the product
25  packaging or on line or how did you obtain them to

                    68

1  review them?
2  A. I obtained it prior to my even
3  considering utilizing the Uphold product in any
4  patient.
5  Q. And how did you obtain them?
6  A. By obtaining training at a Boston
7  Scientific educational cadaveric lab.
8  Q. Okay. And when did you attend that
9  lab?
10  A. Prior to -- I don't know exactly.
11  Probably in 2009.
12  Q. Okay. How many of those trainings have
13  you attended that have been put on by Boston
14  Scientific?
15  A. I don't know the exact number, but more
16  than four and less than ten.
17  Q. All right. And were you a trainee in
18  all those four to ten?
19  A. No.
20  Q. Okay. How many did you attend as a
21  trainee where you were a student, if you will, at
22  those trainings?
23  A. I don't recall exactly; but, obviously,
24  the first ones that I went to was a trainee and
25  student.

                    69

1  Q. Okay. And then did you -- were you on
2  the faculty or did you teach some of those
3  trainings as well?
4  A. Correct.
5  Q. Do you know how many you've taught?
6  A. I believe in 2011, there were two of
7  them.
8  Q. Did you teach any in any other years?
9  A. I -- I don't know. My records, I don't
10  have.
11  Q. Could you describe the trainings that
12  you attended as a trainee?
13  A. As a trainee, it was a multi-day
14  session that involved several didactic lectures;
15  involved several presentations; reviewing then

| | | |
|---|---|---|
| 16  underlying anatomy; reviewing the different<br>17  compartments with the different treatments; getting<br>18  hands-on knowledge, in addition to ability to use<br>19  the products to become familiar with the device,<br>20  with the technique; and then applying that skill on<br>21  cadavers under professionals who had utilized the<br>22  therapy and the device and could offer their<br>23  suggestions, tips, tricks as far as to how to<br>24  improve outcomes for patients.<br>25  Q. Okay. Did you find those trainings<br><div align="center">70</div>1  valuable?<br>2  A. Absolutely.<br>3  Q. The -- do you know who taught at the<br>4  seminars that you attended as a trainee?<br>5  A. The -- I don't recall. There are<br>6  multiple physicians because, remember, pelvic organ<br>7  prolapse and urinary incontinence are several<br>8  conditions. So there are some conditions that are<br>9  treated for stress urinary incontinence, of which<br>10  there are a variety of techniques, variety of<br>11  methods; there's techniques that are used for<br>12  anterior compartment, apical compartment and<br>13  posterior compartment. And so they had a variety<br>14  of surgeons who were skillful at those different<br>15  areas.<br>16  Q. Do you know which Boston Scientific<br>17  products you received that training on?<br>18  A. For the multiple -- like the daily<br>19  sessions, the products at that time were Pinnacle,<br>20  Uphold, the slings, which included Advantage Fit,<br>21  the Solyx, and I believe at the time they also had<br>22  Durasphere.<br>23  Q. So getting back to the directions for<br>24  use that we've marked as Exhibit Number -- what is<br>25  it, Doctor, 16?<br><div align="center">71</div>1  A. Correct.<br>2  Q. Doctor, do you have an understanding<br>3  that the FDA reviews and clears the language in<br>4  directions for use?<br>5  A. Correct.<br>6  Q. And you understand and have testified<br>7  the directions for use provide information about<br>8  how to use the Uphold device, correct?<br>9  A. Yes.<br>10  Q. And they provide information on the<br>11  risks associated with the use of the product?<br>12  A. Correct.<br>13  Q. If you'll turn to the third page of the<br>14  directions for use, Doctor. Up in the first column<br>15  on the left, do you see where it begins, training<br>16  on the use of the Uphold vaginal support system?<br>17  A. Yes. | 71:1-5<br>FRE 403<br>Irrelevant as<br>FDA info has<br>been ruled<br>inadmissible | <br><br><br>*Counter Designation to 71:13 -*<br>*73:23*<br>*mk070214, (Pages 170:7 to*<br>*171:17)*<br><div align="center">*170*</div>*7  Q. We talked a little bit about*<br>*your* |

18 Q. And it says, training on the use of the
19 Uphold vaginal support system is recommended and
20 available. Contact your company's sales
21 representative to arrange for this training.
22 Physicians should have experience in the management
23 of complications resulting from procedures using
24 surgical mesh.
25 Did I read that correctly?

72

1 A. Yes.
2 Q. And that training that's referred to in
3 that paragraph, that's the training you were just
4 describing that you attended?
5 A. Correct.
6 Q. And did you attend that training on the
7 Uphold product prior to your surgery on Ms. Carlson
8 in July of 2010?
9 A. Yes.
10 Q. Where was the training that you
11 attended, if you remember, on the Uphold product?
12 A. I don't recall.
13 Q. Okay. All right. The next paragraph,
14 Doctor, says, the safety and effectiveness of the
15 Uphold vaginal support system compared to
16 conventional surgical repair for pelvic organ
17 prolapse have not been demonstrated in randomized
18 controlled clinical trials. In the United States,
19 substantial equivalence of the Uphold vaginal
20 support system to synthetic mesh has been
21 demonstrated through benchtop testing.
22 Did I read that correctly?
23 A. Correct.
24 Q. And having reviewed directions for use
25 prior to your surgery on Ms. Carlson, you were

73

1 aware of that paragraph?
2 A. Yes.
3 Q. In addition to the training you
4 received from Boston Scientific, did you receive
5 other training in implanting of vaginal mesh for
6 the treatment of pelvic organ prolapse?
7 A. Yes.
8 Q. Can you describe what that training or
9 where you received that training?
10 A. I received the training on a variety of
11 different products over the years. So in regards
12 to Ethicon, I received training regarding their
13 Prolift procedure. Received training on the TVT
14 Secur. Received training on the TVT-ABBREVO.
15 In regards to American Medical Systems,
16 I've received training on all of their products
17 also. In regards to Bard, I received training on
18 all of their products also. In regards to
19 Coloplast, I've received training on all their

8 interaction with Boston
Scientific's sales
9 representatives. Did any sales
representatives
10 talk to you about removal of the
mesh if there's a
11 problem?
12 A. I don't specifically recall.
13 Q. Did any Boston Scientific
sales
14 representatives tell you before
or discuss with you
15 before Martha Carlson was
implanted in 2010 the
16 fact that the mesh may be
impossible to remove once
17 implanted?
18 A. I don't recall them stating
impossible.
19 Q. Did they -- any Boston
Scientific sales
20 representatives tell you before
you implanted
21 Martha Carlson that the
removal process is tedious,
22 it includes cutting the mesh
scaffold from healthy
23 tissue without causing damage?
24 MR. SULLIVAN: Objection.
25 THE WITNESS: I don't recall.

171

1 BY MR. FABRY:
2 Q. However, in -- when was your
article on
3 use of lasers to remove mesh
written?
4 A. This was accepted February
23rd, 2012.
5 Q. And by 2012, you had figured
out that
6 the removal of mesh is a tedious
process that
7 includes cutting the mesh scaffold
from healthy
8 tissue without causing damage?
9 A. Correct.
10 Q. And did any of the Boston
Scientific
11 sales representatives that you
talked with before
12 you implanted Martha Carlson
in 2010 ever tell you
13 that pain can persist even after
the mesh is
14 removed?
15 A. I don't recall.

| | | |
|---|---|---|
| 20  products. | | *16  Q. Is that something you're*<br>*aware of now?* |
| 21  Q. And when you say all of their products, | | *17  A. Yes.* |
| 22  you're referring to vaginal mesh products? | | |
| 23  A. Correct. | | |

**mk070214, (Pages 76:19 to 80:24)**

| | | |
|---|---|---|
| 76 | | |
| 19  Q. And on Page 4, the second bullet point | | |
| 20  on the upper left column says, like all foreign | | |
| 21  bodies, a mesh may potentiate an existing infection | | |
| 22  reaction or sepsis. | | |
| 23  Do you see that? | | |
| 24  A. Yes. | | |
| 25  Q. Then the next one is tissue responses | | |
| 77 | | |
| 1  to the implant could include local irritation of | | |
| 2  the wound site, vaginal erosion or exposure through | | |
| 3  the urethra or other surrounding tissue, migration | | |
| 4  of the device from desired location, fistula | | |
| 5  formation, foreign body reaction and inflammation. | | |
| 6  The occurrence of these responses may require | | |
| 7  removal or revision of the mesh. | | |
| 8  Do you see that? | | |
| 9  A. Yes. | | |
| 10  Q. Were you aware of that, Doctor, back in | | |
| 11  July 2010 when you performed the surgery on | | |
| 12  Ms. Carlson? | | |
| 13  A. Yes. | | |
| 14  Q. And the next bullet point, Doctor, | | |
| 15  says, mild to moderate incontinence may occur due | | |
| 16  to complete support. Were you aware of that as | | |
| 17  well? | | |
| 18  A. I'm aware that occult stress | | |
| 19  incontinence may occur. | | |
| 20  Q. And you were aware of that at the time | | |
| 21  you performed the surgery? | | |
| 22  A. Yes. | | |
| 23  Q. And skipping down one bullet, it says, | | |
| 24  known risks of surgical procedures for the | | |
| 25  treatment of prolapse include pain, infection, | | |
| 78 | | |
| 1  erosion/exposure, device migration, complete | | |
| 2  failure of the procedure resulting in recurrent or | | |
| 3  de novo prolapse and/or incontinence. | | |
| 4  Do you see that? | | |
| 5  A. That's the right-hand column listing | | |
| 6  the adverse events? | | |
| 7  Q. I'm looking at the left-hand column. | | |
| 8  It's the sixth bullet point down there. | | |
| 9  A. Oh, yes. | | |
| 10  Q. Do you see that? | | |
| 11  A. Yes. | | |
| 12  Q. Okay. Were you aware of those risks, | 78:12-78:17 | |
| 13  Doctor, back when you were counseling Ms. Carlson | FRE 401, 403 | |
| 14  on the Uphold procedure? | Irrelevant, | |

| | |
|---|---|
| 15  A. Those are known risks for any surgical<br>16  procedure for prolapse, except the erosion<br>17  exposure.<br>18  Q. Okay. And you were aware of those back<br>19  at that time, July 2010?<br>20  A. Yes.<br>21  Q. Okay. Then going down a little<br>22  further, Doctor, under the heading Precautions. It<br>23  says, surgical treatment of female pelvic organ<br>24  prolapse should be performed by clinicians with<br>25  adequate training and experience.<br><div align="center">79</div>1  Do you see that?<br>2  A. Yes.<br>3  Q. And, Doctor, back in July 2010, did you<br>4  consider yourself to have the requisite training<br>5  and experience to perform the Uphold procedure?<br>6  A. Yes.<br>7  Q. Then turning to the adverse events,<br>8  Doctor, which is the right-hand column on that<br>9  page, it says, potential adverse reactions that may<br>10  be associated with surgically implanted materials<br>11  include, and there's a list of bullet points there<br>12  with -- with those risks indicated, correct?<br>13  A. Yes.<br>14  Q. All right. And I don't have to hit<br>15  them all, but the first one involves foreign body<br>16  reaction; do you see that?<br>17  A. Yes.<br>18  Q. And if you go a little further down,<br>19  there's dyspareunia?<br>20  A. Yes.<br>21  Q. What's dyspareunia, Doctor?<br>22  A. Discomfort during sexual intercourse.<br>23  Q. And the next one is erosion/extrusion?<br>24  A. Yes.<br>25  Q. And a little further down is<br><div align="center">80</div>1  inflammation (acute or chronic)?<br>2  A. Yes.<br>3  Q. And then mesh and/or tissue<br>4  contracture?<br>5  A. Yes.<br>6  Q. A little further down, pain,<br>7  discomfort, irritation; do you see that?<br>8  A. Yes.<br>9  Q. And a little further down, recurrent<br>10  prolapse; do you see that?<br>11  A. Yes.<br>12  Q. That means the prolapse returns at some<br>13  point?<br>14  A. Yes.<br>15  Q. A little further down, urinary<br>16  incontinence? | non-<br>responsive |

