**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION**

RAMONA WINEBARGER and REX WINEBARGER,       **CASE NOS. 5:15CV57-RLV;**
Plaintiffs,                                                                    **3:15CV211-RLV**

v.

BOSTON SCIENTIFIC CORPORATION,
Defendant
-------------------------------------------------------------------

MARTHA CARLSON,
Plaintiff,

v.

BOSTON SCIENTIFIC CORPORATION
Defendants

**PLAINTIFFS OBJECTIONS AND COUNTER DESIGNATIONS TO DEFENDANT
BOSTON SCIENTIFIC'S COUNTER DEPOSITION DESIGNATIONS OF
MICHELLE BERRY TAKEN AUGUST 9, 2013**

| BSC Counter Designation | Objection | Plaintiffs Counter Designation to BSC Counter Designation |
|---|---|---|
| mb040913, (Pages 24:14 to 25:18)<br>9　　Q.　Okay.　Would it be fair in general terms to<br>10　　describe at least part of your responsibilities as a<br>11　　conduit between your team and the regulatory authority<br>12　　you're dealing with?<br>13　　　A.　That's correct. | 25:9-13<br>FRE 401,<br>402, 403<br>FDA | |
| mb040913, (Page 35:1 to 35:6)<br>　　　　　　　35<br>1　Q.　There are CFRs or regulations which govern what<br>2　　you can and cannot say to doctors.　Fair?<br>3　　　A.　Yes.<br>4　　　Q.　Tell you how to identify safety signals, for<br>5　　instance, and report those in a timely manner. Fair?<br>6　　　A.　Fair. | 35:1-6<br>FRE 401,<br>402, 403<br>FDA | |

| mb040913, (Page 40:9 to 40:12) | 40:9-12 | *Counter Designation to BSC Counter* |
|---|---|---|
| 40<br><br>9   Q.   Okay.  Do you believe Polyform mesh is safe for<br>10    insertion into a woman's vagina?<br>11      A.   We have experience from physicians that these<br>12    products are indeed safe. | FRE 401, 402, 403, 801, 802 | *mb040913, (Page 76:3 to 76:21)*<br><br>*76*<br>*3   Q.   The next document is marked as Exhibit*<br>*4   Number 75.*<br>*5        (Pause)*<br>*6        Q.   Are you ready to proceed?*<br>*7      A.   Yes.*<br>*8      Q.   Okay.  So on April 29th, 2009, Boston*<br>*9   Scientific responds to Health Canada and provides them*<br>*10   additional information. Fair?*<br>*11      A.   Yup.*<br>*12      Q.   All right.  And so this particular document,*<br>*13   the e-mail cover page is dated May 14th, 2009, correct?*<br>*14      A.   Yes.*<br>*15      Q.   And again, it's to Dan Krause, your colleague*<br>*16   in Canada, correct?*<br>*17      A.   Yes.*<br>*18      Q.   And if we go to the next page, the title of it*<br>*19   is, "Refusal to Issue a Medical Device License."*<br>*20        Do you see that?*<br>*21      A.   Yes.*<br><br>*mb040913, (Pages 77:8 to 78:4)*<br><br>*77*<br>*8   Q.   And what they say in the second sentence is,*<br>*9   "We regret to inform you that your application has been*<br>*10   refused under Section 38 (2) of the medical devices*<br>*11   regulations for the following reasons."*<br>*12        Do you see that?*<br>*13      A.   Yes.*<br>*14      Q.   And what they say is, "The postmarket clinical* |

| | | 15   experience with the device demonstrates a much higher |
| | | 16   rate of reported adverse events compared to its licensed |
| | | 17   predicate, the Polyform mesh." |
| | | 18        Do you see that? |
| | | 19    A.  Yes. |
| | | 20    Q.  And then it goes on to say, "Boston Scientific |
| | | 21    has not provided objective evidence that this issue has |
| | | 22    been successfully addressed." |
| | | 23        Did I read that correctly? |
| | | 24    A.  Yes. |
| | |            78 |
| | | 1    Q.  Finally they say, "The conclusion is that the |
| | | 2    risk/benefit profile of the device is unacceptable." |
| | | 3        Did I read that correctly? |
| | | 4    A.  Yes. |
| | | |
| | | mb040913, (Pages 79:20 to 80:1) |
| | |            79 |
| | | 20  Q.  Okay.  And then Boston Scientific makes a |
| | | 21    decision to appeal Health Canada's decision, correct? |
| | | 22    A.  That's correct. |
| | | 23    Q.  And you were involved in that decision -- that |
| | | 24    process, correct? |
| | |            80 |
| | | A.  I was involved in the process. |
| | | |
| | | mb040913, (Page 80:3 to 80:12) |
| | |            80 |
| | | 3  MR. LOVE:  I'd like to mark Exhibit Number 76. |
| | | 4        (Exhibit Number 76 |
| | | 5        marked for identification) |
| | | 6    Q.  And this is a series of e-mails, Ms. Berry. |

