**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION**

RAMONA WINEBARGER and REX WINEBARGER,                **CASE NOS. 5:15CV57-RLV;**
Plaintiffs,                                                                    **3:15CV211-RLV**

v.

BOSTON SCIENTIFIC CORPORATION,
Defendant
-----------------------------------------------------------------

MARTHA CARLSON,
Plaintiff,

v.

BOSTON SCIENTIFIC CORPORATION
Defendants


**PLAINTIFFS OBJECTIONS AND COUNTER DESIGNATIONS TO DEFENDANT
BOSTON SCIENTIFIC'S COUNTER DEPOSITION DESIGNATIONS OF
ROGER GOLDBERG, MD TAKEN DECEMBER 13, 2013**


| BSC Counter Designation | Objection | Plaintiffs Counter Designation to BSC Counter Designation |
|---|---|---|
| rg121313, (Page 32:11 to 32:24)<br>32<br>11  Q.  Have you done work with something<br>12  called the Pelvic Floor Institute?<br>13      A.  I have.<br>14      Q.  What have you done with the Pelvic<br>15  Floor Institute?<br>16      A.  Well, the Pelvic Floor Institute<br>17  was a program that was put together<br>involving<br>18  not only myself but a corps of academic<br>19  clinicians and surgeons.  And as a group we<br>20  created, helped Boston Scientific to create<br>21  what we felt were state-of-the-art teaching<br>22  tools and academic teaching programs and<br>23  syllabi.  And through that structure we were<br>24  involved with various training programs. | 32:11-32:34<br>FRE 401,<br>402, 403 | |
| rg121313, (Page 328:3 to 328:24) | 328:3-328:23 | |

| | | |
|---|---|---|
| 328<br>3 Q. Did you, for example, analyze for<br>4 yourself the concept of pore size in the mesh<br>5 that became the component part of the Uphold<br>6 device?<br>7 A. Well, you know, I consider myself<br>8 somewhat lucky by timing that, you know, by<br>9 the time my generation of surgeons entered the<br>10 field the market was -- consisted solely of<br>11 Type 1 polypropylene mesh products.<br>12 So my expertise on mesh is<br>13 certainly been consistently that I would only<br>14 implant the Type I polypropylene mesh because<br>15 of what we learned about nonType I materials.<br>16 But that, again, preceded my time.<br>17 As far as looking deeper again<br>18 into the characteristics of polypropylene or<br>19 the specific aspects of that mesh, no. But I<br>20 had also, you know, done hundreds if not<br>21 thousands of sling procedures. And like most<br>22 of my counterparts had a great comfort with<br>23 Type I polypropylene mesh as a very well<br>24 tolerated material. | FRE 401,<br>402, 403,<br>701, 702 | |
| rg121313, (Pages 413:20 to 440:15)<br>413<br>20 Q. State your name, please.<br>21 A. Roger Goldberg.<br>22 Q. Dr. Goldberg, tell the jury a<br>23 little bit about you, your family.<br>24 A. Well, I'm originally from Chicago<br>414<br>1 and I'm married. My wife is from the East<br>2 Coast. We have four kids.<br>3 I've done my training in various<br>4 parts of the country. I spent about 10 years<br>5 out on the East Coast doing my residency as<br>6 well as undergraduate.<br>7 We eventually found our way back<br>8 here to Chicago where I did my fellowship<br>9 training in urogynecology and was fortunate<br>10 enough to be offered a position right out of<br>11 fellowship.<br>12 Q. Previously marked has been<br>13 Deposition Exhibit Number 786.<br>14 Does that reflect your<br>15 education, training, and experience?<br>16 A. It does. | BSC has<br>previously<br>designated<br>this<br>testimony.<br>Plaintiffs<br>adopt and<br>incorporate<br>any<br>objections as<br>set forth in<br>their<br>counter<br>designations,<br>if any. | Plaintiffs adopt and<br>incorporate their counter<br>designations, if any. |

17    Q.   And tell the jury just briefly
18   where you went to undergrad, medical
school,
19   residency, and then you have a Master's in
20   Public Health too.  Just describe those for
21   me, if you would.
22       A.   Sure.  So, again, I grew up here
23   in Chicago.  I went out to Cornell University
24   for four years of undergraduate.  I was a
              415
 1   pre-med student and an English major.  Came
 2   back to Chicago for medical school at
 3   Northwestern University.  And then actually
 4   took a year and did a Master's degree in
 5   public health at Johns Hopkins in Baltimore
in
 6   epidemiology and biostatistics.  And then
 7   subsequently went to Boston where I did a
 8   four-year residency in obstetrics and
 9   gynecology and then decided to go into this
10   field, female pelvic medicine and
11   reconstructive surgery, and wound up back
here
12   at Northwestern for that fellowship.  That's a
13   three-year training with both research and
14   clinical and surgical training.
15       Q.   So a fellowship would be something
16   in addition to a residency?
17       A.   A fellowship is above and beyond
18   residency in obstetrics and gynecology.
19       Q.   Where is your clinical practice
20   here in the northern uppermost part of the
21   suburbs of Chicago?  Tell the jury a little
22   bit about that.
23       A.   So we're sitting here in Skokie,
24   which is just north of Chicago, and I practice
              416
 1   literally kitty-corner across the street.  So
 2   in Skokie, Illinois.  We are close to
 3   Northwestern University campus just to our
 4   east.
 5           Our practice covers a geography
 6   which stretches north and west.  So essentially
 7   the north part of Chicago.  We service three
 8   different hospitals and have about four
 9   different office sites.  I have four partners
10   and we train three fellows.
11       Q.   How many active patients do you
12   have or patient charts do you have that are
13   part of your clinical practice?
14       A.   It's always hard to estimate.  On

15  a busy clinical day, I'll see perhaps 30
16  patients. I operate on roughly four or five
17  major cases per week. Sometimes more,
18  sometimes less. But it's a very busy clinical
19  practice. And multiplied out throughout the
20  year, I'm sure that's several thousand active
21  clinical charts at any time.
22      Q. So when we talk about
23  urogynecology, explain to the jury what that
24  is and give the jury some sense for how your
         417
1  practice may differ from a typical OB-GYN
2  practice.
3      A. We're very, very highly focused.
4  We're focused strictly on female incontinence
5  and pelvic floor and sometimes pain issues.
6  But largely prolapse and incontinence is
7  enough to keep us busy on a day-to-day basis.
8        My average practice is really
9  truly a blend of office and operating room,
10  which is exactly what I love. It's a lot of
11  variety.
12        Our treatment, our patient
13  population because we're a referral center we
14  often see quite a severe, a number of severe
15  cases every day, patients that are referred
16  from sometimes far away and largely servicing
17  also women who live right here in the
18  community, but with significant incontinence
19  and prolapse symptoms coming for our help.
20      Q. Okay. So you've been practicing
21  here in the North Shore medical group since
22  what year?
23      A. Well, I was a fellow from 1999
24  through 2001, and in 2001 I was hired on. So
         418
1  my actual out of training practice began in
2  2001.
3      Q. Okay. And in 2013 you received a
4  special distinction from your hospital group.
5  Describe that for the jury.
6      A. Well, that was very recent. It
7  was very nice. We've been privileged to
8  receive a number of research awards and
9  clinical awards, but this was special because
10  it was from my peers. And I'll have to
11  actually look to remind myself exactly what
12  they call it.
13        But it was a very surprising
14  award that I received called the Distinguished