| | | |
|---|---|---|
| 17 A. Yes.<br>18 Q. A little further down, vessel/nerve<br>19 injury/perforation; do you see that?<br>20 A. Yes.<br>21 Q. And those are all risks that you were<br>22 aware of back in July 2010 before you performed the<br>23 surgery on Ms. Carlson, correct?<br>24 A. Yes. | | |
| **mk070214, (Pages 81:19 to 82:20)**<br><div align="center">81</div><br> 19 Q. Doctor, how many other -- if you know,<br>20 how many other physicians have you trained on the<br>21 placement of mesh for the treatment of pelvic organ<br>22 prolapse?<br>23 A. I don't know exactly, but probably more<br>24 than 250.<br>25 Q. And were those all at Boston Scientific<br><div align="center">82</div><br>1 Corporation trainings?<br>2 A. No.<br>3 Q. Where -- where -- where did you provide<br>4 those trainings to other physicians?<br>5 A. For Bard Urologic, American Medical<br>6 Systems, Coloplast, Ethicon, J&J and Boston<br>7 Scientific.<br>8 Q. And do you enjoy teaching those<br>9 seminars?<br>10 A. Correct.<br>11 Q. And why is that?<br>12 A. I think the value of sort of going into<br>13 medicine is constantly learning. And once you<br>14 become proficient at things, it's also the joy is<br>15 to train others to try to get the best out of their<br>16 abilities. In addition, it's trying to train<br>17 people so they can help other patients down the<br>18 line and avoid some of the pitfalls that have, you<br>19 know, happened prior to them learning new<br>20 techniques. | 81:19-82:7<br>FRE 401; 403<br>Irrelevant | *mk070214, (Pages 82:21 to 82:23)*<br><div align="center">*82*</div><br>*21 Q. Prior to your surgery on Ms. Carlson,*<br>*22 do you know how many other physicians you trained?*<br>*23 A. I don't know.* |
| **mk070214, (Pages 82:24 to 85:6)**<br><div align="center">82</div><br>24 Q. Okay. Doctor, on Page 3, sorry, of the<br>25 directions for use, there's -- I skipped over the<br><div align="center">83</div><br>1 paragraph that's headed Intended Use/Indications<br>2 for Use; do you see that?<br>3 A. Yes.<br>4 Q. Was your use of the Uphold with respect<br>5 to Ms. Carlson consistent with that intended use?<br>6 A. Yes.<br>7 Q. And, Doctor, did you in considering<br>8 whether to perform the Uphold surgery on<br>9 Ms. Carlson or considering all the available<br>10 treatment options for her, did you weigh the risks<br>11 set forth in the directions for use against the | 84:24-85:6<br>FRE 401; 403<br>Relevance | |

| | | |
|---|---|---|
| 12 potential benefits to her?<br>13 A. Knowing the information, instructions<br>14 for use, knowing the patient's history and the<br>15 associated prolapse and what we were trying to<br>16 accomplish, the risks and benefits were weighed in<br>17 decision to use the Uphold device.<br>18 Q. And that was a decision you and<br>19 Ms. Carlson arrived at together?<br>20 A. As stated before, the challenge is that<br>21 what you notice at the time of surgery may be<br>22 different than what is seen in your preop area.<br>23 In Ms. Carlson's case, she also had a<br>24 gynecologist physician who we were working in<br>25 conjunction, and the issues discussed at that time<br>84<br>1 were how are we going to treat her apical<br>2 component, mainly her uterus. There was some<br>3 discussion whether or not she was planning to have<br>4 a hysterectomy. There was some discussion how much<br>5 uterine prolapse there was.<br>6 And so, consequently, the decision was<br>7 at the time of surgery to decide whether or not she<br>8 would absolutely need to have any type of<br>9 hysterectomy, uterine suspension. Consequently,<br>10 deciding what's happening to the uterus dictates<br>11 the actual treatment that we're using, and given<br>12 the intraoperative findings, given the patient's<br>13 discussions prior to it, given her desire to<br>14 maintain her uterus, that's when the Uphold was<br>15 chosen at that time.<br>16 Q. Okay. And you mentioned the<br>17 plaintiff's -- I'm sorry -- Ms. Carlson's<br>18 gynecologist. Do you recall that doctor's name?<br>19 A. Dr. Stein.<br>20 Q. If we could finish up for the<br>21 directions for use, Doctor. Do you see on Page 4<br>22 there's discussion of the operational instructions?<br>23 A. Yes.<br>24 Q. And do you have any criticism of the<br>25 operational instructions, Doctor, on the DFU?<br>85<br>1 A. I haven't gone through them in detail.<br>2 Do you want me to?<br>3 Q. No. Do you recall -- having reviewed<br>4 them in the past, do you recall having any<br>5 objections or criticisms of them?<br>6 A. No. | 84:24-85:16<br>FRE 401, 403<br>Irrelevant;<br>Foundation,<br>no present<br>recollection<br>as basis to<br>offer opinion | |
| **mk070214, (Pages 85:14 to 86:23)**<br>85<br>14 Q. Doctor, I'm handing you a three-page<br>15 document that we've marked as Exhibit Number 17.<br>16 Are you familiar with that document, Doctor?<br>17 A. I have seen this before, yes.<br>18 Q. Okay. And if you'll tell us what that<br>19 is. | 85:14-86:23<br>FRE 403<br>Irrelevant<br>because FDA<br>info has been<br>ruled | |

| | | |
|---|---|---|
| 20  A. This is a notification from the FDA,<br>21  Food and Drug Administration, regarding a Public<br>22  Health Notification regarding serious complications<br>23  associated with transvaginal placement of surgical<br>24  mesh in the repair of pelvic organ prolapse and<br>25  stress urinary incontinence.<br><div align="center">86</div>1  Q. Okay. Is this a document that you<br>2  reviewed at or near the time it first was published<br>3  by the FDA?<br>4  A. I don't recall.<br>5  Q. Do you see that under that bold print<br>6  heading it has the issued date as October 20th,<br>7  2008?<br>8  A. Correct.<br>9  Q. And that was about a year and a half or<br>10  so prior to your surgery on Ms. Carlson?<br>11  A. Correct.<br>12  Q. Do you know whether you saw this<br>13  document before that surgery?<br>14  A. I don't recall.<br>15  Q. You said you're familiar with the<br>16  document. You have reviewed it at some point?<br>17  A. Yes.<br>18  Q. And did the FDA notification that we<br>19  are discussing, did that provide any new<br>20  information to you in terms of the risks associated<br>21  with pelvic organ prolapse mesh surgery?<br>22  A. It did not provide any new associated<br>23  risks. | inadmissible | |
| **mk070214, (Pages 87:20 to 89:24)**<br><div align="center">87</div>20  Q. Let's look at Exhibit 17, which is the<br>21  2008 notification, Doctor.<br>22  The second paragraph under Nature of<br>23  the Problem, do you see it says, the most frequent<br>24  complications include erosion through vaginal<br>25  epithelium, infection, pain, urinary problems and<br><div align="center">88</div>1  recurrence of prolapse and/or incontinence. There<br>2  were also reports of bowel, bladder and blood<br>3  vessel perforation during insertion. In some<br>4  cases, vaginal scarring and mesh erosion led to a<br>5  significant decrease in patient quality of life due<br>6  to discomfort and pain, including dyspareunia.<br>7  Did I read that correctly?<br>8  A. Yes.<br>9  Q. All right. And are those complications<br>10  that you were aware of back in July 2010 before you<br>11  performed Ms. Carlson's surgery?<br>12  A. Yes.<br>13  Q. Under the recommendations provided here<br>14  at the bottom of the page, it says, physicians | 87:20-89:24<br>FRE 403<br>Irrelevant as<br>FDA info has<br>been ruled<br>inadmissible | |

15  should obtain specialized training for each mesh
16  placement technique and be aware of its risks; do
17  you see that?
18  A. Yes.
19  Q. And that's something you did, correct?
20  A. Correct.
21  Q. You did that before operating on
22  Ms. Carlson, correct?
23  A. Correct.
24  Q. The next one is, be vigilant for
25  potential adverse events from the mesh, especially
                    89
1  erosion and infection; is that correct?
2  A. Yes.
3  Q. And is that -- were you vigilant for
4  such adverse events?
5  A. Yes.
6  Q. And is that one of the reasons you see
7  patients postoperatively?
8  A. Correct.
9  Q. And did you see Ms. Carlson
10  postoperatively?
11  A. I did.
12  Q. And were you vigilant during those
13  postoperative visits for those conditions -- those
14  adverse events?
15  A. As with all events, yes.
16  Q. The fourth bullet point says, Doctor,
17  inform patients that implantation of surgical mesh
18  is permanent, that some complications associated
19  with the implanted mesh may require additional
20  surgery that may or may not correct complication.
21  Back in July 2010, Doctor, were you
22  aware that implantation of the mesh was intended to
23  be permanent?
24  A. Yes.

**mk070214, (Pages 93:3 to 100:10)**
                    93
3  Q. Doctor, I'd like to turn to your care
4  and treatment of Ms. Carlson, and I see you have
5  your records in front of you, and that's fine. You
6  can refer to those if you need to.
7  My first question is: When did you
8  first have contact with Ms. Carlson?
9  A. The first contact that I recall was my
10  initial visit with her, which I -- according to my
11  records, was on 4/26/10.
12  Q. Now, Doctor, do you recall or do you
13  have any record of performing urodynamics testing
14  on Ms. Carlson prior to that date?
15  A. Yeah. So I did interpret urodynamic
16  testing done on her on 3/2/2009.
17  Q. Okay. So let's start with that, if you
18  could. Do you have that record?

19  A. Yes.
20  Q. Okay. First of all, how was Ms. -- how
21  did Ms. Carlson come to you? Was she referred?
22  A. Well, I'm a medical director for the
23  Charlotte Incontinence Center, which is diagnostic
24  testing facilities throughout the Charlotte area,
25  and consequently, part of the services, we allow

94

1  physicians in the community to be able to refer
2  patients into the diagnostic testing area that then
3  have the option of either getting the tests sent
4  back to them so they can interpret or they can
5  interp -- send it it one of their partners, or if
6  they would like me to interpret it, I will do the
7  interpretation, provide them a documentation and a
8  interpretation.
9  Q. Okay. In this case, do you know who
10  referred Ms. Carlson to you?
11  A. Dr. Stein.
12  Q. Okay. And that's the same Dr. Stein we
13  spoke of earlier?
14  A. Correct.
15  Q. So she was Ms. Carlson's gynecologist?
16  A. Yes.
17  Q. All right. And do you know why
18  Dr. Stein was referring Ms. Carlson to you for
19  urodynamic testing or test interpretation?
20  A. She had a prolapsed bladder.
21  Q. What's -- what's the purpose of
22  urodynamic testing then presentation?
23  A. The testing is to evaluate the lower
24  urinary tract regarding filling sensation, looking
25  for any detrusor activity, evaluating for occult

95

1  stress incontinence and then assessing their
2  voiding ability.
3  Q. And why is that something that's
4  indicated in a patient with pelvic organ prolapse?
5  A. If they're planning on surgical repair
6  and they're concerned that there may be occult
7  stress incontinence, then you have to discuss the
8  possibility of treating stress incontinence at the
9  same time or informing the patient that they may
10  have significant stress incontinence after surgery.
11  Q. And what were the results of
12  Ms. Carlson's urodynamic testing?
13  A. So at that time, she had a normal
14  bladder capacity of 520 CCs; intact bladder
15  sensation; normal bladder compliance; there was no
16  overt urodynamic detrusor activity; urge
17  incontinence was not documented; stress
18  incontinence was not documented, even with the
19  prolapse reduced; there's no vesicoureteral reflux
20  or bladder diverticulum; she had a Grade III