7   And we're going to start at the back because logically
8   that's the most -- it goes from -- chronologically from
9   the back to the beginning, and we'll work our way
10   through the front.  And we'll do that on a series of
11   e-mails that we'll be talking about here over the course
12   of the next few months.

mb040913, (Pages 81:13 to 82:1)
                    81
13   if you
14   look in the middle, it's 2 of 4.  You receive an e-mail
15   from Donna Gardner, your boss, correct?
16      A.   Correct.
17      Q.   And what she's doing is she's forwarding you
18   this e-mail chain, correct?
19      A.   Yes.
20      Q.   And she says, "FYI, see this string of e-mails
21   which include the reasons Pinnacle was rejected.  I'm
22   not sure how they came to that conclusion based upon our
23   response."
24         Correct?
                    82
1      A.   Correct.

mb040913, (Pages 83:5 to 84:4)
                    83
5   It says, "Ken, I just wanted to inform you that
6   the Pinnacle pelvic floor repair kit application has now
7   been officially rejected by Health Canada."
8         Do you see that?
9      A.   Yes.
10      Q.   "They feel the complaint and MDR rate (risk)

11 exceeds the benefit of the device."

12    Did I read that correctly?

13    A. Yes.

14    Q. Okay. So he goes down and says, "I am going to

15    be initiating the appeals process, but at this point it

16    looks unlikely that we will be receiving a license in

17    Canada until the product matures in some other markets

18    and complaint rates and MDR rates start to decrease in

19    relation to sales volume."

20    Did I read that correctly?

21    A. Yes.

22    Q. So at least from Dan's perspective, Health

23    Canada had rejected this application until, one, the

24    product matures in other markets, right?

84

1    A. That's what's stated, yes.

2    Q. And two, the complaint rates and MDR rates

3    start to decrease, correct?

4    A. Correct.

mb040913, (Page 85:4 to 85:7)

85

4    Q. Okay. Let's go to the next document, and it's

5    marked Exhibit Number 77.

6    (Exhibit Number 77

7    marked for identification)

mb040913, (Page 85:15 to 85:24)

85

15    Q. If we could, go to the second page of this

16    particular e-mail chain. And this is an e-mail from you

17   at the very bottom.  Do you see that?
18      A.  Yes.
19      Q.  And it's dated May 22nd, 2009.  Do you see
20   that?
21      A.  Yes.
22      Q.  So that's about a week and a half after Health
23   Canada rejected your application for Pinnacle, correct?
24      A.  Yes.

mb040913, (Pages 86:20 to 87:20)
                    86
20   Q.  Let's go to your e-mail. You say, "Hi, Joe.
21   As a followup to a discussion you had with Donna earlier
22   this week, we will be appealing Health Canada's decision
23   on the Pinnacle PFR kit anterior/apical submission, due
24   June 10th."
                    87
1       Do you see that?
2    A.  Yes.
3       Q.  You say, "We would like for you to provide us
4    with two graphs and their supporting data tables."
5       Did I read that correctly?
6    A.  Yes.
7       Q.  You say, "The first graph will summarize the
8    2008 data previously submitted to Health Canada in
9    February."
10       Did I read that correctly?
11      A.  Yes.
12      Q.  "The complaint rate should be on the Y axis and
13   time in months on the X axis."