15  Physician Award for our whole healthcare
16  system.  So that was a bit of a ceremony a
17  couple of weeks back.  Total surprise.
18      Q.  Okay.  You also serve on a
19  professional society and you're on the board
20  of directors for AUGS?
21      A.  That's right.
22      Q.  Describe what that is and why
23  is that significant.
24      A.  Well, AUGS is our premier
                    419
 1  organization.  It strives to be the leader
 2  in female pelvic medicine.  It's such an area
 3  of need.  We've driven a lot of the research
 4  and discussion and awareness and science.
 5          I was asked to run for the board
 6  by the president at the time, Matt Barber, and
 7  I really had never thought about doing so.  I
 8  had run committees for AUGS.  And then
ended up
 9  winning the board election, which has turned
10  out to be a very interesting, engaged, and, you
11  know, fun process to be a part of and
certainly
12  with lots of close colleagues that I've gotten
13  to know better.
14      Q.  Okay.  When you talk about your
15  area of specialty -- and the jury may be
16  familiar with stress urinary incontinence and
17  pelvic organ prolapse -- I want to focus on
18  the pelvic organ prolapse part of that.
19          Describe why that's of interest
20  to you and give the jury some sense for what
21  that condition is and how it affects their
22  lives.
23      A.  Well, prolapse and incontinence,
24  they sound like small problems until you
                    420
 1  have them.  They are, in fact, first of all,
 2  highly prevalent.  We find that in some way,
 3  shape, or form roughly 50 percent of women
who
 4  have had babies, by age 40 even, can describe
 5  some loss of control over the bladder.  Not to
 6  say they all need surgery.  That's a different
 7  subject.  However, this is a prevalent set of
 8  conditions that affects women sometimes at a
 9  shockingly young age.
10          Women tend to retreat from often
11  times a normal quality of life, give up
12  exercise, not feel comfortable socializing.  If

13  any one of us, you know, had a bladder accident
14  right now, I mean you'd really have to stop and
15  think if it were me, you know, what a
16  fundamental loss of control and self-esteem
17  that is.  And it really truly every day is
18  amazing to see how impacted these women are by
19  prolapse and incontinence.  And on the flipside
20  it's truly a privilege to help to greatly
21  improve their quality of life in really the
22  most fundamental way.
23       Q.  What about prolapse?  What is
24  prolapse and how can that affect activities of

 1  daily living?
 2       A.  Well, prolapse is essentially a
 3  loss of support involving the vagina or
 4  uterus.  These are support defects, as we call
 5  them, that come in a variety, a whole range of
 6  severities.
 7           So women with mild prolapse may
 8  not need any treatment.  It might be something
 9  their doctor notices.
10           Women with severe prolapse are
11  the ones that typically reach our office, feel
12  like their insides are hanging out.  I mean
13  it's a very abnormal, uncomfortable feeling.
14           And to an extreme then when
15  those prolapses start to progress, which they
16  often do, that can really very significantly
17  impact a women's comfort, again, exercising,
18  walking, having sexual relations.  That's the
19  nature of prolapse.
20       Q.  Okay.  Let's focus, big picture.
21  From the time of your fellowship to the time
22  it ended, 2001, 2002, describe for the jury,
23  just focusing on pelvic organ prolapse,
24  describe for the jury what the treatment

 1  options were, okay, and then let's talk a
 2  little bit how these treatment options have
 3  evolved in the last 10 years.
 4       A.  Well, when I was a -- I've sort of
 5  been obviously witness on a part of the
 6  transition.  We really have options and a
 7  toolbox now that didn't exist 10 or 15 years
 8  ago.

| | | |
|---|---|---|
| 9       When I was a fellow, I caught<br>10  the tail end of the era where we really had a<br>11  fairly limited number of options.<br>12      In particular, women with<br>13  prolapse, number one, they'd almost always get<br>14  a hysterectomy. That was nearly a guarantee,<br>15  which is a big deal. You know, it's individual<br>16  to a patient how she feels about it, but many,<br>17  many people feared pelvic prolapse repairs<br>18  because they didn't want a hysterectomy.<br>19      And, number two, the treatment<br>20  particularly of the cystocele. The so-called<br>21  dropped bladder was described for generations<br>22  of surgeons as the great challenge in pelvic<br>23  support just because of the way the physics in<br>24  the female body bear down on that area. And I<br>         423<br>1  as a fellow would routinely see women who<br>2  considered us essentially a failure because we<br>3  would perform a repair and they would come<br>4  back, you know, a year later or less with some<br>5  sort of bulge.<br>6    Q. You talk about repairs in this<br>7  time period, 2001, 2002, what were the types of<br>8  repairs that were initially attempted?<br>9    A. Well, native tissue repair, which<br>10  I still do regularly, you know, but<br>11  everything's individualized in this field, but<br>12  native tissue repair was sort of the only<br>13  option.<br>14      So when you talk about very<br>15  specifically what areas have improved so much,<br>16  when you look at the advanced cystocele, the<br>17  dropped bladder -- native tissue repair for a<br>18  dropped bladder is called an anterior repair or<br>19  an anterior colporrhaphy. And that had a<br>20  notably high rate of recurrence. There are<br>21  other areas of prolapse that can recur but that<br>22  was really kind of the focal point, an area<br>23  that you could suspect might come back to<br>24  re-prolapse down the road.<br>         424<br>1      And we had it, you know, a lot | | |