21 cystocele; she had normal to low normal detrusor
22 voiding pressure with some abdominal strain effect
23 and normal uroflow pattern with complete bladder
24 emptying.
25 Q. Okay. So what did that tell you? Was
                    96
1 there anything abnormal in those results?
2 A. She did have a Grade III cystocele,
3 which would be abnormal.
4 Q. What about the detrusor voiding
5 pressure, was that an abnormal finding, Number 9?
6 A. No, that's within normal to the low
7 normal range.
8 Q. Okay. And so did you make any
9 recommendations as a result of this test?
10 A. Yes.
11 Q. What were those recommendations?
12 A. So my addendum was this patient does
13 indeed have pelvic organ prolapse and Grade III
14 cystocele. The patient did not appear to have any
15 signs of stress incontinence with her prolapse
16 reduced. Correlation with clinical exam would be
17 appropriate. If the patient is planning to undergo
18 surgical therapy, does not appear as though
19 stabilization of bladder neck is needed at this
20 point in time. If you have any questions of the
21 study or treatments, please don't hesitate to
22 contact me.
23 Q. And just briefly, what's stress urinary
24 incontinence?
25 A. So stress urinary incontinence is
                    97
1 during exertional activity, increased abdominal
2 pressure causes the urethra to expel urine.
3 Q. So it's urinary incontinence with
4 things like coughing or sneezing or --
5 A. Correct.
6 Q. -- moving from sitting to standing,
7 things like that?
8 A. Correct.
9 Q. And so you didn't find any signs of
10 that, correct?
11 A. Correct.
12 Q. And so that wasn't something that would
13 need to be repaired at the same time as the pelvic
14 organ prolapse repair?
15 A. Based on the urodynamics.
16 Q. Okay. All right. And just to make
17 sure we have it, the date of your -- your -- did
18 you do the testing or you reviewed the test data?
19 A. I reviewed the test data.
20 Q. Okay. When did you do that?
21 A. I dictated the test on March 2nd, 2009.
22 Q. Okay. All right. And when was the

23 next time you had any involvement in Ms. Carlson's
24 care?
25 A. The next time seeing her was on

1 4/26/10.
2 Q. So about a year later?
3 A. Correct.
4 Q. Okay. And you have that report of that
5 office visit in front of you, Doctor?
6 A. Yes.
7 Q. All right. And just looking at that
8 report, the first thing it says is, initial
9 consultation, new patient, history and physical,
10 correct?
11 A. Yes.
12 Q. The reason for consult is pelvic organ
13 prolapse, correct?
14 A. Yes.
15 Q. And the requesting physician is
16 identified as Dr. Stein, correct?
17 A. Yes.
18 Q. What was the history that was --
19 Ms. Carlson provided to you at that visit?
20 A. At that point in time, she stated she
21 had a history of worsening systematic pelvic
22 prolapse with symptoms beginning in 2008 on a
23 bothersome scale, ranged from one to ten; her
24 symptoms rated six out of ten. She mainly
25 complained of heaviness, fullness, tissue

1 protrusion from the vaginal area. She found the
2 pessary use to be very uncomfortable. She had been
3 evaluated by Dr. Stein and felt she needed vaginal
4 reconstruction to include hysterectomy, anterior
5 prolapse repair, plus/minus sling. And she was
6 interested in proceeding with pelvic prolapse
7 repair.
8 Q. Okay. Did -- did you --
9 A. She had other symptoms also.
10 Q. Okay. Symptoms that she reported to
11 you as part of her history?
12 A. Correct.
13 Q. Okay. What were those symptoms?
14 A. She was voiding every two to three
15 hours, getting up one time at night. She had
16 occasional urge -- urgency. She complained of
17 needing to void when rising from a seated position.
18 She denied any obstructive voiding symptoms. She
19 denied stress or urgent incontinence. She does
20 leak a small amount with change of position,
21 transitional movements. She did not wear any pad
22 protection. She did not have any urine leakage

23  with her pessary in place. She was complaining of
24  vaginal pressure heaviness, tissue protrusion from
25  the vaginal area, low back pain. She did use
                    100
1  digital manipulation with splinting to help her
2  with voiding and bowel movements. She does not
3  have any blood in her urine, dysuria, bladder
4  infections, pyelonephritis, kidney stones. She
5  does have some problems with constipation, painful
6  bowel movements, and a feeling of incomplete
7  evacuation. She was not using any laxatives or
8  fecal incontinence. She was menopausal. She was
9  not currently sexually active and denied any
10  symptoms of female sexual dysfunction.

**mk070214, (Pages 100:22 to 102:7)**
                    100
22  Q. Okay. So the first thing you note in
23  your report about her history is that she has had
24  worsening symptomatic pelvic organ prolapse and her
25  symptoms had begun in 2008, correct?
                    101
1  A. Yes.
2  Q. And then you refer to a bothersome
3  scale. What is a bothersome scale?
4  A. So, it's a very subjective patient
5  response that they rate themselves how bothered
6  they are based on their symptoms. One being --
7  zero being no bother, ten being the worst bother.
8  Q. Okay. And she rated that six out of
9  ten?
10  A. Correct.
11  Q. And the symptoms that she complained
12  of, which of those symptoms do you attribute to the
13  pelvic organ prolapse?
14  A. After the exam, I would state the
15  heaviness, the fullness, the tissue protruding from
16  the vaginal area, those were definitively from the
17  pelvic prolapse.
18  Q. All right. And you make note that she
19  found the pessary to be very uncomfortable,
20  correct?
21  A. Yes.
22  Q. So that reflects that she had tried a
23  pessary to deal with the pelvic organ prolapse
24  before coming to you?
25  A. Yes.
                    102
1  Q. That's your understanding of her
2  history?
3  A. Yes.
4  Q. Okay. So when she presented to you,
5  she was already wanting to have pelvic organ
6  prolapse repair?
7  A. Yes.

**mk070214, (Pages 102:19 to 119:25)**

102

19  Q. Did you speak with Dr. Stein after
20  seeing Ms. Carlson this first visit?
21  A. Yes.
22  Q. Okay. And why did you -- why did you
23  get in touch with Dr. Stein at that time?
24  A. Well, the patient thought that she
25  needed a hysterectomy. Based on my evaluation and

103

1  examination, I questioned whether a hysterectomy
2  would be needed or not. So, consequently, we
3  wanted her to meet with Dr. Stein again and discuss
4  the actual needs for hysterectomy or not.
5  Q. Getting back to some of the symptoms
6  she presented with, you made mention of occasional
7  urinary urgency. Can you explain what urinary
8  urgency is?
9  A. Urgency is the sensation to have to go
10  to the rest room, whether bowel or bladder, that is
11  more of an uncomfortable sensation.
12  Q. Okay. Feeling an urgent need to
13  urinate?
14  A. Correct.
15  Q. All right. And you said she typically
16  voids every two to three hours and nocturia once a
17  night, and that means she gets up from sleep to go
18  to the bathroom?
19  A. Yes.
20  Q. All right. Is -- is that voiding every
21  two or three hours, is that a frequent frequency of
22  urination?
23  A. It's very individualized, but in a
24  24-hour day that's voiding typically, you know,
25  upwards 10 to 12 times a day, which would be more

104

1  than normal.
2  Q. Okay. And you noted she had some low
3  back pain. And you mentioned digital manipulation
4  splinting. What is that?
5  A. Typically, when someone is trying to
6  either empty their bowels or their bladder, if they
7  have significant prolapse with things protruding,
8  they feel as though they can't empty. So they will
9  use their fingers to push on the prolapse to push
10  it back inside the vaginal area or push on their
11  peroneum to try to improve bladder emptying or
12  bowel emptying.
13  Q. Okay. Okay. After taking
14  Ms. Carlson's history, you examined her?
15  A. Yes.
16  Q. And what did you find in your
17  examination on April 26th, 2010?
18  A. Specifically regarding sort of the GU
19  exam, she had mild atrophic genitalia without any

20　ulcerations; her genital hiatus was 3 centimeters,
21　her perineal body was 3 centimeters; her urethral
22　meatus was in normal position without any caruncles
23　or abscesses; the urethra was palpated and showed
24　no significant periurethral scarring, diverticulum
25　or tenderness; her urethrovesical junction was

<center>105</center>

1　supported; the bladder was palpated showing
2　prolapse; the anterior vaginal wall showed a Grade
3　III cystocele with rugations at the bladder neck;
4　loss of apical rugations; she has a central apical
5　and paravaginal defect.
6　Posteriorly, the vaginal wall showed a
7　Grade II apical rectovaginal defect. With Valsalva
8　straining, with the prolapse reduced, no stress
9　incontinence was documented. In the standing
10　position, with Valsalva straining, the cervix
11　appeared to be supported; no significant uterine
12　descensus. The Adnexa showed bimanual exam did not
13　reveal any masses in the left or right paravaginal
14　areas. Her cervix and uterus were intact without
15　descensus. The anus and perineum were without
16　excoriation or lesion.
17　Q. Okay. So you found she had a Grade III
18　cystocele, correct?
19　A. Correct.
20　Q. And earlier I think you testified that
21　the grading runs from, is it from I to IV?
22　A. Correct.
23　Q. Okay. So this was a more significant
24　prolapse?
25　A. Correct. Outside the vaginal opening.

<center>106</center>

1　Q. Okay. So the bladder was actually
2　coming out the vaginal opening?
3　A. Correct.
4　Q. And you also noted a Grade II apical
5　rectovaginal defect, correct?
6　A. Correct.
7　Q. And the -- is that a rectocele?
8　A. It's a high rectocele.
9　Q. Okay. And is Grade II a significant
10　prolapse?
11　A. It's not outside the vaginal opening.
12　Q. Okay. Is it -- I'm sorry. Rectoceles
13　graded I through IV as well?
14　A. Correct.
15　Q. Okay. Okay. And your diagnosis at
16　that time is listed next to impression, correct?
17　A. Yes.
18　Q. And you noted, symptomatic pelvic organ
19　prolapse, Grade III cystocele with apical and
20　paravaginal defect. You noted Grade II rectocele
21　mildly bothersome for the patient.
22　How was the rectocele bothersome?

23  A. Getting back to whether or not she was
24  using splinting, if she was having difficulty with
25  her bowel movements.

1  Q. All right. And then Number 4 you have,
2  overactive bladder symptoms. What's overactive
3  bladder?
4  A. So overactive bladder is a lower
5  urinary tract symptoms of urgency, frequency,
6  nocturia and/or urgent incontinence.
7  Q. Okay. And then Number 5 says, long
8  discussion with patient today regarding the anatomy
9  and physiology of the bladder function and the
10  various treatment options for pelvic prolapse,
11  overactive bladder and urinary incontinence. She
12  was informed she will likely need interior prolapse
13  repair with graft, plus or minus sling, depending
14  on urodynamic testing.
15  Let me stop there for a second. Did
16  you order updated urodynamic testing or were you
17  sort of unaware at this point that it had been done
18  a year prior?
19  A. I think in my -- let's see. I thought
20  I recalled that she said she has had urodynamic
21  testing. So as of the initial visit consultation,
22  I did not have any documentation of her testing.
23  Q. Okay. But you interpreted her
24  urodynamic testing about a year before?
25  A. Correct.