14      *Did I read that correctly?*
15      A.  Yes.
16      Q.  "The second graph should show this same data
17   but be updated to include the number of complaints
18   through May 2009."
19      *Did I read that correctly?*
20      A.  Yes.

mb040913, (Pages 88:22 to 92:13)
                88
22   Q.  All right.  Fair enough.  And then we have a
23   series of e-mails discussing various issues related to
24   this, but I'm interested in the next one, the bottom
                89
 1   e-mail on the first page.  And this is from a gentleman
 2   whose name I can't pronounce.
 3      *How do you pronounce his name?*
 4      A.  Well, he went by Ram.
 5      Q.  Ram?
 6      A.  Yeah.
 7      Q.  We'll call him Ram.
 8      *And this is Tuesday, May 26th, 2009.  Do you*
 9   see that?
10      A.  Yes.
11      Q.  So that's four days after your e-mail to Joe,
12   saying this is the information we're collecting,
13   correct?
14      A.  Yes.
15      Q.  And then again it's regarding the Health Canada
16   appeal.  Do you see that?
17      A.  Yes.
18      Q.  And Ram says, "Hi all.  Piz" --

19      What is that? Please?

20      A.  Please.

21      Q.  Gotcha.

22      "Plz find the attached Excel file.  The Sheet 1

23   will have all the rough data and the Sheet 2 will have

24   both graphs."

90

1      Do you see that?

2      A.  Yes.

3      Q.  And so what he's doing, I assume, is sending

4   the data that you asked to be collected to you, Joe, and

5   Donna, correct?

6      A.  Correct.

7      Q.  Donna, if we go one e-mail above, e-mails you a

8   day later, correct?

9      A.  Yes.

10      Q.  And what she says is, "Michelle.  Can the month

11   and year be added to this? Should we touch base on this

12   to see where we are?"

13      Do you see that?

14      A.  Yes.

15      Q.  And so the data had now been accumulated and

16   sent to at least you, Joe, and Donna, correct?

17      A.  Correct.

18      Q.  And this is data that you're going to include

19   in your appeal, I assume.

20      A.  Well, to be reviewed and -- Yes.

21      Q.  Okay.  And then you have an e-mail the same day

22   Donna e-mailed you, and it's from you at the top.  Do

23   you see that?

24      A.  Yes.

91

1      Q.  And it's to Donna. You see that?

2      A.  Yes.

| | | 3    Q.  And then it's regarding the Health Canada
4    appeal, correct?
5    A.  Yes.
6    Q.  What it says is, "Sure.  I will have the graphs
7    updated with the month and year along the X axis."
8        Do you see that?
9    A.  Yes.
10   Q.  Go ahead and if you could for the jury read the
11   rest of that paragraph.
12   A.  "After looking at the graphs that Ram created,
13   I don't think we want to provide Health Canada, HC, the
14   newer complaint data.  I did not see the downward trend
15   we were hoping for.  The complaint rate was up again for
16   April and May, and I asked Ram why this is and he was
17   going to look into it for me to see if it can be
18   explained."
19   Q.  Okay.  Thank you. So the complaint-rate data
20   for April and May of 2009 that you'd accumulated for
21   your appeal went up, correct?
22   A.  That's what my e-mail states.
23   Q.  All right.  And obviously the e-mail states it
24   wasn't the trend that you were hoping for, correct?
                    92
1    A.  Correct.
2    Q.  You were hoping to see a downward trend so that
3    you could submit that data in support of your
4    application, correct?
5    A.  Right.  We were looking for a downward trend. |

6    Q.  Okay.  Now, Health Canada had indicated
7    that based upon the data that you had previously
8    submitted that the risk/benefit profile was
9    unacceptable, correct?
10    A.  That's what they stated.
11    Q.  And obviously if you're appealing this, they're
12    interested in complaint-rate data.  Fair?
13    A.  Sure.

mb040913, (Page 96:11 to 96:18)
                    96
11    Q.  You were trying to convince Health Canada to
12    approve your product, right?
13    A.  That's the appeal process.
14    Q.  Right.  And the data that you were looking at
15    didn't show the trends you hoped for, correct?
16    A.  On this particular date, that's what the data
17    was showing.  I don't know what happened subsequent to
18    these e-mails.

mb040913, (Page 97:7 to 97:11)
                    97
7    MR. LOVE:  I'd like to go to the next exhibit,
8    if we could.  It's going to be marked as Exhibit
9    Number 78.
10         (Exhibit Number 78
11         marked for identification)

mb040913, (Page 97:15 to 97:23)
                    97
15    Q.  This is an e-mail from you, correct?

| | | |
|---|---|---|
| | | 16    A.  Yes.
17    Q.  And it is dated May 28th, 2009, correct?
18    A.  Correct.
19    Q.  And that's one day after your recommendation --
20    your e-mail recommendation of the 27th not to submit the
21    new data to Health Canada, correct?
22         MR. KEENAN:  I object to the form.
23    A.  That's correct.