2   of women viewed these repairs as well, they'll
3   work for a few years and then you got to come
4   back.  And there was some fairness to that
5   criticism, it was somewhat true.
6       Q.  So how did your treatment practice
7   then evolve to a point when you began to use
8   additional tools like the term Capio?  And
9   give the jury some sense for what a Capio is
10   and why that was, in your mind, an
innovation
11   that was useful in the treatment of pelvic
12   organ prolapse.
13       A.  Well, so Capio was a device that I
14   actually had seen in my residency.
15           First and foremost, what Capio
16   allowed us to do was a much, much smaller
17   dissection, much less trauma to the tissues, to
18   do what we call a sacrospinous suspension,
19   which is a core procedure.  For any
20   urogynecologist like myself, to do a vaginal
21   suspension many of us rely on the
sacrospinous.
22           In the old days we used to have
23   to use retractors.  And it would actually be
24   kind of a long operation, tough visualization,
                425
1   we'd use large deep retractors to expose the
2   ligament visually.
3           So with Capio, and we were a
4   part of this to help, you know, sort of push
5   the best technique along with the Capio, we
6   started to develop techniques that involved
7   very, very small dissection, placement of the
8   stitches without the retractors.  And that
9   translated into a quicker operation, less blood
10   loss, just a much more elegant repair.
11           So for this so-called
12   sacrospinous suspension, it was this gem of a
13   device.
14       Q.  And you have a Capio there.  Why
15   don't you show that for the video camera.
16       A.  So this is the Capio device.  And
17   if you've never seen, obviously it might not
18   make much sense, but it's actually quite
19   simple.
20           The goal here is instead of,
21   again, using a standard stitch technique deep
22   in the body, we'd have to use long suturing
23   instruments.  Here, we can slide the device
up,
24   place it against the ligament -- and obviously

426
1  I don't have this loaded with a suture.  But
2  it's a single press.  And if you look
3  carefully, I don't know if you can see it
4  against my hand, there's a catch mechanism.
5      Q.  Okay.
6      A.  And so it basically places a
7  suture with a very controlled depth.  It'll
8  never go deeper than this.  We developed,
9  again, a technique that was real quick and
10  efficient for sacrospinous.
11      Q.  Okay.  So how did you use the
12  Capio initially with something called biologic
13  and then how did you evolve into polyform mesh
14  and then evolve into the idea of the Uphold?
15  Explain that for the jury's benefit.
16      A.  Yes, so that's exactly right.  So
17  we had developed, around 2000, we published on
18  this actually, the anterior approach to the
19  sacrospinous, using the Capio was sort of a
20  watershed transition.
21          Without getting too technical,
22  this was apparently a much improved approach to
23  the sacrospinous ligament deep in the pelvic
24  area resulting in a better anatomic outcome
                 427
1  than what had been taught in the textbook for
2  many decades.
3          So on the heels of that, to
4  answer your question, we then started to ask
5  ourselves well, we have this really elegant
6  fixation method, how can we start to tackle the
7  cystocele.  We keep seeing these cystoceles
8  come back.
9      Q.  And cystocele is the bladder?
10      A.  That's the dropping of that
11  anterior vaginal wall which provides a
12  platform of support for the bladder.
13          So a woman will see a balloon of
14  tissue coming out --
15      Q.  Coming out of the vagina?
16      A.  Coming out.  And what she's seeing
17  is actually the vaginal skin.  But right
18  behind that is the actual organ of the
19  bladder.  You don't see the bladder, but
20  you're seeing the vaginal wall collapse
21  underneath it.

22          So to elevate it in a way that
23  would actually hold up durably in a reliable
24  fashion, we started to ask can we begin to use
                428
1  this technique not only to suspend the top of
2  the vagina to the sacrospinous but can we
3  incorporate something to reinforce the
4  cystocele.
5          And that, to answer your
6  question, is where we got into the
7  incorporation of biological grafts.
8      Q.  And what's a biological graft?
9      A.  So a biological graft, similar to
10  how you have a skin graft put on a defect in
11  the skin, these are biological products.  They
12  either come from human tissue or animal
13  tissue.
14      Q.  Okay.
15      A.  In some cases they're actually
16  autologous where they're harvested from the
17  patient's own skin.  I've never done that
18  technique.  But I for several years used an
19  off-the-shelf product called Repliform --
20      Q.  Okay.
21      A.  -- which was just a very, very
22  well tolerated, been used for years in various
23  degrees, various areas of surgery, had an
24  excellent tolerability profile.
                429
1          We actually incorporated
2  Repliform into a Capio-based technique that
3  started to move the needle fairly dramatically
4  actually.  Our cystocele recurrence rates
which
5  at our center had historically been around
6  42 percent actually started to decline by I
7  think around 68 percent, drop in failures.
8      Q.  Okay.
9      A.  So that was very encouraging.  And
10  we started to in a sense gain a reputation for
11  having, you know, developed this anterior
12  apical new method.
13      Q.  Okay.  And then you transitioned
14  to using a mesh.  Explain that to the jury.
15      A.  Well, so as the, you know, as
16  the -- as mesh was becoming part of the
17  discussion in surgery, you know, we started to
18  ask ourselves, you know, the outcomes would
19  certainly indicate that mesh can provide
20  certainly a better anterior outcome.  And
even

21  to this day, there's really uniformity that
22  the randomized trials have shown that in terms
23  of sheer anterior compartment support, you can
24  get a phenomenally strong repair.  We started
            430
 1  to ask can we incorporate a very simplified
 2  approach, you know, again, building on what we
 3  had done with Capio, leveraging what we had
 4  learned with Repliform and the biological
 5  graft, can we use the unique properties of
 6  mesh to actually reduce our fixation points.
 7          Because of the inherent bonding
 8  properties of mesh, you know, we could
 9  potentially do a lot less fixation, perhaps
10  have less pain for the patient, and a quicker,
11  simpler operation, which, you know, years later
12  did eventually come to fruition.
13      Q.  How did you go from that
14  intermediary step then to the device that the
15  jury may be hearing about called the Uphold?
16      A.  So Uphold was -- so we were in our
17  center, again, evolving from biological grafts
18  to a mesh that we were cutting ourselves and
19  having to stitch in.
20      Q.  Okay.
21      A.  And the sutures themselves tend
22  to, with any surgery, cause pain, and also
23  involve a lot of adjustment, fine-tuning,
24  which is difficult, it's difficult to teach
            431
 1  and it's difficult to do.
 2          So Uphold was a true merge.  And
 3  perhaps there was a lucky timing involved.  But
 4  the technology that was being introduced to
 5  Boston Scientific's line called the mesh leg or
 6  the mesh arm which was incorporated into the
 7  Capio needle -- and Dr. Miller had contributed
 8  this technology -- came at the perfect time for
 9  all of us to realize, you know, boy, we can
10  eliminate the suture tie-downs, we can make
11  this operation even simpler.  And so it was a
12  collaboration of these two ideas into one.
13      Q.  So if you assume and assume with
14  me that the Uphold would have received