1  Q. Okay. But you didn't have that handy
2  is basically what the problem was?
3  A. Correct.
4  Q. And when you say, plus or minus sling,
5  that refers to, for treatment of possible stress
6  urinary incontinence, depending on the results of
7  that testing?
8  A. Correct, whether or not she has occult
9  stress incontinence with the prolapsed reduced.
10  Q. Okay. And when you refer to graft in
11  that section, you're referring to synthetic or
12  biological graft?
13  A. All of the above.
14  Q. All of the above. Okay.
15  Do you recall -- do you have an
16  independent memory of this discussion with
17  Ms. Carlson?
18  A. I do not.
19  Q. Do you know why you would have
20  discussed overactive bladder with Ms. Carlson at
21  that time?
22  A. Because oftentimes overactive bladder
23  occurs without any type of pelvic prolapse;
24  consequently, if you repair pelvic prolapse, the

25  overactive bladder symptoms may still persist. And
109
1  so trying to get proper expectations prior to
2  surgery improves the postoperative outcomes.
3  Q. Okay. All right. And I left out that
4  this says you talked about overactive bladder and
5  urinary incontinence. Was that sort of all in the
6  same setting?
7  A. Correct. With urinary incontinence,
8  you can have urgent incontinence, in addition to
9  stress incontinence.
10  Q. In her case, she was having urgent
11  incontinence or at least urgency?
12  A. She was having urgency.
13  Q. Although I think you said --
14  A. I think she had occasional leakage when
15  she went from sitting to standing.
16  Q. Okay. So as part of your discussion
17  with Ms. Carlson at this initial visit, one of the
18  things you wanted to do was manage her expectations
19  in terms of the overactive bladder symptoms and
20  urinary urgency, frequency, nocturia?
21  A. Correct.
22  Q. All right. Further down in that same
23  impression Number 5, you said, her symptoms are
24  mainly overactive bladder. She will likely need
25  regular plication, posterior -- and I can never say
110
1  that word -- colporrhaphy?
2  A. Colporrhaphy.
3  Q. Colporrhaphy. What is colporrhaphy?
4  A. It's a native tissue repair of the
5  posterior compartment.
6  Q. When you say she would likely need
7  regular plication, what does that mean?
8  A. Native tissue repair plication of the
9  posterior compartment, she will not need a graft.
10  Q. Okay. That was to deal with the
11  rectocele?
12  A. Correct.
13  Q. All right. When you say her symptoms
14  are mainly overactive bladder, why did you say
15  that?
16  A. She was complaining of urgency,
17  frequency, nocturia.
18  Q. Okay. And continuing on it says, the
19  indications, alternatives, risks and benefits of
20  vaginal reconstruction were reviewed in detail.
21  She verbalized her understanding and wishes to
22  proceed with surgery, all questions were answered.
23  Did I read that correctly?
24  A. Correct.
25  Q. All right. Do you recall whether
111

| | | |
|---|---|---|
| 1 Ms. Carlson had specific questions? | | |
| 2 A. I don't recall. | | |
| 3 Q. Okay. Under plan, Number 2 says, | | |
| 4 schedule patient for anterior prolapse repair with | | |
| 5 graft, posterior colporrhaphy, coordinate surgery | | |
| 6 with Dr. Stein. Check with Dr. Stein to see if | | |
| 7 patient needs hysterectomy. | | |
| 8 When you say anterior prolapse repair | | |
| 9 with graft, are you referring to the cystocele | | |
| 10 repair? | | |
| 11 A. Correct. | | |
| 12 Q. Okay. When you use the word graft in | | |
| 13 that context, are you referring to synthetic graft? | | |
| 14 A. It's synthetic or biologic. | | |
| 15 Q. Okay. All right. So that's -- when do | | |
| 16 you make the determination of what course in -- in | | |
| 17 the care of a patient like this do you decide what | | |
| 18 type of graft to use? | | |
| 19 A. The main issue determines on what -- at | | |
| 20 the time of surgery what else is prolapsing. If | | |
| 21 you're trying to get apical support, which is for | | |
| 22 her case, then using an Uphold strap support system | | |
| 23 that's really elevating the apex and cervix is the | | |
| 24 key. If she did not have uterine descensus, then | | |
| 25 the options -- I wouldn't have used the Uphold | | |

<div align="center">112</div>

| | | |
|---|---|---|
| 1 device. It was just truly a cystocele with | | |
| 2 paravaginal defect. | | |
| 3 Q. Okay. So that was the right product | 112:3-10 | |
| 4 for her -- | FRE 611 | |
| | Leading | |
| 6 BY MR. SULLIVAN: | | |
| 7 Q. -- specific circumstances? | | |
| | | |
| | | |
| 9 THE WITNESS: Based on her -- based on | | |
| 10 her presentation, yes. | | |
| 11 BY MR SULLIVAN: | | |
| 12 Q. All right. Number 3, you said, | 112:12- | |
| 13 brochures/information given to patient regarding | 113:15 | |
| 14 pelvic prolapse; do you see that? | FRE 401, 403 | |
| 15 A. Yes. | Irrelevant | |
| 16 Q. Do you recall what brochures or | | |
| 17 information you provided to her? | | |
| 18 A. We -- typically, we give the Krames | | |
| 19 pelvic organ prolapse booklet of contemporary that | | |
| 20 was at 2010. There are updated versions today. | | |
| 21 Often we give information on pelvic prolapse | | |
| 22 specific to materials that we use. | | |
| 23 Q. When you say specific to materials you | | |
| 24 use, what do you mean by that? | | |
| 25 A. There are -- telling patients that | | |

<div align="center">113</div>

1 there are native tissue repairs, there are biologic

2  repairs, there are synthetic repairs.
3  We also have a handout that talks about
4  the different types of surgical repairs, including
5  anterior colporrhaphy, posterior colporrhaphy,
6  sacral colpopexy, uterosacral vault suspension.
7  Q. Based on this entry in the record, it
8  says, brochures/information given to patient
9  regarding pelvic prolapse.
10  Do you know whether you provided
11  brochures that discussed those procedures or just
12  that --
13  A. The Krames brochure would be the
14  definitive one that was given. As far as those two
15  other documents, I do not recall.
16  Q. All right. Number 4 in your plan, it
17  says, dietary modification, pelvic physiotherapy;
18  do you see that?
19  A. Yes.
20  Q. And can you tell me what -- what the
21  plan was there, what you meant by that?
22  A. So overactive bladder, one of the two
23  behavioral treatments are dietary modification,
24  avoiding coffee -- coffee, teas, colas, citrus
25  products, acidity foods, nutritional things that
                    114
1  can irritate the urgency, frequency, nocturia.
2  In regards to pelvic physiotherapy,
3  urge suppression techniques, trying to improve the
4  pelvic floor just in general will help overactive
5  bladder and stress incontinence and has marginally
6  support for pelvic prolapse, however, not for
7  Stage III.
8  Q. Okay. And Number 5, you said, patient
9  was informed that overactive bladder symptoms will
10  likely persist following pelvic reconstructive
11  surgery, correct?
12  A. Yes.
13  Q. All right. It says, operative consent
14  was obtained today emphasizing the enumerated
15  risks, correct?
16  A. Yes.
17  Q. And when you -- when you note that, are
18  you referring to a written informed consent form?
19  A. Yes.
20  Q. Okay. And we have as Exhibit Number 3
21  a document -- two-page document, looks like, with
22  McKay Urology on the first page and says, Informed
23  Consent for Repair of Pelvic Organ Prolapse; do you
24  see that? Do you have that, Exhibit 3? Am I
25  holding it?
                    115
1  A. Yeah, you're holding it. Yes, that's
2  okay.

114:13-118:3
FRE 401, 403
Irrelevant

3  Q. I don't have that.
4  A. I have one. You can have it. I have a
5  copy.
6  Q. I'll look at the copy. I'll let you
7  look at the exhibit. How's that? Can I look at
8  your copy? Thank you.
9  What is this document?
10  A. This is our informed consent for repair
11  of pelvic organ prolapse.
12  Q. All right. Is this a document that you
13  discussed with Ms. Carlson?
14  A. Yes.
15  Q. How do you go through this document
16  with her?
17  A. So the process of going through it is
18  to either, you know, have the patient first read
19  through the document and then we go through and
20  circle specifically based on the compartment that
21  is prolapsing, talking about her underlying
22  diagnosis, talking about the indications of what
23  we're trying to do in surgery, discussing the
24  possible risks, making sure that she's either, you
25  know, had the information -- she's had the
                          116
1  opportunity to read it, making sure it's either
2  been read to her, if she's had any questions to ask
3  us about it, and then asking her to sign it if she
4  would like to proceed with surgical therapy.
5  Q. Okay. And she signed that document on
6  the second page?
7  A. Yes, she did.
8  Q. And who's the witness signature?
9  A. My physician assistant, Amber Herr.
10  Q. Okay. You sign on the bottom line as
11  well?
12  A. Correct.
13  Q. All right. And on the front page of
14  the form it says, the risks of this procedure
15  include but are not -- include but not limited to
16  are, and then it has a bunch of bullet points,
17  right?
18  A. Correct.
19  Q. All right. Did you -- is it your
20  practice back in July of 2010 to actually read all
21  those to the patient or was it your practice to
22  have the patient read that to themselves or --
23  A. I don't recall in 2010.
24  Q. What's your practice today?
25  A. The practice today, all patients get
                          117
1  this. They have an opportunity to review it.
2  If -- as we review it, I will either read the

3  document to them. My physician assistant may read
4  the document to them. When I come in to counsel
5  them, question if they have any comments, concerns,
6  clarifications, and then ask if they would like to
7  sign the consent form.
8  Q. And one of the risks listed in this
9  form is possibly no improvement or only temporary
10  improvement in urine control, correct?
11  A. Correct.
12  Q. One of the other risks listed here is
13  possible pain or discomfortable with sexual
14  intercourse?
15  A. Yes.
16  Q. Is that correct?
17  And then the last one says, if implant
18  is used, local irritations of wound and/or foreign
19  body response could occur. This response could
20  result in extrusion, erosion, fistula formulation
21  or inflammation, correct?
22  A. Yes.
23  Q. And then further on down, it has the
24  practical alternatives to this procedure include,
25  and the first one is observation, do nothing and
                        118
1  accept the consequences of patient's condition,
2  correct?
3  A. Yes.
4  Q. Is it fair to say that her prognosis,
5  if she didn't have the surgical repair, would be --
6  well, strike that.
7  What would her prognosis have been
8  without undergoing procedure?
9  A. She would continue with her current
10  symptoms that she currently has at a bothersome
11  scale, six out of ten.
12  Q. Okay. And those symptoms could
13  potentially worsen as well?
14  A. They could.
15  Q. The second alternative listed there is
16  use of artificial supports (pessaries), correct?
17  A. Correct.
18  Q. And she had tried those, correct?
19  A. Yes.
20  Q. And she found them very uncomfortable,
21  according to your record?
22  A. Correct.
23  Q. And then lastly was Kegel exercise,
24  correct?
25  A. Correct.
                        119
1  Q. And I think you testified earlier --
2  are those effective treatments for Grade III
3  prolapse?
4  A. For Grade III prolapse, it's marginally