mb040913, (Page 98:6 to 98:20)
                98
 6   Q.  Okay.  And what you say to Donna and Rob is,
 7    "Good morning, Donna and Rob.  I wanted to forward you
 8    my rough draft of the comprehensive document for our
 9    discussion today at 10:00."
10         Do you see that?
11    A.  Yes.
12    Q.  "Please see the attachment above.  Also for Rob
13    I have attached the complaint data charts that quality
14    sent to me earlier this week."
15         Did I read that correctly?
16    A.  Yes.
17    Q.  "Per our discussion, the data does not appear
18    to support our anticipated result of a downward trend."
19         Did I read that correctly?
20    A.  Yes.

mb040913, (Pages 100:12 to 101:6) |

12   MR. LOVE:  Let's go ahead and mark that as

13     Exhibit Number 79.

14          (Exhibit Number 79

15          marked for identification)

16      Q.  Okay.  And this is one of the attachments to

17   your e-mail.  And this is actually the complaint data

18    charts that are referenced in your original request,

19    right?

20      A.  Correct.

21      Q.  And if we look at this particular chart, the

22    top one actually shows that the rate indeed did

23    increase, as you had suggested in your previous e-mail,

24    correct?

1      A.  I think if you look at the latter couple of

2    months, 15, 16, 17, there is definitely an upward

3    movement, but overall it's pretty flat.

4      Q.  I mean, in your e-mail you're referencing that

5    upward trend, correct?

6      A.  At the end, correct.

mb040913, (Page 101:7 to 101:12)

7   Let's go on to the next

8    exhibit, which is your draft of the comprehensive

9    document to Health Canada.  And this will be Exhibit

10    Number 80.

11          (Exhibit Number 80

12          marked for identification)

mb040913, (Pages 107:11 to 108:6)

11 Q. The phrase "complaint rate is trending
12 downward" is the opposite of "complaint rate is trending
13 upward," correct?
14 A. Correct.
15 Q. All right. And you have upward trends in April
16 and May, correct?
17 A. I assume that's what these months -- it's 15,
18 16, 17. The months aren't listed.
19 Q. Well, according to your e-mail on the 27th, you
20 said the complaint rates were trending up in April and
21 May, correct?
22 A. That's correct.
23 Q. All right. And you had previously submitted
24 information to Health Canada from March '08 to

1 March '09, correct?
2 A. Correct.
3 Q. So the only new data you could submit would be
4 from April and May, correct?
5 MR. KEENAN: Objection to form.
6 A. That makes sense, yes.

mb040913, (Pages 120:22 to 121:5)

22 Q. My question is simple. Is the information from
23 April '09 and May '09 included in this appeal?
24 A. No, it's not.

1 Q. Thank you. Okay. We know what ultimately
2 happened with the appeals process, correct?
3 A. Yes.
4 Q. It was approved, was it not?

| | | |
|---|---|---|
| | | *5   A.  We received a license.* |
| mb040913, (Page 67:19 to 67:24)<br>67<br>19  Q.  Now, as I appreciate it, that product was<br>20   cleared in the United States in November of 2007.<br>21      A.  Yes, that sounds about right.<br>22      Q.  All right.  And clearance is a little bit<br>23   different than approval.  Correct?<br>24      A.  Correct. | 67:19-23(24)<br>FRE 401, 402, 403<br>FDA | |
| mb040913, (Page 172:10 to 172:23)<br>172<br>10  could be included if it was something that I guess FDA<br>11   or others felt they wanted to put that information out<br>12   there.<br>13      Q.  What about you?  What about your company?  What<br>14   about you feeling like you wanted to put it out there?<br>15         MR. KEENAN:  I object to the form.<br>16      A.  We work on these directions for use.  We<br>17   provide information.  We work hand in hand with the<br>18   regulatory agencies to ensure that we're providing<br>19   appropriate information to physicians.<br>20         Through our dialogue back and forth with FDA<br>21   and all of the various submissions we've had, they've<br>22   provided input on what adverse events we list. And we<br>23   comply with that. | 172:10-23<br>FRE 401, 402, 403<br>FDA | |
| mb040913, (Pages 181:22 to 182:3)<br>181<br>22  The patient brochure that we worked on with the<br>23   advice and guidance of FDA, I know they themselves are<br>24   trying to get that information out to patients. And in<br>182<br>1   our most recent version of that document there's a web<br>2   address provided which FDA specifically asked us to do, | 181:22-182:3<br>FRE 401, 402, 403<br>FDA | mb040913, (Page 182:7 to 182:14)<br>182<br>7  Q.  It's not the FDA's product, correct?<br>8      A.  Correct.<br>9      Q.  You make all the profits off this product,<br>10   correct?<br>11         MR. KEENAN:  I object to the form.<br>12      A.  I do not make the profits. |