| | | |
|---|---|---|
| 15  clearance from the FDA in late 2008, was there<br>16  a time prior to that where you were having<br>17  your own clinical experience with a device<br>18  that essentially was the equivalent of the<br>19  Uphold?  And describe that for me.<br>20       A.  Well, yes, I mean and to varying<br>21  degrees.  And in the end actually, pre Uphold,<br>22  we had experience with cutting down the<br>23  Pinnacle device to the specs that we felt were<br>24  going to be Uphold.<br>                     432<br>1            Moving from that point in time<br>2  actually a little bit further back, we had been<br>3  cutting polyform mesh to sort of convince<br>4  ourselves what's the best configuration here.<br>5  So there was a period of time where we were<br>6  self-shaping polyform and Pinnacle mesh to<br>7  match the specs of what eventually became<br>8  Uphold.<br>9       Q.  And you have with you I believe an<br>10  example of the Uphold.  If you could hold that<br>11  up.<br>12            So just describe what the<br>13  various components of that are.<br>14       A.  So I should have loaded this a<br>15  minute ago because I'll show you right now.<br>16  Let me show first the implant.<br>17            The actual implant is what you<br>18  see here, the blue.  It's very small.  So this<br>19  is the implant size.  It has a top edge which<br>20  fixes onto the top of the cystocele.<br>21            This little curvature on the<br>22  bottom actually is designed to secure either<br>23  onto the cervix, to fix onto the cervix, which<br>24  would go right there, or to the apex of the<br>                     433<br>1  vagina if a woman has had a hysterectomy<br>2  before.  These arms actually are what fixes the<br>3  mesh into place.  And to show you this, let me<br>4  just load it up.<br>5            It's very simple engineering<br>6  which I think is always, my feeling is simple<br>7  is always good when it comes to surgery.<br>8            So the Capio needle loads into<br>9  the device.  It just pulls back into place.  So<br>10  the needle is now set in the device.<br>11       Q.  Okay.<br>12       A.  And I don't know if it'll go<br>13  through a napkin -- I've never tried this as a | | |

14   demonstration but it probably will.  So if
15   that's the ligament, say deep into the body,
16   you place a suture -- this is an ordinary
17   suture, no bigger than any other suture
18   caliber we've used for years with Capio.
19          This is called a dilator tube.
20   All the dilator tube does is as it passes
21   through this ligament tissue creates just
22   enough wiggle room, just that extra millimeter
23   or two, to allow for passage of this component.
24          And this is a sleeve which you

434

1   will see in a moment this is all going to be
2   removed.  The only implant left behind is the
3   mesh.  Just to show you how it goes through the
4   ligament, it'll pull through.  Obviously this
5   is a napkin, so it's a bit challenging.
6          Whereas normally in years past
7   we would have had to suture this down, this
8   mesh will now self-affix into place.  Now, it
9   doesn't pass through and through the muscle.
10   It's actually just making sort of a hairpin
11   turn in a very, very defined small space.
12      Q.  And what about the rest of the arm
13   there, what happens to that?
14      A.  This all comes off.  I could do
15   that if we had a pair of scissors or something
16   to cut with.
17      Q.  That's okay.  I think we want to
18   keep that intact, if we can.
19      A.  Essentially this plastic,
20   everything is removed except -- with the
21   exception of the implant, which this implant
22   will not only suspend the cervix or top of the
23   vagina but also this main body of the implant
24   sits underneath the cystocele.  And the

435

1   combination of the --
2      Q.  The cystocele meaning the bladder?
3      A.  The dropped bladder, the dropped
4   vaginal wall.
5      Q.  Okay.
6      A.  This provides that reinforcement
7   to that critical area which was at the highest
8   rate of recurrence.  And this implant
9   unchanged from its original design has reduced
10   our risk of cystocele recurrence literally by

11  about 95 percent.
12          So the number of women who have
13  recurred after this to date with very careful
14  follow-up, we always say we never know what's
15  going to happen tomorrow, but it's truly
16  changed the reality for these cystocele
17  outcomes.
18      Q.  Okay.  How does the size of the
19  Uphold compare to earlier generations of the
20  transvaginal mesh products for pelvic organ
21  prolapse?  And you brought some.
22      A.  I did.
23      Q.  And let me, for the jury's
24  benefit, let me mark as Exhibit 827 the Uphold
                    436
 1  and let me mark as 828 the Capio.  And we'll
 2  have to figure out a more elegant way of
 3  preserving those.
 4          (Deposition Exhibit Number 827 and
 5          Exhibit Number 828 were marked for
 6          identification.)
 7  BY MR. KEENAN:
 8      Q.  What did you bring here and hold
 9  it up to the jury?
10      A.  So this is a Prolift.  Full
11  disclosure, I've never used the device.  This
12  is something that I was able to get through
13  training.
14      Q.  Who makes the Prolift?  Not Boston
15  Scientific?
16      A.  No.  This is Ethicon.  So this was
17  one of the quote unquote first generation lift
18  kits that came onto the market using a trocar
19  system.
20          So the Prolift -- I would be
21  unable to give a great demonstration of how
22  this goes in.  But I can show you the basic
23  elements are, you know, just fundamentally
24  different, which it does not take a pelvic
                    437
 1  surgeon to see.
 2          So going back to the Uphold
 3  implant, this is it.  I mean I have a small
 4  hand, it's in the palm of my hand, and this is
 5  the total Prolift mesh.  This is just what it
 6  is.
 7          There are anterior and posterior
 8  components.  There are, as you can see, arms

9   that are designed to go through the gluteus
10   muscles, the levator muscles, and the obturator
11   muscles.
12           And by "going through," what I
13   mean is unlike the Capio where these arms of
14   mesh just pass into the tissue a small degree
15   and hitch on, these are arms that were actually
16   designed to go from inside the vagina out to
17   literally the external skin.
18           How do we do that?  Well, the
19   technique was using a long needle, and this is
20   what we call a trocar-based kit where basically
21   this needle, believe it or not, would pass from
22   an external incision, like near the buttocks,
23   and the doctor would then fish this needle out
24   through the vagina.  Albeit certainly was used
                        438
1   successfully by a lot of good doctors out
2   there, this you can see is just a very, very
3   different mesh size and delivery system.
4           These are the tubes that are
5   used for the device just to facilitate the mesh
6   placement.
7       Q.  Okay.  Why don't you put that --
8   we'll collectively mark that as Exhibit 829.
9           (Deposition Exhibit Number 829 was
10           marked for identification.)
11           MR. KEENAN:  Why don't you put
12   that back in the box.
13   BY MR. KEENAN:
14       Q.  And then you brought another
15   device made by another company.  Just describe
16   briefly what that is.
17       A.  Sure.  This is Bard.  And, again,
18   I've never used this, so I can't give you an
19   intimate introduction to it.  But this is more
20   of an isolated anterior compartment repair
21   that Bard was --
22       Q.  What's the name of this device?
23       A.  This is Avaulta.  So this is
24   Avaulta.  It was designed as a four-arm
                        439
1   system, you know, with these arms going into
2   the side wall muscles.
3           So a through and through passage
4   with needles.  Similar in delivery system