| | | |
|---|---|---|
| 5 effective.<br>6 Q. And when was the next time you saw this<br>7 patient, Doctor?<br>8 A. The next time was on July 8th, 2010.<br>9 Q. All right. Okay. And according to<br>10 that record -- do you have that in front of you,<br>11 Doctor?<br>12 A. Yes.<br>13 Q. Okay. Under the heading subjective, is<br>14 that a heading -- strike that.<br>15 What information do you put under the<br>16 subjective heading?<br>17 A. The reasons for her visit.<br>18 Q. Okay. It says, Ms. Carlson returns<br>19 today for follow-up and further discussion<br>20 regard -- regarding surgical therapy?<br>21 A. Yes.<br>22 Q. And says, she is interested in<br>23 proceeding with reconstructive surgery to resolve<br>24 her pelvic organ prolapse. She has met with<br>25 Dr. Stein. She would like to retain her uterus, if | | |
| **mk070214, (Pages 120:11 to 121:4)**<br>          120<br>11 Did you see Ms. Carlson yourself this<br>12 visit?<br>13 A. Yes.<br>14 Q. All right. And do you have any<br>15 independent recollection of what you discussed with<br>16 her or things she said to you or that you said to<br>17 her?<br>18 A. Only things that are documented in the<br>19 note.<br>20 Q. Okay. All right. And there's<br>21 reference in this record to the urodynamic testing<br>22 from March 2nd, 2009?<br>23 A. Correct.<br>24 Q. Correct?<br>25 And the significance of those findings<br>          121<br>1 were what?<br>2 A. She had a Grade III cystocele. She did<br>3 not have any stress incontinence with the prolapse<br>4 reduced. | | |
| **mk070214, (Pages 121:22 to 122:19)**<br>          121<br>22 A. I don't recall those conversations.<br>23 Q. Okay. All right. Turning to the next<br>24 page of the document under the objective section.<br>25 A. Okay<br>          122<br>1 Q. It says, more than half of today's<br>2 30-minute visit was spent in discussion with<br>3 patient. The indications, alternatives, risks and | 121:23-<br>122:19<br>FRE 401, 403<br>Irrelevant | |

| | | |
|---|---|---|
| 4 benefits of pelvic reconstructive surgery were<br>5 reviewed in detail. She verbalized her<br>6 understanding and wishes to proceed with surgery.<br>7 In parentheses, you have anterior<br>8 repair, posterior repair, plus or minus graft, end<br>9 parentheses. It says, we discussed the various<br>10 graft materials. She's aware that her overactive<br>11 bladder symptoms will likely persist after prolapse<br>12 surgery.<br>13 Did I read all that correctly?<br>14 A. Correct.<br>15 Q. All right. It says you discussed the<br>16 various graft materials. What materials would you<br>17 have discussed with her at this visit?<br>18 A. We discussed biological grafts and<br>19 synthetic materials. | | |
| **mk070214, (Pages 123:5 to 157:157:5)**<br>               123<br>5 Q. Yeah. Was there any decision made<br>6 about what graft materials to use with respect to<br>7 Ms. Carlson at this visit?<br><br>10 THE WITNESS: Typically, if someone is<br>11 maintaining their uterus and they have any type of<br>12 uterine descensus, then a synthetic-based Uphold<br>13 device material is what I would use.<br>14 BY MR. SULLIVAN:<br>15 Q. It says, she is aware that her<br>16 overactive bladder symptoms will likely persist<br>17 after the surgery.<br>18 So that was something you particularly<br>19 emphasized to her, was it not?<br>20 A. Yes.<br>21 Q. All right. And then down -- the<br>22 impression section contains your diagnoses,<br>23 correct?<br>24 A. Yes.<br>25 Q. And had any of those diagnoses changed?<br>               124<br>1 A. The only thing I said was mild uterine<br>2 descensus.<br>3 Q. Then under plan, again, you noted that<br>4 an operative consent was obtained today emphasizing<br>5 the enumerated risks?<br>6 A. Yes.<br>7 Q. And that consent form is the second<br>8 consent form contained in Exhibit 3?<br>9 A. Yes.<br>10 Q. All right. That was signed by<br>11 Ms. Carlson as well as yourself on --<br>12 A. Yes.<br>13 Q. -- July 8th, 2010?<br>14 A. Yes. | 124:3-124:25<br>FRE 401, 403<br>Irrelevant | |

15 Q. Do you know why you had her do a second
16 informed consent form?
17 A. I believe the reason she decided not to
18 have surgery at first, there was either some
19 psychosocial family issue going on, so she deferred
20 surgery. So when someone decides to come back in
21 to reproceed with surgery, it's as if they're
22 starting all back over again to clarify again what
23 we're doing, why we're doing it, what the
24 associated risks, to make sure that they do
25 understand.

125

1 Q. All right. And was the next time you
2 saw Ms. Carlson at her surgery?
3 A. Yes.
4 Q. And is your operative note for the
5 surgery contained in Exhibit 2 --
6 A. Yes.
7 Q. -- of your record?
8 Okay. And is that record the one with
9 the heading has the Carolinas Medical Center in
10 bold print?
11 A. Yes.
12 Q. It says, operative/procedure
13 documentation?
14 A. Yes.
15 Q. Okay. Was this a report you drafted?
16 A. Yes.
17 Q. And you do that by dictating it?
18 A. Correct.
19 Q. Okay. Were there any complications
20 during the course of the procedure?
21 A. No.
22 Q. It says -- according to the operative
23 report, it has Dr. Stein listed as an assistant; do
24 you see that?
25 A. Correct.

126

1 Q. What was Dr. Stein's role in the
2 surgery?
3 A. Usually for pelvic organ prolapse
4 surgery, an assistant is often needed for
5 retraction; in addition, this is predominantly
6 Dr. Stein's patient who she's been following for
7 many years, who knows the patient the best. There
8 was possibility that hysterectomy may have been
9 needed. That predominant decision would have been
10 Dr. Stein's, whether there was some other type of
11 uterine pathology. So having her there was
12 integral to the operation.
13 Q. So prior to this point, Doctor, prior
14 to the time of this surgery, Ms. Carlson was at a
15 Grade III cystocele, correct?
16 A. Correct.

126:13-
127:17
FRE 403

| | | |
|---|---|---|
| 17 Q. Her symptoms had -- her pelvic organ<br>18 prolapse had been symptomatic since about 2008,<br>19 correct?<br>20 A. Correct.<br>21 Q. And those symptoms had been worsening?<br>22 A. Yes.<br>23 Q. Kegel exercises at that point were not<br>24 a good option for her?<br>25 A. Correct.<br>          127<br>1 Q. And she tried a pessary?<br>2 A. Yes.<br>3 Q. And that had not been satisfactory to<br>4 Ms. Carlson, correct?<br>5 A. Correct.<br>6 Q. And so at that point, did you recommend<br>7 the surgery to Ms. Carlson?<br>8 A. I believe at her initial visit,<br>9 Dr. Stein had already discussed with her about<br>10 having surgical repair, and Dr. Stein wanted her to<br>11 see me to more than likely assist in the surgery or<br>12 help out regarding different prolapse.<br>13 Q. Okay. So you understood that Dr. Stein<br>14 had already discussed the surgery with --<br>15 A. Correct.<br>16 Q. -- Ms. Carlson before you even saw her?<br>17 A. Correct.<br>18 Q. When you were discussing the various<br>19 graft materials with Ms. Carlson back in your<br>20 July 8th visit before the surgery, did you show her<br>21 samples of what the material looked like?<br>22 A. Typically, I do. That's my normal<br>23 practice to show them biological materials, in<br>24 addition to synthetic materials.<br>25 Q. Okay. That was your practice back in<br>          128<br>1 July of 2010 as well?<br>2 A. Correct.<br>3 Q. And did you have a sort of a standard<br>4 speech that you would give to patients about the<br>5 mesh materials?<br>6 A. Right.<br>7 Q. What was that?<br>8 A. Typically, in discussing with someone<br>9 regarding prolapse, we talked to them about the<br>10 native tissue repairs, which is using their own<br>11 natural tissues. In utilizing that type of repair,<br>12 the results have shown over time in the anterior<br>13 compartment 40 percent of people will have some<br>14 recurrence in their lifetime.<br>15 Other options to try to minimize that<br>16 are using other materials, including biological<br>17 materials. Whether that's your own body's tissue,<br>18 which may be very challenging due to the | Needlessly<br>presenting<br>cumulative<br>evidence<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>127:18-129:7<br>FRE 401, 403<br>Irrelevant | |

| | | |
|---|---|---|
| 19 harvesting, consequently, you can use human tissue.<br>20 You can also use materials from animals with the<br>21 goal of it being an interpositional graft to allow<br>22 that material to resupport that area, trying to<br>23 decrease the recurrence rate from 40 percent to be<br>24 less.<br>25 Other alternatives are utilizing<br><div align="center">129</div>1 synthetic-based materials. Synthetic-based<br>2 materials are inert, meaning that they're permanent<br>3 in nature. They allow the body to integrate within<br>4 the structure around the material.<br>5 Q. Was native tissue repair an option for<br>6 Ms. Carlson's cystocele repair?<br>7 A. Yes, it was discussed with her.<br>8 Q. Okay. And why was that course not<br>9 chosen?<br>10 A. Well, it was chosen. We did perform an<br>11 anterior colporrhaphy.<br>12 Q. Okay. Using native tissue?<br>13 A. Correct.<br>14 Q. All right. So you also did the Uphold<br>15 procedure?<br>16 A. Correct.<br>17 Q. So why did you choose to use Uphold?<br>18 A. Because in her situation at the time of<br>19 surgery, she had uterine descensus, so the apex was<br>20 coming down. She had a desire to maintain her<br>21 uterus, and trying to decrease the risk of<br>22 recurrence for cystocele, you need to have a very<br>23 good strong support of the apex. So by using the<br>24 Uphold strap support going to bilateral<br>25 sacrospinous ligaments that secures to the cervix<br><div align="center">130</div>1 provides excellent apical support.<br>2 In addition, by elevating the cervix,<br>3 it took care of the rectocele because the rectocele<br>4 was an apical rectovaginal defect. So trying to<br>5 provide long-term stability and decrease recurrence<br>6 from her apex in the posterior and anterior, that<br>7 was the best option for her.<br>8 Q. Doctor, do you feel comfortable prior<br>9 to this surgery that -- that Ms. Carlson understood<br>10 the potential risks?<br>11 A. I believe to the best of our ability,<br>12 going through the consent process, which includes<br>13 from the -- each time we saw her and reviewing the<br>14 documents, she had opportunity, you know, to ask<br>15 questions, so yes.<br>16 Q. All right. And were you confident at<br>17 the time of the surgery that Ms. Carlson understood<br>18 the potential benefits of the procedure?<br>19 A. I would hope. We did discuss the risks<br>20 and the benefits. | 130:8-131:6<br>FRE 401, 403<br>Irrelevant | |

| | | |
|---|---|---|
| 21  Q. Okay. Would you ever perform surgery<br>22  on a patient if you didn't feel that patient<br>23  adequately understood the risks and benefits of the<br>24  procedure?<br>25  A. As long as patients verbalize it and<br><div align="center">131</div>1  are cognitively intact and they're desiring to<br>2  undergo things under their own accord and have<br>3  given consent, yes.<br>4  Q. Okay. That's what Ms. Carlson did,<br>5  right?<br>6  A. Correct.<br>7  Q. Did the procedure you performed on<br>8  Ms. Carlson take place under general anesthesia?<br>9  A. Yes.<br>10  Q. Okay. How long was the procedure?<br>11  A. I don't recall.<br>12  Q. Does your operative note reflect that?<br>13  A. No.<br>14  Q. And did you have any problems placing<br>15  the Uphold mesh in Ms. Carlson?<br>16  A. No.<br>17  Q. Was this particular surgery more<br>18  difficult or complex than other pelvic organ<br>19  prolapse surgical procedures that you performed?<br>20  A. No.<br>21  Q. Do you know when Ms. Carlson left the<br>22  hospital after this procedure?<br>23  A. The day after.<br>24  Q. Upon placing the Uphold mesh and during<br>25  the course of the surgery, were you able to<br><div align="center">132</div>1  visually determine whether the surgery was<br>2  successful?<br>3  MR. FABRY: Objection, form.<br>4  THE WITNESS: As for -- yes. You can<br>5  tell based on the anterior colporrhaphy, based on<br>6  the elevation of the cervix and uterus, she had<br>7  very good support apically, anteriorly and<br>8  posteriorly.<br>9  BY MR. SULLIVAN:<br>10  Q. All right. In other words, her pelvic<br>11  organ prolapse was reduced and supported?<br>12  MR. FABRY: Objection, form, leading.<br>13  THE WITNESS: Correct.<br>14  BY MR. SULLIVAN:<br>15  Q. Yes?<br>16  A. Yes.<br>17  Q. Were you pleased with the result at the<br>18  conclusion of the surgery?<br>19  A. I was satisfied with the result.<br>20  Q. All right. And then you saw | 131:24-132:8<br>FRE 401; 403<br>use of<br>"successful"<br>is misleading | |