| | | |
|---|---|---|
| 3   and it talks to the summary, FDA's summary of harms. | | 13      Q.  Your company makes the profits off this<br>14    product, correct?<br><br><br>mb040913, (Page 183:7 to 183:14)<br>                         183<br>  7  So along with those profits come obligations,<br>  8    right?<br>  9      A.  Yes.<br>10      Q.  Your obligation is to inform physicians and<br>11    patients so they can use your product safely, correct?<br>12      A.  Yes.<br>13      Q.  And rates of occurrences are relevant to a<br>14    risk/benefit analysis, correct? |
| mb040913, (Pages 283:1 to 291:2)<br><br>***<br>2      Q.  There's been a lot of questions asked of you<br>  3    about what rules and what kind of materials you rely<br>  4    upon to do your job as a regulatory affairs consultant.<br>  5          Talk to me a little bit about what those -- if<br>  6    there is a document that's specifically drafted for<br>  7    surgical mesh.  And I'll mark that as Exhibit Number 94.<br>  8          (Exhibit Number 94<br>  9          marked for identification)<br>10      A.  So in regulatory there are numerous documents<br>11    available to anybody in this profession, whether it be<br>12    the Code of Federal Regulations.  But subsequently FDA<br>13    does publish guidance documents.<br>14          And the one you've presented here is the<br>15    "Guidance for the Preparation of Premarket Notification<br>16    Applications for a Surgical Mesh."<br>17      Q.  Okay.  And so this would be one document that<br>18    you would review and use as guidance as part of | 285:2-291:2<br>FRE 401,<br>402, 403<br>FDA | |

| | | |
|---|---|---|
| 19   preparation for the submission of a medical device that<br>20   would be surgical mesh?<br>21       MR. MORELAND:  Form.<br>22     A.   That's correct.<br>23     Q.   And directing your attention to the next page,<br>24   page 1 -- I'm sorry.  The next page.<br>                     286<br> 1        In particular, if the jury -- there's a<br> 2   paragraph here that states, "Summary of information<br> 3   regarding safety and effectiveness upon which a<br> 4   equivalence determination can be made or a statement<br> 5   that such information will be made available to<br> 6   interested persons upon request."<br> 7        Is that an important part of this document and<br> 8   what does that mean to you?<br> 9       MR. MORELAND:  Form.<br>10     A.   Well, the application for doing a premarket<br>11   notification, we provide information to the agency for<br>12   review.  And there is a process in place that if they<br>13   have questions or would like additional information that<br>14   they have an avenue to do so.<br>15     Q.   Directing your attention to page 4 of this<br>16   document, there are additional specifications with<br>17   regard to biocompatibility.<br>18        Are these part of the requirements for any<br>19   device that you submit pursuant to this guidance<br>20   document?<br>21       MR. MORELAND:  Form.<br>22     A.   That's correct.  We provide summary of<br>23   biocompatibility test data.<br>24     Q.   Okay.  And with respect to the next page,<br>                     287<br> 1   page 5, labeling, the jury has heard quite a bit of<br> 2   discussion about labeling.<br> 3        What is labeling and what role does the FDA<br> 4   have to review the labeling that we propose with respect<br> 5   to a particular device that is -- that consists of<br> 6   pelvic mesh?<br> 7       MR. MORELAND:  Form. | | |

8        MR. ORENT:  Objection.
9     A.   The labeling that we provide here, we typically
10    would include maybe a copy of the outer box, the product
11    label, which describes the product, what it is, what's
12    in it.  And then there's also the directions or
13    instructions for use that would be packaged within that
14    product.
15         And so they would review that information.  And
16    again, their role is to determine whether or not we were
17    substantially equivalent to the predicate devices.
18     Q.   Okay.  With respect to -- There's been
19    questions asked of you of something called patient
20    brochures.  Is that something that also the FDA will
21    review and comment on?
22        MR. MORELAND:  Form.
23     A.   They have reviewed and commented on our patient
24    brochures.
                    288
1     Q.   Specifically patient brochures for the pelvic
2    organ prolapse devices?
3        MR. MORELAND:  Form.
4     A.   That's correct.
5     Q.   And they have also commented on the directions
6    for use, the DFU that was the subject of questions
7    earlier?
8        MR. MORELAND:  Form.
9     A.   That is correct.  They have.
10     Q.   And give us an example of something that they
11    have asked us to add and we've added.
12        MR. MORELAND:  Form.
13     A.   We've added a few warnings, precautions, as
14    well as adverse events following their review and
15    feedback of our submission documents.
16     Q.   There's another document that I want to direct
17    your attention to quickly, and it's also a guidance