| | | |
|---|---|---|
| 5  concept to the Prolift but obviously a somewhat<br>6  scaled-down implant for single compartment use.<br>7      Q.  But also using the trocars as<br>8  distinct from the Capio?<br>9      A.  Exactly.<br>10          So the trocar -- just to show --<br>11  this is just a different shape.  This is, again<br>12  this is designed for passage from the external<br>13  skin into the vagina.  So inherently a<br>14  different concept than a direct suturing<br>15  technique using the Capio device.<br>16      Q.  Okay, okay.<br>17          MR. KEENAN:  Let's mark that<br>18  collectively Exhibit 830.<br>19          (Deposition Exhibit Number 830 was<br>20              marked for identification.)<br>21  BY MR. KEENAN:<br>22      Q.  And I think the jury understands<br>23  this, but just so we're clear, you have no<br>24  clinical experience with either of those two<br>                440<br>1  trocar-based delivery systems.<br>2      A.  That's right.  I literally never<br>3  used one of them.<br>4      Q.  And why is that?<br>5      A.  I guess it's a funny way of<br>6  putting it, but I grew up on the Capio.  Again,<br>7  I happened to train in the Capio fixation<br>8  methods and actually early on started to<br>9  innovate simpler ways of using the Capio.<br>10          So by the time the trocar<br>11  products entered the market, it was not even an<br>12  afterthought to begin passing needles from<br>13  outside to in.  We knew very efficient ways of<br>14  getting suture graft or mesh into place with a<br>15  simple vaginal incision. | | |
| rg121313, (Pages 442:14 to 444:21)<br>                442<br>14  Q.  Okay, okay.  One of the things I<br>15  want to -- going back to the Uphold, I wanted<br>16  to direct your attention to an exhibit that is<br>17  described as a technique spotlight.  This is<br>18  Exhibit Number 831.<br>19          (Deposition Exhibit Number 831 was<br>20              marked for identification.)<br>21  BY MR. KEENAN:<br>22      Q.  It's captioned "A New 'Minimal | BSC has previously designated this testimony. Plaintiffs adopt and incorporate any objections as set forth in their | Plaintiffs adopt and incorporate their counter designations, if any. |

| | | |
|---|---|---|
| 23  Mesh' Approach to Apical & Anterior<br>Prolapse."<br>24  (Document tendered to the witness.)<br>          443<br>1        Just identify that for me, if<br>2  you would.  And let's just take a minute to<br>3  identify what -- this is something you<br>4  authored; is that right?<br>5     A.  That's right.<br>6     Q.  Okay.  And what is this?  Let's<br>7  talk generally about what this is.<br>8     A.  Well, this is a piece that is just<br>9  designed to basically give an overview.  It<br>10  obviously was produced on the BSC end.  It's<br>11  not meant to be an academic document but<br>just<br>12  to give a fair overview of what the concept<br>13  here is, the principles that led to this<br>14  device, and also the experience that we had<br>15  had at our center, and also giving some<br>16  background into some of the literature.<br>17     Q.  Okay.  I think this has been<br>18  covered a little bit with plaintiffs' counsel.<br>19  But directing your attention to the second<br>20  paragraph of the first page inside, the<br>21  question was asked "What was the least<br>amount<br>22  of material we could implant using the least<br>23  invasive means of fixation to achieve the best<br>24  results?"<br>          444<br>1        Do you see that?<br>2     A.  Yes.<br>3     Q.  Describe how the Uphold<br>4  accomplished those goals.<br>5     A.  Well, you know, the least amount<br>6  of material was -- this was a shockingly small<br>7  implant to a lot of people.  But through our<br>8  device -- through that progression of device<br>9  development, we were fairly confident that<br>10  this was, you know, that this relatively small<br>11  implant would provide a Level I, II support.<br>12       The best means of fixation is<br>13  fairly self-evident from what I was just<br>14  showing you.  The use of trocars was not in<br>15  question here.  We needed something<br>16  Capio-based, no external incisions, and, more<br>17  importantly, no passing through sensitive<br>18  muscle groups of the body, and then<br>achieving | counter<br>designations,<br>if any. | |

| | | |
|---|---|---|
| 19  the best results.  I mean we were committed to<br>20  following these patients, and we still are to<br>21  this day. | | |
| rg121313, (Pages 445:9 to 452:14)<br>                   445<br> 9  Q.  On the next page you talk about<br>10  the no overlapping suture line.  And I'll just<br>11  read it here.  "Thus far in our experience, it<br>12  appears the rate of vaginal mesh erosion<br>13  associated with our repairs is favorable as<br>14  there is no overlapping of the mesh implant<br>15  and the suture line."<br>16         Do you see that?<br>17     A.  Yes, I do.<br>18     Q.  Explain to the jury how that was<br>19  built into the design of the Uphold.<br>20     A.  Well, frankly this was about I<br>21  think 30 cases into our Uphold experience.<br>22  And I remember the day that we were operating,<br>23  we realized gosh, why are we making a vertical<br>24  incision, why not, you know, as with other<br>                   446<br> 1  vaginal procedures we do, why not configure<br> 2  that incision to avoid overlap with the mesh.<br> 3     Q.   And when you say "overlap with the<br> 4  mesh," just explain what you mean.<br> 5     A.  Well, so at the end of the -- this<br> 6  would be a very crude rendering -- but if you<br> 7  look at the Uphold as an implant, I'll show it<br> 8  alone here, this is something we drew before<br> 9  for a different reason.<br>10         But at the end of the day you<br>11  either have to make an incision in the vagina<br>12  that is closed in a configuration that's<br>13  directly overlying the mesh, which we had done<br>14  initially with very good success, we didn't<br>15  have many exposures at all.  But it was the<br>16  sort of "aha" moment where why don't we just<br>17  put our incision a few millimeters going this<br>18  way above the mesh, so when we close it your<br>19  stitch line, when you see that sutured vaginal<br>20  incision nice and closed, would have no<br>21  communication with the mesh, and over the mesh<br>22  would just be intact vagina that was brought<br>23  back up into place. | BSC has previously designated this testimony.  Plaintiffs adopt and incorporate any objections as set forth in their counter designations, if any. | Plaintiffs adopt and incorporate their counter designations, if any. |

24         So it was just another principle

            447

1  that we felt might help to reduce mesh exposure

2  and complications. And we still do it to this

3  day. I like the technique.

4      Q. How have your patients responded

5  to the Uphold? Just give the jury some sense

6  for what your clinical experience has been

7  with your patients using the Uphold all these

8  years.

9      A. You know, it's been a real

10  positive practice shift in many fundamental

11  ways.

12       I just did two procedures

13  yesterday. I wouldn't be doing the procedure

14  if I didn't believe in it after all this time.

15       But these are patients who have

16  in many, many cases been able to avoid a

17  hysterectomy they didn't want. These are

18  patients who we have been able to drive down

19  the rate of cystocele or large prolapse

20  recurrence from a 42 percent range to literally

21  now we're looking at about 1 to 3 percent,

22  which is a phenomenal reduction.