| | |
|---|---|
| 21 Ms. Carlson postoperatively, correct? | |
| 22 A. Yes. | |
| 23 Q. When was the first time you saw | |
| 24 Ms. Carlson postoperatively? | |
| 25 A. She was seen on 7/27/10. At that | 132:10-16 |
|           133 | FRE 611 |
| 1 visit, she was seen by my physician assistant. | Leading |
| 2 Q. Okay. Was that Ms. Herr? | |
| 3 A. Correct. | |
| 4 Q. Did you see Ms. Carlson that day as | |
| 5 well or no? | |
| 6 A. I don't recall. | |
| 7 Q. All right. And under the subjective | |
| 8 section of the report, it notes that Ms. Carlson is | |
| 9 returning for follow-up after pelvic reconstructive | |
| 10 surgery. She has done quite well, but had some | |
| 11 pain at the right side of her introitus. | |
| 12 Initially, her pain was eight out of ten. Now it | |
| 13 is three out of ten. She has been using Estrace | |
| 14 vaginal cream with benefit. She's not had any | |
| 15 vaginal bleeding, fevers or calf pain. | |
| 16 Do you see that? | |
| 17 A. Yes. | |
| 18 Q. And then on examination -- well, strike | |
| 19 that. | |
| 20 Pain at the right side of the | |
| 21 introitus, is that a common or uncommon finding | |
| 22 after surgery? | |
| 23 A. The -- at the time of surgery, we | |
| 24 utilize a retractor system where it has hooks, and | |
| 25 part of those hooks are sharp that are used to be | |
|           134 | |
| 1 placed inside the vaginal introitus to provide | |
| 2 retraction and exposure. So those hooks can create | |
| 3 a -- a mark. They can penetrate the skin, sort of | |
| 4 a small irritation. | |
| 5 Q. Okay. | |
| 6 A. So -- | |
| 7 Q. Is that what you attributed her | |
| 8 introitus pain to? | |
| 9 A. Yes, based on Amber's definition where | |
| 10 she had a small divot in the vaginal tissue at 7:00 | |
| 11 just inside the introitus, no sign of infection, | |
| 12 there's no bleeding, but it is tender. | |
| 13 Q. Would the location of that, what she | |
| 14 calls a small divot, be consistent with the | |
| 15 retractors? | |
| 16 A. Yes. | |
| 17 Q. Okay. Is there -- it notes she's been | |
| 18 using Estrace vaginal cream. Is that something | |
| 19 that you had prescribed? | |
| 20 A. Typically we encourage patients to use | |

21 Estrace vaginal cream, you know, prior to surgical
22 intervention in preparation for surgery and then
23 also after surgery.
24 Q. And why is that?
25 A. We're trying to decrease the risk of
                    135
1 exposure, if we're using synthetic material, trying
2 to improve the health of the vaginal tissue.
3 Q. Does it help the vaginal tissue to
4 heal?
5 A. There are good healing properties of
6 it, yes.
7 Q. Were there any concerning signs or
8 symptoms at this initial postoperative visit?
9 A. No.
10 Q. So at this point, did you have -- was
11 it your belief that she was doing well?
12 A. Amber Herr felt she was doing well.
13 Q. Do you have any reason based on the
14 record to disagree with that?
15 A. No.
16 Q. Okay. And when did you next see or
17 when did Ms. Carlson next visit your office?
18 A. The next visit was on August 12th,
19 2010.
20 Q. All right. It was about a month after
21 the surgery?
22 A. It's probably three weeks.
23 Q. Okay. So under the subjective heading,
24 it says, Ms. Carlson returns for follow-up four
25 weeks status post vaginal paravaginal repair; do
                    136
1 you see that?
2 A. Yes.
3 Q. All right. Notes doing well; do you
4 see that?
5 A. Yes.
6 Q. She feels she's greatly improved. She
7 is dry all the time and wears no pads. She voids
8 every one to two hours; nocturia, zero to one time,
9 and on a bothersome scale of zero to ten,
10 frequency, nocturia and urgency are zero out of
11 ten; incontinence is two out of ten.
12 So she has some incontinence with
13 vigorous activity/sneezing. It says, she is
14 satisfied and would recommend the therapy to a
15 friend. Did I read all that correctly?
16 A. Correct.
17 Q. All right. Those frequency, nocturia
18 and urgency symptoms, why were you monitoring
19 those?
20 A. Prior to the plan -- part of my

21  practice is after interventions, I have patients
22  fill out a questionnaire, and this questionnaire is
23  her answers on that. They typically fill it out
24  prior to us seeing them for that day so they can
25  fill it out in their own -- they can do it

137

1  unbiased.
2  Q. Then it notes she has some increased
3  right vulvar irritation and has been applying
4  estrogen cream to the area as well as Lidocaine.
5  What is right vulva irritation?
6  A. So the vulvar area is where the labia
7  majora and minora or, in other words, the opening
8  to the vaginal area.
9  Q. She had some irritation there?
10  A. Correct.
11  Q. And did you have an understanding at
12  that time as to what the cause of that irritation
13  was?
14  A. Based on review of prior notes, it was
15  apparent that it was likely due to the Lone Star
16  retractor hooks.
17  Q. And you examined Ms. Carlson at this
18  visit?
19  A. Yes.
20  Q. And you noted that she had atrophic
21  external genitalia?
22  A. Yes.
23  Q. What does atrophic mean?
24  A. Typically, signs of loss of estrogen,
25  so that the tissue becomes friable, a little bit

138

1  more easily bruisable or irritated. The vaginal
2  area can be sometimes narrowed.
3  Q. Okay. So is that a significant finding
4  in terms of her complaints of this irritation?
5  A. Based on my notation, I think she was
6  complaining mainly sort of not on the external
7  genitalia, but more just on the inside of the
8  vulvar area.
9  Q. It says, she has some slight attachment
10  of the labia minora and majora. What do you mean
11  by that?
12  A. That's signs of atrophy where both of
13  those two structures fuse together from loss of
14  estrogen.
15  Q. Are those -- is that a significant
16  finding in terms of potential for future
17  complications?
18  A. Only for patients if they're having
19  issues regarding dyspareunia or pain, sexual
20  function, if they have urogenital atrophy.
21  Q. Okay. And then it says, no obvious

22  sign of ulceration, no irritation of the area. Is
23  that referring back to the labia minora and majora?
24  A. Correct.
25  Q. It says, pal -- palpation of the vulva

            139

1  shows no trigger point tenderness.
2  A. Correct.
3  Q. She complains of some mild irritation
4  of the labia minora, labia majora, superficial on
5  the right side. Did you have a -- did you come to
6  any conclusion as to what the cause of that
7  irritation was?
8  A. My impression that it could be possibly
9  related to the cleansing that was done at the time
10  of surgery with her preparation. It could be also
11  possibly the retractors or she could possibly have
12  a condition that's called vulvodynia.
13  Q. What's vulvodynia?
14  A. Vulvodynia is a -- is a pain condition
15  of the vulvar tissues.
16  Q. What causes that condition?
17  A. They don't know at this point in time.
18  Q. Okay. So that was sort of all listed
19  in impression Number 2 as your --
20  A. Correct.
21  Q. -- essentially your differential
22  diagnosis on -- on that particular complaint?
23  A. Correct.
24  Q. All right. And you note she has no
25  cystocele, no rectocele. She has excellent apical

            140

1  support, correct?
2  A. Yes.
3  Q. And that's -- is that indicative of the
4  procedure being successful?
5  A. Yes.
6  Q. Okay. Your impression Number 1 is, she
7  is doing well four weeks status post vaginal
8  reconstructive surgery with resolution of prolapse,
9  meaning -- resolution prolapse meaning she doesn't
10  have prolapse anymore, correct?
11  A. Correct.
12  Q. And you talked about Number 2 and
13  Number 3 says, no voiding dysfunction. So her
14  urinary or overactive bladder symptoms that she had
15  prior to the surgery weren't presenting at this
16  time, correct?
17  A. Well, it's, in essence, no voiding
18  dysfunction, I'm meaning that she's able to empty
19  her bladder adequately. Her post residual was
20  zero.
21  Q. So at this point in time, did you feel
22  she was doing well?

23  A. Yes.
24  Q. Were there any complications at this
25  point?
                    141
1  A. She was just complaining of right-sided
2  vaginal irritation.
3  Q. Okay. Which was, in your mind,
4  attributable probably to the retractors?
5  A. Yes.
6  Q. Okay.
7  A. Or possibly maybe she could have
8  developed, you know, new onset vulvodynia.
9  Q. And when did you next see Ms. Carlson?
10  A. She was next seen in September 14th,
11  2010.
12  Q. Okay. Was she seen by you at that time
13  or your physical -- I'm sorry -- your physician's
14  assistant or both?
15  A. It was likely both.
16  Q. Okay. All right. And at this time
17  under subjective, it says, Ms. Carlson returns for
18  follow-up now two months status post vaginal
19  reconstructive surgery. She developed some
20  right-sided vulvodynia -- vulvodynia, but is now
21  doing well and her labial pain has improved. She's
22  not currently using Estrace scream. She denies
23  vaginal bleeding or pain. And it says, she's had
24  three episodes of urinary urgency and difficulty
25  getting to the bathroom in time, correct?
                    142
1  A. Yes.
2  Q. So the irritation that she -- that had
3  been noted on the prior visit was no longer
4  present?
5  A. That I don't -- I don't know -- recall.
6  Q. It had improved?
7  A. Yes.
8  Q. That was your impression Number 1 on
9  the next page, right?
10  A. Yes.
11  Q. Okay. All right. In your impression,
12  you also note, she is doing well status post
13  reconstruct -- vaginal reconstructive surgery, and
14  Number 3, you note urinary urgency, correct?
15  A. Yes.
16  Q. Did you have any discussion with
17  Ms. Carlson at that time about the urinary urgency
18  symptoms?
19  A. Yes. Dietary modifications and using
20  Prelief antacid supplements.
21  Q. Did you draw any conclusions at that
22  point in time as to why she was having urinary
23  urgency at this time?