18   document.  And I will mark this as Exhibit
Number 95.
19        (Exhibit Number 95
20        marked for identification)
21     Q.  And I had would ask you to identify this
for
22   me.  What is this document?
23     A.  This is the guidance for industry and FDA
24   staff.  It's the format for traditional and
abbreviated

                289

1   510(k)s.
2     Q.  And what significance does this have in
your
3   job?
4     A.  This outlines how to go about creating an
5   actual submission for a 510(k) process.  And so it
6   outlines all of the elements, what they're looking
for,
7   and what is the basis for our submission.
8     Q.  The date of this is the fall of 2005.  So
would
9   this have been an additional document you'd
have used as
10   part of the preparation of the 510(k) submissions
for
11   the pelvic organ prolapse devices?
12        MR. MORELAND:  Form.
13     A.  It is.
14     Q.  I want now to -- Are there additional
documents
15   and regulations that are important to you in your
16   position in regulatory that -- and if so, give the
jury
17   a sense for those.
18        MR. MORELAND:  Form.
19     A.  Well, one of the items that we included in
our
20   submission, again, because we followed this
abbreviated
21   510(k) format, the abbreviated approach allows
you to
22   cite a more specific product guidance document.
In this
23   case, we referenced the surgical mesh guidance.
24        But it also allows to reference standards.
And

                290

1   there are numerous standards.  There are ISO
standards,

| | | |
|---|---|---|
| 2    ASTM, product test standards that exist for these types<br>3    of devices that cover both biocompatibility testing,<br>4    performance testing of the mesh, packaging -- testing of<br>5    the package, sterilization.<br>6           So we cited all of those standards that we<br>7    followed in providing this information to the agency.<br>8       Q.   Okay.  And just so we can give the jury a<br>9    sense -- big picture for the various devices that you<br>10   did submit to the FDA and that were cleared by the FDA,<br>11   if you could, just recite those.  And if you could, give<br>12   some general approximate date for when those would have<br>13   been cleared by the FDA.<br>14          MR. MORELAND:  Form.<br>15      A.   So in the -- For the pelvic floor repair<br>16   products, the first one we talked about earlier is the<br>17   Pinnacle pelvic floor repair kits.  And that submission<br>18   went in -- I'm trying to remember the exact date it went<br>19   in.  It was cleared in, I want to say, November 2007.<br>20   And that's the K0810 -- now I'm going to -- K071957.<br>21      Q.   And then go on to the next one.<br>22      A.   And then the next one would have been our<br>23   Uphold vaginal support system, K081048.  That one was<br>24   submitted it looked like it was in the spring, April<br>              291<br>1    of 2008 or so, and was subsequently cleared in August<br>2    of 2008. | | |
| mb040913, (Page 291:22 to 291:24)<br>              291<br>22   Q.   Okay.  At any time was the clearance that was<br>23   granted to those devices ever rescinded or revoked by<br>24   the FDA? | 291:22-24<br>FRE 401,<br>402, 403<br>FDA | |

| | | |
|---|---|---|
| mb040913, (Page 292:2 to 292:2)<br>292<br>2  A.  No, they were not | 292:2<br>FRE 401,<br>402, 403<br>Foundation,<br>FDA | |
| mb040913, (Pages 292:20 to 296:18)<br>292<br>20  Q.  I want to briefly mark the 510(k) file for the<br>21   Pinnacle and the Uphold.  Counsel earlier marked Exhibit<br>22   Number 93.  Do you recall this?<br>23    A.  Yes.<br>24    Q.  And this represents just a part of the actual<br>293<br>1   510(k) submission.  Correct?<br>2    A.  Correct.<br>3    Q.  Give the jury some sense for how the 510<br>4   submission, 510(k) submission, typically proceeds.<br>5      You make a submission.  You hear back from the<br>6   FDA.  And just give us a sense for how it typically will<br>7   proceed from there.<br>8      MR. MORELAND:  Form.<br>9    A.  So I mean, I can speak from experience in these<br>10   particular submissions.<br>11      After each one was submitted, FDA had some<br>12   questions.  They would provide us a letter outlining the<br>13   questions that they had regarding our application, and<br>14   then a dialogue back and forth with the agency would<br>15   begin.  Our correspondence with them was part in written<br>16   form as well -- via a formal submissions or in e-mails.<br>17      We also had numerous phone calls, conversations<br>18   with them, and those were documented in our file.<br>19    Q.  Okay.  I'm going to hand you Exhibit Number 96.<br>20      (Exhibit Number 96<br>21      marked for identification)<br>22    Q.  And it is a -- it's a rather bulky document. | 292:20-<br>296:18<br>FRE 401,<br>402, 403<br>FDA | |