23      So for these women who I see

24  every day who when I lay all options on the

            448

1  table with a vast amount of discussion these

2  days, these women are going to the gym, they're

3  traveling, they want to be lifting suitcases

4  and squatting and exercising in the years to

5  come and they in many cases don't want a

6  hysterectomy. This turns out to be an excellent

7  match for many of them.

8       And in terms of patient

9  satisfaction, it's been tremendously positive.

10  To date, I'll knock wood as I say it, I have

11  never had to remove one of these implants.

12  I've never seen an infection. I tell patients

13  I've never seen a rejection certainly, I've

14  never even heard of that. And this is I

15  think one of the happier groups in my practice.

16      Q. Well, let's talk about, let's

17  shift to talk a little bit about the published

18  clinical studies of your device, the Uphold,

19  and I'm talking about both things published in
20  peer-reviewed journals and also poster
21  presentations.
22          I'm going to mark as Exhibit
23  Number 832 a document that's entitled "Uphold
24  Clinical Overview."
            449
 1          (Deposition Exhibit Number 832 was
 2          marked for identification.)
 3  BY MR. KEENAN:
 4      Q.  If you could describe for the jury
 5  what that summary exhibit represents.
 6  (Document tendered to the witness.)
 7      A.  So this looks like it goes beyond
 8  the scope of just our practice, but several of
 9  these studies on here are from our division.
10          It looks like this is a
11  compilation of not only the peer-reviewed
12  publications but also some clinical posters
13  presented at meetings.
14          You know, what this I guess I'll
15  say overall because I've looked at this set of
16  studies before, one thing that stands out is it
17  shows a great consistency in terms of the
18  safety.
19          Mesh exposure is not the only
20  important issue to talk about in terms of
21  safety, we need to talk about pain and
22  dyspareunia.  But if you look at the mesh
23  exposure rate, it's very low, single digits for
24  all of these studies, and low single digits at
            450
 1  our institution and elsewhere with the De
 2  Tayrac study.
 3          Our Vu et al. study, that's Andy
 4  Vu, he's the physician that drove the analysis
 5  of this International Urogynecology Journal
 6  study in 2012.  This is important for me
 7  because it represents a snapshot of every
 8  Uphold case we had ever done.
 9          That was the goal is to get
10  every patient in.  We literally mailed out
11  Starbucks cards until we got a nearly uniform
12  follow-up.
13          These were just very satisfied
14  patients.  The mesh exposure rate at that time
15  was 2.6 percent.  With re-analysis, that may

16  even go down.  And very satisfied patients with
17  excellent anatomic outcomes.  So we continue to
18  follow not only that cohort but the others very
19  closely.
20          What's helpful with this
21  compilation though is it shows me also in other
22  people's hands, in surgeons' hands, and in
23  other parts of the world, they seem to be
24  getting a consistent result.
                    451
1          There's absolutely nothing we do
2  that is free of risk, but this shows me it's a
3  very reasonable risk profile for a good
4  anatomic outcome.
5      Q.  Let's just pause for a moment and
6  let's identify what studies then would not be
7  reflected on this sheet, either because they
8  are not finished or they're just beginning.
9  So what additional studies a year from now may
10  we have additional information about that
11  would not be reflected in this exhibit?
12      A.  Uphold is kind of in a unique
13  position worldwide right now, and I think it's
14  a great compliment to the device itself, is
15  that it's being studied in many different
16  arenas.
17          At our center, for example,
18  there's a multi-center study that actually
19  doesn't involve me but my senior partner,
20  Dr. Sand, along with Dr. Culligan and
21  Dr. Rosenblatt at Harvard, they have a
22  multi-center study of Uphold.
23          There's an NIH-funded study.
24  Essentially it's one of the pelvic floor
                    452
1  networks.  Two major studies actually.  One
2  looking at Uphold as a comparison to a
3  hysterectomy.  Another looking at Uphold in
4  comparison to abdominal sacral colpopexy which
5  is another very common procedure for advanced
6  prolapse.
7          These are very prominent
8  investigators, very high level studies, Level I
9  evidence, very exciting to see it held up to

| | | |
|---|---|---|
| 10  that level of scientific scrutiny.<br>11        And then additional studies I<br>12  should say in Australia and Europe.  I have no<br>13  connection to those, but it's nice to see that<br>14  they're ongoing. | | |
| rg121313, (Pages 453:9 to 459:13)<br>           453<br> 9  Q.  Let me shift gears and talk a<br>10  little bit about compensation, okay.<br>11        There's been questions asked of<br>12  you about how much money you've earned.<br>13  Generally speaking, do you feel like you've<br>14  been compensated fairly or unfairly?  What<br>15  would you say about the kind of money you've<br>16  earned over this period of time?<br>17      A.  You know, I guess I don't look at<br>18  things quite that way.  I mean it is what it<br>19  is.  The work I've put into this is the<br>20  equivalent of a whole other job.  So I think<br>21  that I've brought innovation to the field that<br>22  I feel very, very proud of.<br>23        If I had any doubt about that, I<br>24  may have questions about making money outside<br>           454<br> 1  of my day job.  But these I think are real<br> 2  advances in our field, and I see these advances<br> 3  helping women in real life.  I see these women<br> 4  come back.<br> 5        So I'm comfortable with the fact<br> 6  that I made a business arrangement with Boston<br> 7  Scientific, and that this what I consider to be<br> 8  good work that I'm very proud of, and through a<br> 9  lot of hard work, has translated into that<br>10  money.<br>11      Q.  Okay.  I want to talk a little bit<br>12  about training.<br>13        Have you been involved in<br>14  helping train physicians in the surgical<br>15  techniques of implantation of the Uphold?<br>16      A.  Yes.<br>17      Q.  I want to hand you the Directions<br>18  for Use, and I want to mark it as Exhibit 833.<br>19        (Deposition Exhibit Number 833 was<br>20         marked for identification.)<br>21  BY MR. KEENAN:<br>22      Q.  Do the Directions for Use tell | BSC has previously designated this testimony.  Plaintiffs adopt and incorporate any objections as set forth in their counter designations, if any. | Plaintiffs adopt and incorporate their counter designations, if any. |