| | | |
|---|---|---|
| 24 A. She had had overactive bladder symptoms | | |
| 25 prior to surgery. We counseled her that she may | | |
|           143 | | |
| 1 have it after surgery. It is -- it is apparent two | | |
| 2 months after surgery she still has overactive | | |
| 3 bladder. | | |
| 4 Q. Okay. All right. And under your plan, | | |
| 5 you note that she should have an office follow-up | | |
| 6 in one year or follow-up as needed with any | | |
| 7 problems, correct? | | |
| 8 A. Correct. | | |
| 9 Q. And she was cautioned about lifting | | |
| 10 more than 15 or 20 pounds; otherwise, she may | | |
| 11 return to all normal activities, correct? | | |
| 12 A. Yes. | | |
| 13 Q. Was that your last visit with | | |
| 14 Ms. Carlson. | | |
| 15 A. Yes. | 143:16- | |
| 16 Q. Did you ever speak with her after that | 143:21 | |
| 17 visit? | FRE 401, 403 | |
| 18 A. No. | Irrelevant, | |
| 19 Q. Did she ever call you to complain of | misleading | |
| 20 any new symptoms? | | |
| 21 A. No, not that I know of. | | |
| 22 Q. So at the time of your last visit with | | |
| 23 Ms. Carlson, what was your assessment of how she | | |
| 24 was doing after the surgery? | | |
| 25 A. She was doing well. | | |
|           144 | | |
| 1 Q. Okay. Do you have any knowledge, | 144:1-144:4 | |
| 2 Doctor, as to the injuries Ms. Carlson is claiming | FRE 401, 403 | |
| 3 in this case? | Irrelevant, | |
| 4 A. No. | misleading | |
| 5 Q. And we marked your curriculum vitae as | | |
| 6 Exhibit 5. I don't know if you have a copy of that | | |
| 7 with you. | | |
| 8 A. Okay. | | |
| 9 Q. Or do you? Do you have a copy? | | |
| 10 A. Yes. | | |
| 11 Q. All right. Why don't I give you the | | |
| 12 exhibit. I'll take your copy. Thank you. | | |
| 13 Just -- you mentioned this is up to | | |
| 14 date through, I think you said the beginning of | | |
| 15 2014? | | |
| 16 A. Correct. | | |
| 17 Q. All right. Is there anything | | |
| 18 additional that would be included in order to | | |
| 19 update it to the present? | | |
| 20 A. Several different presentations, maybe | | |
| 21 a couple articles, updated honors and awards, new | | |
| 22 research studies. | | |
| 23 Q. Can you describe for me your practice, | | |
| 24 your patient population? | | |

25  A. So I have three really separate

145

1  practices. In regards to Women's -- the Women's
2  Center for Pelvic Health practice, it's able-bodied
3  females who have pelvic organ prolapse, urinary
4  incontinence, voiding dysfunction. In regard --
5  and that's at the location we're at today.
6  I do also have a male incontinence
7  practice at McKay Urology, and that's for men with
8  urinary incontinence. And then I also have a
9  practice at Carolinas Rehabilitation, which is a
10  neuourology practice, patients who have spinal
11  cord injury, Parkinson, brain injury, stroke that
12  lower urinary tract, urinary incontinence,
13  overactive bladder, voiding dysfunction.
14  Back in 2010, there was no Women's
15  Center For Public Health. So I saw all the male
16  and female patients at McKay.
17  Q. I see. Can you just -- briefly,
18  Doctor, can you just describe for us your
19  educational background, start with college.
20  A. So college at University of Notre Dame.
21  Subsequent to that was at University of Cincinnati
22  Medical School. Then surgical internship followed
23  by urology residency up at University of Michigan.
24  And then fellowship training at University of
25  Texas, Houston, in female urology, voiding

146

1  dysfunction, neuourology and urodynamics.
2  Q. What's fellowship training?
3  A. It's extra training beyond standard
4  urology that tries to dedicate your interest and
5  focus into a particular urologic specialization.
6  So my area was really the lower urinary tract.
7  Q. How long have you been practicing,
8  Doctor?
9  A. I've been in Charlotte here since 1995.
10  Q. And are you board certified in urology?
11  A. Correct, board certified in urology and
12  female pelvic medicine reconstructive surgery.
13  Q. How do you become board certified in
14  those areas?
15  A. For urology, you need to go through an
16  ACGME approved residency program. You need to pass
17  written and then oral board certified tests,
18  maintain your certification and then recertify
19  every ten years.
20  For the female pelvic medicine
21  reconstructive surgery, you have to show a case log
22  that shows you're specializing into women's health
23  within the various surgical procedures, review a
24  complications list, and then also sit for a
25  certifying exam and pass the exam.

147

1  Q. Doctor, did you -- do you recall
2  speaking with any Boston Scientific Corporation

| | | |
|---|---|---|
| 3  sales representatives regarding the Uphold product | | |
| 4  at any time prior to Ms. Carlson's surgery? | | |
| 5  A. I believe that during training, you | | |
| 6  know, the initial training, there were sales | | |
| 7  representatives there. So I'm sure that with my | | |
| 8  initial training, and then subsequent with | | |
| 9  follow-ups, I've had discussions with | | |
| 10  representatives. | | |
| 11  Q. When you say at training, you're | | |
| 12  referring to the training that was put on by Boston | | |
| 13  Scientific Corporation? | | |
| 14  A. Correct. | | |
| 15  Q. And in treating patients, do you rely | | |
| 16  on what sales representatives tell you or do you | | |
| 17  rely on your own expertise and experience? | | |
| | | |
| 19  THE WITNESS: So there's a variety of | | |
| 20  things we utilize; but, clearly, it's my own | | |
| 21  expertise, understanding of the literature, | | |
| 22  understanding of my prior experience, my | | |
| 23  background, surgical training and then information | | |
| 24  gathered from variety of resources, whether that be | | |
| 25  the company, the instructions for use, the | | |
|             148 | | |
| 1  hands-on, colleagues, medical literature, journals. | | |
| 2  BY MR. SULLIVAN: | | |
| 3  Q. And, Doctor, do your interactions with | 148:3-7 | |
| 4  companies' manufacturers' sales representatives | FRE 611 | |
| 5  replace your own independent medical judgment in | Leading | |
| 6  treating a patient? | | |
| 7  A. No. | | |
| 8  MR. SULLIVAN: Objection to form, | | |
| 9  leading. | | |
| 10  BY MR. SULLIVAN: | | |
| 11  Q. Specifically with respect to the Uphold | | |
| 12  product, do you recall having any communication | | |
| 13  with Boston Scientific Corporation sales rep -- | | |
| 14  representatives? | | |
| 15  A. I don't recall specifically. | | |
| 16  Q. Do you recall receiving any written | | |
| 17  information regarding the Uphold product from any | | |
| 18  Boston Scientific Corporation sales | | |
| 19  representatives? | | |
| 20  A. I don't recall other than information | | |
| 21  that would have been shared regarding from the | | |
| 22  company as far as invitation to the initial | | |
| 23  training sessions and then follow-up after that. | | |
| 24  Q. Would that also include information | | |
| 25  that you may have received to teach some of these | | |
|             149 | | |
| 1  trainings? | | |
| 2  A. Correct. | | |
| 3  Q. With respect to your contracts with | | |
| 4  Boston Scientific Corporation, we've marked as | | |

5  Exhibits 9 and 10. What did you understand --
6  strike that.
7  Let me clarify first. You said one of
8  these was unexecuted or unsigned, and that was the
9  June 2014 version --
10  A. Correct.
11  Q. -- marked as Exhibit 11?
12  A. Yes.
13  Q. So do you have a current contract with
14  Boston Scientific Corporation?
15  A. No.
16  Q. And when was the last time you were
17  under contract as a consultant with Boston
18  Scientific Corporation?
19  A. I believe it's 2011.
20  Q. Okay. And what did you understand the
21  scope of your consulting agreement to be?
22  A. The scope of the agreement actually had
23  several areas to be able to train, speak, advise
24  Boston Scientific personnel on technology,
25  developments and procedures in the field; to
                    150
1  consult with and advise Boston Scientific employees
2  on current issues in the field; to train and speak
3  on Boston Scientific's behalf on topics relevant to
4  the field; to consult and advise other medical
5  advisers, consultants and other Boston Scientific
6  designated professionals on current medical issues
7  in the field; and to develop educational materials
8  for Boston Scientific.
9  Q. And you mentioned that you taught at
10  Boston Scientific Corporation trainings for other
11  physicians, correct?
12  A. Correct.
13  Q. What other services did you provide?
14  A. My services were training, proctoring
15  and precepting.
16  Q. And what's proctoring?
17  A. So proctoring -- proctoring and
18  precepting are very similar types of terms. So
19  precepting is where other physicians will come in
20  and sort of come to your practice. You will spend
21  dedicated time going through education, training,
22  the background. They may see how you work up
23  patients, evaluate patients and then they have the
24  opportunity of watching you operate. And then
25  afterwards, you go through and discuss cases with
                    151
1  them.
2  Whereas, proctoring patient --
3  proctoring is where a surgeon who has been trained
4  on the product would like to have an additional
5  observer at the time when they're doing it to maybe
6  guide them in other steps or to provide reassurance
7  or questions and queries to their operative

| | | |
|---|---|---|
| 8 techniques, their setup, their preop and postop | | |
| 9 evaluation of patients. | | |
| 10 Q. And when you performed proctoring or | | |
| 11 preceptorships, were you compensated for your time | | |
| 12 spent doing that? | | |
| 13 A. Yes. | | |
| 14 Q. And when you perform the training for | | |
| 15 other physicians, were you compensated for your | | |
| 16 time in doing that? | | |
| 17 A. Yes. | | |
| 18 Q. Okay. And did any of those payments | | |
| 19 influence -- strike that. | | |
| 20 Did any of those payments influence | | |
| 21 your decision to use Uphold in Ms. Carlson's case? | | |
| 22 A. No. | | |
| 23 Q. Did they influence your decision to use | | |
| 24 Uphold in any other case? | | |
| 25 A. No. | | |
|         152 | | |
| 1 Q. When Ms. Carlson first came to see you, | 152:1-6 | |
| 2 did she have a significant problem with her pelvic | FRE 403 | |
| 3 organ prolapse? | Asked and | |
| | Answered, | |
| 6 THE WITNESS: Yes. | needlessly | |
| 7 BY MR. SULLIVAN: | cumulative | |
| 8 Q. And was her condition adversely | testimony | |
| 9 impacting her daily life at that point? | | |
| 10 A. Yes. | | |
| 11 Q. And, Doctor, did you offer -- did you | 152:11- | |
| 12 discuss with Ms. Carlson any nonsurgical options to | 153:13 | |
| 13 try and improve her condition? | FRE 403 | |
| | Asked and | |
| 16 THE WITNESS: Discussed observation and | Answered, | |
| 17 pelvic physiotherapy. | needlessly | |
| 18 BY MR. SULLIVAN: | cumulative | |
| 19 Q. And were you available to Ms. Carlson | testimony | |
| 20 if she had questions or concerns about any aspect | | |
| 21 of her condition or -- or treatment options? | | |
| | | |
| 24 THE WITNESS: Yes. | | |
| 25 BY MR. SULLIVAN: | | |
|         153 | | |
| 1 Q. Did you give Ms. Carlson as much time | | |
| 2 as she needed to make sure she understood the | | |
| 3 options and the course of treatment? | | |
| 4 A. Yes. | | |
| | | |
| 7 BY MR. SULLIVAN: | | |
| 8 Q. And as part of your care and treatment | | |
| 9 of Ms. Carlson, did you ultimately choose to use | | |
| 10 the Uphold to help treat her pelvic organ prolapse? | | |
| 11 MR. FABRY: Objection, form, asked and | | |
| 12 answered. | | |
| 13 THE WITNESS: Yes. | | |
| 14 BY MR. SULLIVAN: | | |