23    Without getting too burdened into details, give the jury
24    some sense what this represents.
                    294
1          You reviewed this prior to the deposition?
2      A.   Correct.
3      Q.   Just take a minute to confirm that it is what
4    I'm representing it to be.
5      A.   Right.  So this is the K071957 submission,
6    which is the very first pelvic floor repair kit
7    submission, dated July 12th, 2007.
8      Q.   Okay.  And does this document reflect on Bates
9    Number 140000199 a letter from the FDA, dated
10   November 8th, 2007, in which they have cleared this
11   device?
12     A.   That is correct.  This is the clearance letter.
13     Q.   And what does this represent?
14     A.   That they've reviewed all the information that
15   was provided to them and that the device is safe and
16   effective.
17     Q.   Okay.  And for the jury's benefit, if it's
18   cleared on this date, it may not -- might not actually
19   be marketed for some time after that?
20     A.   That is correct.
21     Q.   Just a general sense.  Are we talking about
22   several months?  Are we talking about years? How long
23   typically does it take from the clearance to actually
24   beginning the process of selling this device?
                    295
1      A.   Each product is -- will vary depending upon the
2    readiness of the product.  In this case, FDA had
3    provided some feedback to us in the directions for use.
4    To make modifications or changes to those instructions
5    for use takes some time.  It has to go through
6    translations, prints, review, and then packaging with
7    the device.  So it takes a little bit of time to do
8    that.

| | | |
|---|---|---|
| 9      Q.   But this exhibit would reflect the totality or<br>10    most of the give and take and exchanges from the FDA and<br>11    the revisions and whatnot?<br>12          MR. MORELAND:  Form.<br>13      A.   Correct.<br>14      Q.   Okay.  I also want to mark for you now the next<br>15    exhibit, which is Exhibit Number 97, which I'll<br>16    represent to you is the Uphold 510(k).<br>17          (Exhibit Number 97<br>18          marked for identification)<br>19      Q.   And I'll ask you to take a brief moment to<br>20    review and confirm that this is, in fact, what it is.<br>21          (Pause)<br>22      A.   Okay.  So this is submission K081048, stamped<br>23    with an April 11th, 2008, date for when it was<br>24    submitted.<br>                   296<br>1      Q.   Okay.  And just like you described with the<br>2    Pinnacle, this would represent the -- among other<br>3    things, the submission to the FDA that would be in<br>4    conformity with the guidance document that we previously<br>5    marked as an exhibit?<br>6          MR. MORELAND:  Form.<br>7      A.   That's correct.  We followed the guidance<br>8    documents and the information that's available to<br>9    provide a document that FDA can follow and easily read.<br>10      Q.   Okay.  And directing your attention to the<br>11    Bates number that ends in the numbers 405, this is an<br>12    August 22nd, 2008, letter.<br>13          And what does this represent?<br>14      A.   This is the clearance letter stating that the<br>15    device is substantially equivalent.<br>16      Q.   And this would be, then, the clearance from the<br>17    FDA to begin marketing the device?<br>18      A.   That's correct. | | |
| mb040913, (Pages 300:24 to 301:11)<br>                   300<br>24  Q.  The directions for use that counsel marked as<br>                   301<br>1    Exhibit Number 83 and took you through contains specific | 300:24-<br>301:11<br>Foundation | |