23  physicians they need to get trained?
24  (Document tendered to the witness.)
                    455
1       A.  Yes.
2       Q.  Exhibit 833 -- let me just to
3  expedite things.  The Directions for Use state
4  that "Training on the use of the Uphold
5  Vaginal Support System is recommended and
6  available.  Contact your company's sales
7  representative to arrange for this training.
8  Physicians should have experience in the
9  management of complications resulting from
10  procedures using surgical mesh."
11          You'd agree with that?
12      A.  Correct.
13      Q.  Okay.  Give the jury some sense
14  for what kind of training you have provided
15  physicians in the field with respect to your
16  device, the Uphold?
17      A.  Speaking to my involvement?
18      Q.  Yes.
19      A.  Well, specific to Uphold, the
20  training I've provided and my involvement with
21  the Pelvic Floor Institute, which was a
22  program that involved not only myself but
23  other academic and nonacademic surgeons
24  teaching cadaver labs, providing anatomy
                    456
1  lectures and didactics.
2          I've also precepted doctors
3  visiting my operating room just to look at our
4  best practices.  That's usually a fine-tuning
5  issue, not so much for a new surgeon but
6  somebody looking just to see the finer points
7  of how we manage our operating room.
8          But largely through the Pelvic
9  Floor Institute and through weekend cadaver
10  labs.
11      Q.  I'm going to mark as Exhibit 834 a
12  document that I believe is from the Pelvic
13  Floor Institute.
14          (Deposition Exhibit Number 834 was
15          marked for identification.)
16  BY MR. KEENAN:
17      Q.  Can you identify this for me?
18  (Document tendered to the witness.)
19      A.  This looks like one of the slide
20  decks that would have been used for the
21  didactic portion of the Pelvic Floor Institute
22  lab.

```
23        Q.  There's a Table of Contents,
24   Didactic Topics, on Page 2.  Do you see that?
                 457
 1        A.  Yes.
 2        Q.  What does this represent?
 3        A.  This just represents an overview
 4   when doctors are arriving early in the
morning
 5   to show them the topics that we'll be covering
 6   for that day.
 7        Q.  And how long typically would the
 8   didactic go on for?
 9        A.  Several hours.  This was usually,
10   my recollection, boy, probably a two- to
11   three-hour chunk of time, depending on the
12   number of questions and discussion.
13        Q.  There's a page here, I don't
14   believe they're numbered, but there's a page
15   here that has an illustration of the
16   sacrospinous ligament.
17        A.  Okay.
18        Q.  What is that?
19        A.  Well, that's showing obviously
20   kind of in a stripped down view of the -- it's
21   showing a key element of the repair which is
22   the surgeon's finger here identifying what's
23   called the ischial spine, which is a little
24   bit of a bony landmark.  And then the Capio
                 458
 1   being placed adjacent to that finger.
 2           It's actually in surgical terms
 3   quite a simple technique, but this is showing
 4   the relationship between the bony anatomy
and
 5   the proper placement of the suture.
 6        Q.  What about managing complications,
 7   was that something that was typically
 8   addressed in the didactic?
 9        A.  Typically, yes.  I mean naturally,
10   and that became obviously a bit more
detailed
11   at certain points in time.  But the
management
12   of surgical complications I think even in this
13   slide deck is going to show up at the end.  So
14   this was a typical sort of set of slides.
15   Usually we covered this as its own unit.
16        Q.  Okay.
17        A.  Oftentimes after the actual
18   hands-on lab, we'd go and purposefully do
this
```

| | | |
|---|---|---|
| 19 over lunch so that we had time to kind of<br>20 dwell on questions, finer points, how do you<br>21 manage this, how do you manage that, do you<br>22 use estrogen cream, things along those lines.<br>23 That's where the complications were usually<br>24 covered.<br>      459<br>1    Q. And after every one of these<br>2 didactics and cadaver labs, did Boston<br>3 Scientific endeavor to reach out to those who<br>4 attended and evaluate whether they thought the<br>5 training was useful and beneficial?<br>6    A. I'm assuming that was every time.<br>7 I know that they would often send us e-mails<br>8 just echoing positive feedback. You know, a<br>9 certain percentage of patients expressing that<br>10 they love the course or would recommend it to<br>11 their colleagues, whatever it may be.<br>12       (Deposition Exhibit Number 835 was<br>13        marked for identification.) | | |
| rg121313, (Pages 460:7 to 462:11)<br>     460<br>7 (Deposition Exhibit Number 836 and<br>8     Number 837 were marked for<br>9     identification.)<br>10 BY MR. KEENAN:<br>11    Q. And I've marked as Exhibit 835,<br>12 836, and 837. (Documents tendered to the<br>13 witness.)<br>14     Are these examples of the<br>15 results of the feedback that we received back<br>16 from those that attended? And are you copied<br>17 on these?<br>18    A. I recall being copied on several<br>19 of these, you know. It seemed to me that for<br>20 the vast majority of labs they'd collect this<br>21 feedback.<br>22     We sort of knew doctors were<br>23 getting a great experience. They'd often tell<br>24 us during the labs. But it was always nice to<br>     461<br>1 see the formal feedback in the collection of<br>2 this data.<br>3    Q. And based on the evaluations<br>4 received from those that attended, it looks<br>5 like what, the rankings were --<br>6    A. Well, for the ones that you<br>7 provided, I mean it looks like close to the | BSC has<br>previously<br>designated<br>this<br>testimony.<br>Plaintiffs<br>adopt and<br>incorporate<br>any<br>objections as<br>set forth in<br>their<br>counter<br>designations,<br>if any. | Plaintiffs adopt and<br>incorporate their counter<br>designations, if any. |

| | | |
|---|---|---|
| 8   exceptional range, which is a good thing, in<br>9   terms of the faculty, didactic, hands-on.<br>10       And not to toot our own horns,<br>11   because it wasn't just me, but I was never<br>12   surprised by these results because it really<br>13   was a very high caliber teaching module that<br>14   was put together for really surgeons that came<br>15   in oftentimes with a whole set of different<br>16   interests and needs that day, but I felt like<br>17   we could meet their needs very well.  They<br>18   invested a lot in the hemi-pelvis.<br>19       It was a unique training<br>20   environment.  So I was never surprised to see<br>21   the good feedback.<br>22     Q.  Okay.  I want to shift gears and<br>23   talk a little bit about what your clinical<br>24   experience has been with respect to your<br>         462<br>1   clinical observations with respect to how<br>2   polypropylene responds to human tissue.<br>3       I want to ask some questions<br>4   based on your experience as a clinician what<br>5   you have seen in terms of the healing process<br>6   with patients who have had polypropylene<br>7   implants, either in the form of sutures or in<br>8   transvaginal mesh.<br>9       Based upon your experience as a<br>10   physician, how would you describe the tissue<br>11   response in the body to polypropylene? | | |
| rg121313, (Pages 462:13 to 463:8)<br>         462<br>13   THE WITNESS:  My clinical<br>14   experience with polypropylene has been, again,<br>15   I'm privileged that I've been able to operate<br>16   in the era of using these Type I polypropylene<br>17   mesh products, because I know that other<br>18   implants, like Goretex and whatnot, were less<br>19   well tolerated in years past.  But I've just<br>20   simply never had a material problem with<br>21   polypropylene, period.<br>22       And I tell patients that, you<br>23   know, I've now done these in the thousands when<br>24   you talk about slings, for example, I have<br>         463<br>1   literally never seen an infection or rejection,<br>2   some kind of a delayed strange material<br>3   complication, inflammation, ever, not once.<br>4       Complications, of course, are | BSC has previously designated this testimony. Plaintiffs adopt and incorporate any objections as set forth in their counter designations, if any. | Plaintiffs adopt and incorporate their counter designations, if any. |