| | | |
|---|---|---|
| 15  Q. At the time of her surgery, Doctor, did<br>16  you have adequate information on the use of Uphold<br>17  to properly perform the procedure?<br>18  MR. FABRY: Objection, form, and asked<br>19  and answered and foundation.<br>20  THE WITNESS: Yes.<br>21  BY MR. SULLIVAN:<br>22  Q. And at the time of Ms. Carlson's<br>23  surgery, did you have adequate information to<br>24  properly evaluate the risks and the benefits of the<br>25  Uphold for Ms. Carlson?<br>                   154<br><br>2  THE WITNESS: Yes.<br><br>5  BY MR. SULLIVAN:<br>6  Q. Regarding the risks of the procedure<br>7  that you performed on Ms. Carlson at the time of<br>8  that surgery, you were aware or were you aware of<br>9  all the risks included in the Uphold directions for<br>10  use that have been marked as an exhibit earlier?<br><br>13  THE WITNESS: Yes.<br>14  BY MR. SULLIVAN:<br>15  Q. At the time of your surgery on<br>16  July 16th, 2010, you were aware of the risks of<br>17  erosion?<br>18  A. Yes.<br><br>20  BY MR. SULLIVAN:<br>21  Q. Were you aware of the risks of<br>22  recurrence?<br><br>24  THE WITNESS: Yes.<br>25  BY MR. SULLIVAN:<br>                   155<br>1  Q. Were you aware of the risks that her<br>2  urgency symptoms may continue?<br>3  A. Yes.<br><br>6  BY MR. SULLIVAN:<br>7  Q. Were you aware of the risk of urinary<br>8  incontinence?<br>9  A. Yes.<br><br>12  BY MR. SULLIVAN:<br>13  Q. Were you aware of the risk of pain?<br>14  A. Yes.<br><br>17  BY MR. SULLIVAN:<br>18  Q. Did you inform Ms. Carlson of these<br>19  risks prior to the procedure?<br>20  A. Yes. | 153:15-<br>154:14<br>FRE 401,<br>403, 703<br>Irrelevant,<br>needlessly<br>cumulative<br>testimony<br><br>153:15-154:2<br>FRE 703<br>Foundation<br><br>153:14-<br>155:16<br>FRE 403<br>needlessly<br>cumulative<br>testimony<br>FRE 611<br>Leading<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>155:17-<br>155:22<br>FRE 401, 403<br>Irrelevant | |

| | | |
|---|---|---|
| 23  BY MR. SULLIVAN:<br>24  Q. Based on your clinical experience,<br>25  Doctor, and your medical training, do you believe<br>         156<br>1  Ms. Carlson was an appropriate candidate for the<br>2  Uphold?<br>3  A. Yes.<br><br>6  BY MR. SULLIVAN:<br>7  Q. Doctor, has any of your testimony today<br>8  been colored or influenced by your -- any payments<br>9  you received from Boston Scientific for the<br>10  trainings you provided, the proctors --<br>11  proctorships or preceptorships that you performed?<br>12  A. No.<br>13  Q. Do you believe consulting roles such as<br>14  you had with Boston Scientific Corporation provides<br>15  any benefit to your patients?<br><br>17  THE WITNESS: The more informed that a<br>18  physician is in regards to all the details of any<br>19  type of surgical procedure will obviously improve<br>20  the aspect and understanding.<br>21  So I think that as a continual learner,<br>22  to continue to learn and be educated and be able to<br>23  learn from others to gain knowledge of their<br>24  experiences what they've been going through, which<br>25  is part of this networking and sharing of<br>         157<br>1  knowledge, is definitely a value to not only my<br>2  patients, but my future patients, and also the<br>3  other colleagues that are there at the time.<br>4  MR. SULLIVAN: Okay. Thank you,<br>5  Doctor. I have no more questions. | 155:23-156:3<br>FRE 403<br>Needlessly<br>cumulative | |
| **mk070214, (Pages 172:14 to 172:20)**<br>        172<br>14  mentioned earlier. Is there a bio -- rephrase it<br>15  this way. In 2010, was there a biological implant<br>16  option that would serve the same purpose as the<br>17  Uphold?<br>18  MR. SULLIVAN: Objection.<br>19  THE WITNESS: For the Uphold, the<br>20  answer would be no. | | |
| **mk070214, (Pages 176:12 to 176:19)**<br>        176<br>12  Q. And as a physician, do you feel it's<br>13  important for you to know the rate of occurrence<br>14  for the risks associated with Boston Scientific's<br>15  products?<br>16  A. I think within the space of all pelvic<br>17  floor reconstruction no one has rates, so that has<br>18  not been the standard of care in regards to pelvic<br>19  prolapse. | 176:12-19<br>FRE 403<br>Non-<br>responsive,<br>FRE 703<br>Foundation | *mk070214, (Pages 175:14 to 176:11)*<br>      *175*<br>*14  Q. And you did receive some monetary*<br>*15  benefits. You were compensated for your time*<br>*16  relative to Boston Scientific pelvic mesh products,*<br>*17  correct?* |

| | | |
|---|---|---|
| | | *18  A. I was --*<br>*19  MR. SULLIVAN: Objection.*<br>*20  THE WITNESS: -- compensated for my*<br>*21  time of training regarding Boston Scientific*<br>*22  products.*<br>*23  BY MR. FABRY:*<br>*24  Q. Okay. And as a physician, did you*<br>*25  reasonably rely on Boston Scientific Corporation to*<br>176<br>*1  advise you of all the risks associated with their*<br>*2  mesh products?*<br>*3  A. Yes.*<br>*4  Q. As a physician, do you feel it's*<br>*5  important for you to know the severity of*<br>*6  complications for Boston Scientific's products?*<br>*7  A. Yes.*<br>*8  MR. SULLIVAN: Objection.*<br>*9  BY MR. FABRY:*<br>*10  Q. And that would include the Uphold?*<br>*11  A. Yes.* |
| **mk070214, (Pages 202:18 to 203:13)**<br>202<br>18  Q. And, Doctor, I think you testified that<br>19  you are a member of AUGS, correct?<br>20  A. Yes.<br>21  Q. What's AUGS stand for again?<br>22  A. The American Urogynecological Society.<br>23  Q. And are you a member of SUFU?<br>24  A. Society of Urodynamics and Female<br>25  Urology.<br>203<br>1  Q. Are you familiar, Doctor, with the AUGS<br>2  SUFU position statement from 2013 --<br>3  A. Yes.<br>4  Q. -- on polypropylene material in mesh?<br>5  A. Yes.<br>6  Q. Okay. Are you aware that those<br>7  organizations issued a statement saying,<br>8  polypropylene material has been used in most<br>9  surgical specialties for over five decades in<br>10  millions of patients in the U.S. and the world?<br>11  A. Yes.<br>12  Q. Do you agree with that statement?<br>13  A. Yes. | 203:1-203:13<br>FRE 802, 803<br>Hearsay, no<br>exception<br>FRE 403<br>Unduly<br>prejudicial<br>FRE 703<br>Foundation | |

| | | |
|---|---|---|
| **mk070214, (Pages 203:19 to 206:2)**<br>203<br>19 Q. What sort of medical applications has<br>20 polypropylene had in the body over the past five<br>21 decades?<br>22 MR. FABRY: Objection, foundation.<br>23 THE WITNESS: It has a variety of uses<br>24 that it's been used upon, but within the general<br>25 surgery literature, abdominal herniorrhaphies have<br>204<br>1 been predominantly used; within the sort of<br>2 urogynecology aspect for abdominal sacral colpopexy<br>3 for many, many years they've utilized<br>4 polypropylene.<br>5 There are other surgical applications<br>6 that have been utilized in different disciplines,<br>7 but predominantly the ones that I've been aware of<br>8 are the abdominal and pelvic floor related.<br>9 BY MR. SULLIVAN:<br>10 Q. Are you aware of whether the American<br>11 Urologic Association has endorsed the use of<br>12 polypropylene mesh to treat pelvic organ prolapse<br>13 repair in appropriate patients?<br>14 A. They have a -- they have a position<br>15 statement. I don't know whether they've endorsed.<br>16 Q. Okay.<br>17 A. They don't endorse things.<br>18 Q. Okay. So are you aware that the<br>19 American Urologic Association issued a statement<br>20 November 2011?<br>21 A. Yes.<br>22 Q. Okay. And in that statement stated,<br>23 mesh may improve long-term anatomic results of<br>24 surgery as compared to nonmesh repairs for some<br>25 types of prolapse?<br>205<br>1 A. Yes.<br>2 Q. Do you agree with that statement?<br>3 A. Yes.<br>4 Q. Do you know that in that same<br>5 statement, the AUA said -- said, certain patients<br>6 may benefit from mesh techniques and the use of<br>7 mesh techniques should be a choice that is made<br>8 after a careful discussion between surgeon and<br>9 patient?<br>10 A. Yes.<br>11 Q. Do you agree with that statement?<br>12 A. Yes.<br>13 Q. And are you aware that the AUA also<br>14 said, it is also important to recognize that many<br>15 of these complications are not unique to mesh<br>16 surgeries. They are known to occur with nonmesh<br>17 pelvic organ prolapse procedures as well? | 203:19-204:8<br>FRE 703<br>No<br>foundation to<br>offer opinion<br>on general<br>usage outside<br>of practice<br>specialty | |

| | | |
|---|---|---|
| 18 A. Yes.<br>19 Q. You agree with that, right?<br>20 A. Yes.<br>21 Q. In fact, you testified earlier that all<br>22   of the risks associated with mesh pelvic organ<br>23   prolapse repair are associated with native tissue<br>24   repair other than erosion, correct?<br>25 MR. FABRY: Objection, form, asked and<br>                206<br>1  answered.<br>2 THE WITNESS: Correct. | | |

Exhibits

1. Exhibit 2 – McKay Urology office notes
2. Exhibit 3 – Informed Consent form for Ms. Carlson
3. Exhibit 4 – Ms. Carlson's Billing Records
4. Exhibit 5 – Dr. Kennelly's Curriculum Vitae
5. Exhibit 8 – Cross-Notice of Deposition
6. Exhibit 9 – Contract with Boston Scientific from 6/1/09
7. Exhibit 10 – Contract with Boston Scientific from 8/3/11
8. Exhibit 11 – Unexecuted Contract with BSC from 6/26/14
9. Exhibit 12 – Confirmation of Service from 9/25/11
10. Exhibit 13 – Confirmation of Service from 10/16/11
11. Exhibit 14 – 2011 1099
12. Exhibit 15 – Pelvic Floor Institute, Women's Health Business of BSC Faculty Guide from June 2010
13. Exhibit 16 – Uphold DFU
14. Exhibit 17 – FDA Public Health Notification regarding serious complications associated with transvaginal placement of surgical mesh in the repair of pelvic organ prolapse and stress urinary incontinence.

DATED: June 26, 2015                           Respectfully Submitted,

/s/ *John R. Fabry*
John R. Fabry
Texas Bar No. 06768480
Mark R. Mueller
Texas Bar No. 14623500
MUELLER LAW, PLLC
404 West 7th Street
Austin, TX 78701
(512) 478-1236
(512) 478-1473 (Facsimile)
John.Fabry@muellerlaw.com
Mark@muellerlaw.com
Meshservice@muellerlaw.com

/s/ Sean Tracey
Sean Patrick Tracey
State Bar No. 20176500
Shawn P. Fox
State Bar No. 24040926
Clint Casperson
State Bar No. 24075561
440 Louisiana, Suite 1901
Houston, TX 77002
(800) 925-7216
(866) 709-2333
stracey@traceylawfirm.com
sfox@traceylawfirm.com
ccasperson@traceylawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

/s/ *John R. Fabry*
John R. Fabry
Texas Bar No. 06768480
Mark R. Mueller
Texas Bar No. 14623500
MUELLER LAW, PLLC
404 West 7th Street
Austin, TX 78701
(512) 478-1236
(512) 478-1473 (Facsimile)
John.Fabry@muellerlaw.com
Mark@muellerlaw.com
Meshservice@muellerlaw.com

/s/ Sean Tracey
Sean Patrick Tracey
State Bar No. 20176500
Shawn P. Fox
State Bar No. 24040926
Clint Casperson
State Bar No. 24075561
440 Louisiana, Suite 1901
Houston, TX 77002
(800) 925-7216
(866) 709-2333
stracey@traceylawfirm.com
sfox@traceylawfirm.com
ccasperson@traceylawfirm.com