| | | |
|---|---|---|
| 2 language, did it not, that doctors be trained?<br>3 MR. MORELAND: Form.<br>4 MR. LOVE: I object to form.<br>5 A. Correct.<br>6 Q. Let's go to Exhibit Number 83. And Exhibit<br>7 Number 83 in the precautions --<br>8 MR. KEENAN: You can zoom in on that a little.<br>9 Q. So Michelle, this was in the Uphold directions<br>10 for use?<br>11 A. Yes. | | |
| mb040913, (Pages 312:6 to 313:18)<br>312<br>6 Q. But this is a document that attempts to capture<br>7 all of the complaint data the company had at the time,<br>8 right?<br>9 MR. MORELAND: Form.<br>10 A. That is correct.<br>11 Q. In other words, if I wanted to know what the<br>12 totality of the company's complaint data was on<br>13 Pinnacle, Uphold, and Pinnacle LITE, this is the place<br>14 I'd go to, right?<br>15 A. Correct.<br>16 Q. And if I had someone like Allison, she could<br>17 take the jury through this document and explain the<br>18 biostatistical summary that goes into this?<br>19 MR. MORELAND: Form.<br>20 A. Yes.<br>21 Q. Someone other than you?<br>22 A. Yes.<br>23 Q. But this document does attempt to capture all<br>24 the peer-reviewed literature that's out there, whether<br>313<br>1 involving our products or similar products, correct?<br>2 MR. MORELAND: Form.<br>3 A. That's correct.<br>4 Q. So when Mr. Love was identifying for the jury's<br>5 benefit -- when he was identifying for you particular | 312:16-20<br>Foundation | |

| | | |
|---|---|---|
| 6  rates of occurrence, this is reflective of harms in the<br>7  literature for synthetic pelvic mesh pelvic floor kits<br>8  no matter the manufacturer, right?<br>9      MR. MORELAND:  Form.<br>10    A.  That's correct.<br>11    Q.  If we were to go to the footnotes, it would<br>12  identify the particular study that's reflecting those<br>13  statistics?<br>14    A.  That is correct.<br>15    Q.  And I think, as Mr. Love noted and I think you<br>16  acknowledge, some of these statistics vary widely.<br>17      MR. MORELAND:  Form.<br>18    A.  They do. | | |

1. **Objections to Counter Exhibits.**

   a.  Plaintiffs object to Berry 94 under FRE 401, 402, and 403 as it contains FDA references

   b.  Plaintiffs object to Berry 95 under FRE 401, 402, and 403 as it contains FDA references.

   c.  Plaintiffs object to Berry 96 under FRE 401, 402, and 403 as it contains FDA references.

   d.  Plaintiffs object to Berry 97 under FRE 401, 402, and 403 as it contains FDA references.

2. **Counter Exhibits to Counter Exhibits**

   a.  Berry 75
   b.  Berry 76
   c.  Berry 77
   d.  Berry 78
   e.  Berry 79
   f.  Berry 80
   g.  Berry 81
   h.  Berry 82

DATED: July 20, 2015 Respectfully Submitted,

**TRACEY & FOX LAW FIRM**

/s/ Sean Tracey
Sean Patrick Tracey
State Bar No. 20176500
Shawn P. Fox
State Bar No. 24040926
Clint Casperson
State Bar No. 24075561
440 Louisiana, Suite 1901
Houston, TX 77002
(800) 925-7216
(866) 709-2333
stracey@traceylawfirm.com
sfox@traceylawfirm.com
ccasperson@traceylawfirm.com

/s/ *John R. Fabry*
John R. Fabry
Texas Bar No. 06768480
Mark R. Mueller
Texas Bar No. 14623500
MUELLER LAW, PLLC
404 West 7th Street
Austin, TX 78701
(512) 478-1236
(512) 478-1473 (Facsimile)
John.Fabry@muellerlaw.com
Mark@muellerlaw.com
Meshservice@muellerlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

TRACEY & FOX LAW FIRM

/s/ Sean Tracey
Sean Patrick Tracey
State Bar No. 2176500
Shawn P. Fox
Clint Casperson
State Bar No. 24075561
State Bar No. 24040926
440 Louisiana, Suite 1901
Houston, TX 77002
(800) 925-7216
(866) 709-2333
stracey@traceylawfirm.com
sfox@traceylawfirm.com
ccasperson@traceylawfirm.com

/s/ John R. Fabry
John R. Fabry
Texas Bar No. 06768480
Mark R. Mueller
Texas Bar No. 14623500
MUELLER LAW, PLLC
404 West 7th Street
Austin, TX 78701
(512) 478-1236
(512) 478-1473 (Facsimile)
John.Fabry@muellerlaw.com
Mark@muellerlaw.com
Meshservice@muellerlaw.com