| | | |
|---|---|---|
| 5   inherent to anything we do.  But on a material<br>6   level, absolutely no concerns recommending it<br>7   to my patients, to my wife, to my mother,<br>8   clinically based on what I know as a surgeon. | | |
| rg121313, (Pages 463:15 to 464:11)<br>                    463<br>15  Q.  But have you ever seen any<br>16  evidence, clinical evidence, of mesh shrinkage,<br>17  for example?<br>18       A.  I truly have not.  I know that<br>19  that's been a point of discussion, and I have<br>20  my -- I think that, you know, I have my clinical<br>21  clinical experience to indicate that I've just<br>22  never seen that happen.<br>23             I think there's certainly a<br>24  fibrous scar that forms around any surgery.<br>                    464<br>1   That's the nature of surgical scar even<br>2   probably with native tissue.<br>3             So if there's any contraction or<br>4   scar deposition, that may be plausible as a<br>5   reason why things can contract slightly.  But<br>6   I've just never seen that clinically with this<br>7   technique.<br>8       Q.  What about degradation or<br>9   degrading of the mesh, have you ever seen that<br>10  clinically?<br>11      A.  No. | BSC has previously designated this testimony. Plaintiffs adopt and incorporate any objections as set forth in their counter designations, if any. | Plaintiffs adopt and incorporate their counter designations, if any. |
| rg121313, (Pages 473:15 to 476:4)<br>                    473<br>15  As a clinician, do you believe<br>16  polypropylene mesh is a safe and appropriate<br>17  material for use in the treatment of prolapse?<br>18      A.  Yes.<br>19      Q.  As a clinician, do you believe the<br>20  Uphold is a safe and effective device for the<br>21  use in treatment of prolapse?<br>22      A.  Yes.<br>23      Q.  Is mesh appropriate for every<br>24  woman who's experiencing prolapse?<br>                    474<br>1       A.  No.<br>2       Q.  What kind of things weigh into<br>3   your risk/benefit equation in determining<br>4   whether or not a patient is an appropriate<br>5   candidate for the Uphold?<br>6       A.  Well, we go through this every<br>7   day.  It's a large part of our job is to talk | BSC has previously designated this testimony. Plaintiffs adopt and incorporate any objections as set forth in their counter designations, if any. | Plaintiffs adopt and incorporate their counter designations, if any. |

```
 8   to the patient.
 9             First of all, what's the
10   severity of her prolapse.  Is it a high grade
11   prolapse in a woman prone to recurrence?  Is
it
12   a recurrent case, she's already failed a native
13   tissue repair.  These are two factors that
14   could steer you towards something more
durable,
15   whether it's transvaginal mesh or perhaps in
16   some surgeons' hands an abdominal
colpopexy, we
17   reach for these next level operations because
18   we want to offer this woman with severe
19   prolapse as one of her options a more durable
20   repair.  No question in my mind that these fill
21   that role.
22             And then finally patient choice.
23   I ask my patients directly every day what is
24   your biggest goal and what is your biggest
                475
 1   fear.  And if you are unwilling to accept the
 2   risks and benefits of any potential procedure,
 3   it's not for you.  For someone then that means
 4   native tissue repair is unacceptable because
 5   they will not accept a 30 percent risk of it
 6   bulging back in the future.  And for other
 7   women they prefer the native tissue repair
 8   because they're not willing to accept the 3 or
 9   2 or 5 percent risk of a mesh exposure,
10   whatever it may be for her surgeon.  And
that's
11   fair.
12             So it's about individual choice,
13   it's about honest counseling, and that's how I
14   select.
15       Q.   Today what are the sources of
16   information for physicians about the risks
and
17   benefits of the Uphold or similar products
18   using transvaginal mesh?
19       A.   Well, it's pervasive.  I mean on
20   the level of literature, you know, society,
21   guideline statements, opinion papers,
22   continuing medical education.  Industry is a
23   slice of that pie but actually a very small
24   slice.
                476
 1             The doctor who chooses to adopt
 2   this into his or her practice, you know, really
 3   has all tiers to get that sort of training or
```

| 4 | expertise. | | |
|---|---|---|---|

1. **Objections to Counter Exhibits.**

   a. Goldberg 786, 827, 828, 829, 830, 831, and 832 have been previously designated by BSC. Plaintiffs adopt and incorporate the objections to these exhibits as set forth in Plaintiffs Objections and Counter-Designations to Roger Goldberg, MD, if any.

2. **Counter Exhibits to Counter Exhibits**

   a. Plaintiffs adopt and incorporate the exhibits designated in their counter exhibits for this witness.


DATED: July 20, 2015                    Respectfully Submitted,

                                        **TRACEY & FOX LAW FIRM**

                                        /s/ Sean Tracey
                                        Sean Patrick Tracey
                                        State Bar No. 20176500
                                        Shawn P. Fox
                                        State Bar No. 24040926
                                        Clint Casperson
                                        State Bar No. 24075561
                                        440 Louisiana, Suite 1901
                                        Houston, TX 77002
                                        (800) 925-7216
                                        (866) 709-2333
                                        stracey@traceylawfirm.com
                                        sfox@traceylawfirm.com
                                        ccasperson@traceylawfirm.com

                                        /s/ *John R. Fabry*
                                        John R. Fabry
                                        Texas Bar No. 06768480
                                        Mark R. Mueller
                                        Texas Bar No. 14623500
                                        MUELLER LAW, PLLC
                                        404 West 7th Street
                                        Austin, TX 78701
                                        (512) 478-1236
                                        (512) 478-1473 (Facsimile)
                                        John.Fabry@muellerlaw.com
                                        Mark@muellerlaw.com
                                        Meshservice@muellerlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

**TRACEY & FOX LAW FIRM**

/s/ Sean Tracey
Sean Patrick Tracey
State Bar No. 2176500
Shawn P. Fox
Clint Casperson
State Bar No. 24075561
State Bar No. 24040926
440 Louisiana, Suite 1901
Houston, TX 77002
(800) 925-7216
(866) 709-2333
stracey@traceylawfirm.com
sfox@traceylawfirm.com
ccasperson@traceylawfirm.com

/s/ *John R. Fabry*
John R. Fabry
Texas Bar No. 06768480
Mark R. Mueller
Texas Bar No. 14623500
MUELLER LAW, PLLC
404 West 7th Street
Austin, TX 78701
(512) 478-1236
(512) 478-1473 (Facsimile)
John.Fabry@muellerlaw.com
Mark@muellerlaw.com
Meshservice@muellerlaw.com